# EXHIBIT A

1   Secretary of Health had put out priorities for strategic

2   actions that they -- that he wanted reflected in all

3   evaluations and all goals, if you will, that we had for

4   V.A. employees.

5           And -- and that was the crosswalk.  That --

6   that, you know, it all related to the Under Secretary of

7   Health priorities for -- and they were all priorities to

8   improve the Department in various ways.  I can't

9   remember, specifically, what they were.

10      Q.   That's great.  Thank you.

11           And you'll note here there is a check box

12  checked that says, "A performance review was conducted

13  and discussed, and the employee's performance as of this

14  date" -- and it's checked -- "is considered Fully

15  Successful or better."

16      A.   Uh-huh.

17      Q.   And that's what you were just talking about

18  regarding Dr. Gill is that you thought she did her job

19  at least satisfactorily; is that correct?

20      A.   Yeah.  She was -- She was successful, uh-huh.

21      Q.   And then that's what this next page shows is

22  Actual Achievement.  All the boxes are marked

23  Exceptional.  Three of the boxes where there's, you

24  know, entries on the left for the Elements, three of

25  them indicate a Critical Element.

1          So she -- if I were to summarize, she did her

2   job; is that correct?

3          A.   Yes.

4          Q.   And the Performance Rating here is marked as

5   "Outstanding:  Achievement levels for all elements are

6   designated as Exceptional."  Am I reading that

7   correctly?

8          A.   Yes.

9          Q.   Okay.  And then you had what's called a

10  Performance Plan, is what this page is titled as page 5

11  of the exhibit, Bates stamped ending in 684, FY16

12  Performance Plan.  I'm assuming that means Fiscal Year

13  2016 Performance Plan; is that correct?

14         A.   Correct.

15         Q.   And it's about Allison Gill.  And it walks

16  through those PSAs as you talked about a moment ago.

17         A.   Yeah.  Can you stop right there?

18         Q.   Yes.

19         A.   You see where it says Blueprint Themes 3 & 4,

20  Strategies 9 & 10?

21         Q.   Yeah.

22         A.   Okay.  Well, that would be the crosswalk.

23         Q.   Ah.  Thank you.

24              There's, of course, language in here that

25  means nothing to me because I didn't work at the V.A.

ALEJANDRO BARBERENA
DECEMBER 04, 2024

JOB NO. 1296865

```
 1       the record right now
 2               (Plaintiff's Exhibit 8, Executive Career Field
 3       Performance Appraisal Program, was marked for
 4       identification.)
 5   BY MR. BEARMAN:
 6       Q.   This, again, is a Department of Veterans
 7   Affairs, Executive Career Field Performance Appraisal
 8   Program, Veterans Health Administration for Allison M.
 9   Gill.  This time it is -- The performance cycle covered
10   is from October 1st, 2017 through September 30th, 2018.
11   It is thirteen pages.  And encompasses Bates numbers
12   USA_Gill_000644 through 656.
13               So, Alejandro, again, this appears to be the
14   next year's performance appraisal that you conducted of
15   Allison Gill; is that correct?
16       A.   Yes.
17       Q.   And when we look at that second page again
18   with the check boxes of levels of achievement, it
19   appears that Section C, Actual Achievement, is identical
20   to the prior years with four boxes checked
21   "Exceptional", one "Fully Successful", and that was for
22   "Innovation and Creativity, 10 percent non-critical"; is
23   that correct?
24       A.   Yes.
25       Q.   And then, again, the overall performance
```

1  rating here in Section D, Summary, is checked

2  "Excellent"; is that correct?

3       A.   Correct.

4       Q.   And if we scroll through those same details,

5  except for now October 2017 through September 2018, it's

6  the same format as we reviewed previously and at the --

7  it no longer has those check boxes at the end of each

8  category, though; correct?

9            Is that what you see as well?

10      A.   Yes.  Uh-huh.

11      Q.   Okay.  And then the final page says -- is

12 checked that you, Alejandro Barberena, "fully concur

13 with the employee's self assessment," and it appears

14 that you signed this on November 5th of 2018; is that

15 correct?

16      A.   Yes.

17      Q.   Okay.  And next I'm going to introduce into

18 the record Plaintiff's Exhibit Number 9.

19           (Plaintiff's Exhibit 9, Notification of

20      Personnel Action,  was marked for identification.)

21 BY MR. BEARMAN:

22      Q.   And this is a single-page document.  It is

23 Bates stamped USA_Gill_000657, and it is captioned

24 "Notification of Personnel Action."

25           Box 1 is Allison M. Gill.  Box 4 is the

| VA | Department of Veterans Affairs |
|---|---|

## EXECUTIVE CAREER FIELD (ECF) PERFORMANCE APPRAISAL PROGRAM
## VETERANS HEALTH ADMINISTRATION (VHA)

### PERFORMANCE PLAN AND APPRAISAL OF

| EMPLOYEE'S NAME (Last, First, Middle Initial) | POSITION TITLE, SERIES AND NUMBER | GRADE/SALARY |
|---|---|---|
| Gill, Allison M. | Health Systems Specialist GS-0671 | GS-14 $108,843 |

| DEPARTMENT/OFFICE | LOCATION |
|---|---|
| Medical Sharing Office 10P5 | TRICARE Regional Office -West 401 West A Street Ste 2100 San Diego, CA 92101 |

| DATE ASSIGNED PRESENT POSITION | PERFORMANCE CYCLE COVERED BY THIS PERFORMANCE PLAN |
|---|---|
| 07/26/2015 (MM/DD/YYYY) | FROM (MM/DD/YYYY) 10/01/2015    TO (MM/DD/YYYY) 09/30/2016 |

### SECTION A - PERFORMANCE PLAN

Identify the elements (critical, non-critical, and additional) and performance standards for the position to be rated. Critical elements (i.e., those elements which contribute towards accomplishing organizational goals and objectives and are of such importance that unacceptable performance of them would result in unacceptable performance in the position) are to be identified with an asterisk. Each position must have at least one critical element and one non-critical element. Performance standards are statements of the individual's expectations and organizational expectations or requirements established by management for each element. There are usually three to five performance standards for each element. Attach Performance Plan.

### PERFORMANCE PLAN COMMUNICATED

| DATE COMMUNICATED | SIGNATURE OF RATER | SIGNATURE OF EMPLOYEE |
|---|---|---|
| 11/12/2015 | Alejandro Barberena 660282 | Allison M. Gill 135249 |

### CHANGES TO PERFORMANCE PLAN

Attach changes to Performance Plan. Changes may be recorded anytime during the rating period. Communication of changes must be documented.

| DATE COMMUNICATED | SIGNATURE OF RATER | SIGNATURE OF EMPLOYEE |
|---|---|---|
| 05/31/2016 | Alejandro Barberena 660282 | Allison M. Gill 135249 |

### SECTION B - PROGRESS REVIEW

At least one progress review is required during the appraisal year. Employee must be informed of his/her level of performance as measured against the performance plan.

A performance review was conducted and discussed, and the employee's performance as of this date:

☒ Is considered Fully Successful or better.

☐ Needs improvement to be Fully Successful or better.

| SIGNATURE OF RATER | DATE |
|---|---|
| Alejandro Barberena 660282 | 03/09/2016 |

| SIGNATURE OF EMPLOYEE | DATE |
|---|---|
| Allison M. Gill 135249 | 03/09/2016 |

COMMENTS

*THE CHANGES IN MAY WERE TO ADD THE CROSSWALK TO THE USH PRIORITIES FOR STRATEGIC ACTIONS (PSA's) TO EACH ELEMENT OF THE PERFORMANCE PLAN.*

*ALEJANDRO BARBERENA.*

VA FORM JUN 2011 **3482e**        SUPERSEDES VA FORM 3482e, SEP 2008, WHICH WILL NOT BE USED.

**Exhibit A**
**Page 006**

## SECTION C - ACTUAL ACHIEVEMENT

Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. **Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpassed. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.**

| ELEMENTS *(Use the same keyword description for each element as in Section A)* | *INDICATES CRITICAL ELEMENT | LEVELS OF ACHIEVEMENT | | |
|---|---|---|---|---|
| | | EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE |
| Change Management (20%; non-critical) | ☐ | ☒ | ☐ | ☐ |
| Innovation and Creativity (10%; non-critical) | ☐ | ☒ | ☐ | ☐ |
| Professional Accountability (30%; critical) | ☒ | ☒ | ☐ | ☐ |
| Customer Service (10%; critical) | ☒ | ☒ | ☐ | ☐ |
| Business Results (30%; critical) | ☒ | ☒ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |

Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned. Specific achievements at the Fully Successful level may also be described.

ELEMENTS/ACHIEVEMENT(S)
See Attached

This section may also be used to describe significant accomplishments not otherwise described in the appraisal, to comment on the potential for higher level positions, and/or to document VHA Personal Development Plans. Append additional pages as necessary.

VA FORM 3482e, JUN 2011                    2

**Exhibit A**
**Page 007**

## SECTION D - SUMMARY RATING

TYPE OF RATING

☒ ANNUAL RATING OF RECORD    ☐ SPECIAL RATING (Position Changes - Employee or Rater)

PERIOD COVERED BY THIS APPRAISAL

FROM  10/01/2015  *(MM DD YYYY)*    TO  09/30/2016  *(MM DD YYYY)*

**NOTE: Performance Rating -** Using achievement levels assigned in Section C (excluding additional elements if used) and the criteria described below, check the appropriate rating.

PERFORMANCE RATING

☒ **OUTSTANDING -** Achievement levels for all elements are designated as Exceptional.

☐ **EXCELLENT -** Achievement levels for all critical elements are designated as Exceptional. Achievement levels for noncritical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.

☐ **FULLY SUCCESSFUL -** The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

☐ **MINIMALLY SATISFACTORY -** Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical elements is (are) designated as Unacceptable.

☐ **UNACCEPTABLE -** The achievement level(s) for one (or more) critical element(s) is (are) designated as Unacceptable.

| SIGNATURE OF RATER | TITLE OF RATER | DATE *(MM DD YYYY)* |
|---|---|---|
| Alejandro Barberena 660282 | Director, VA/DoD Medical Sharing Office | 10/18/2016 |

## SECTION E - HIGHER LEVEL APPROVAL

**NOTE:** Required *only* for *Minimally Satisfactory and Unacceptable ratings of record.*

☐ Concur with recommended rating.

☐ Do not concur with rating. Approve rating of: _____ .

BASIS FOR PERFORMANCE RATING CHANGE

| SIGNATURE AND TITLE OF APPROVING OFFICIAL | | DATE *(MM DD YYYY)* |
|---|---|---|
| A copy of this performance appraisal was given to me. ▶ | SIGNATURE OF EMPLOYEE Allison M. Gill 135249 | DATE *(MM DD YYYY)* 11/02/2016 |

VA FORM 3482e, JUN 2011    3

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle)<br>GILL, ALLISON M | 2. Social Security Number | 3. Date of Birth<br>1/20/1974 | 4. Effective Date<br>5/3/2016 |
|---|---|---|---|

## FIRST ACTION / SECOND ACTION

| 5–A. Code<br>849 | 5–B. Nature of Action<br>INDIVIDUAL CASH AWARD (NRB) | 6–A. Code | 6–B. Nature of Action |
|---|---|---|---|
| 5–C. Code | 5–D. Legal Authority | 6–C. Code | 6–D. Legal Authority |
| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number<br>HEALTH SYSTEM SPECIALIST<br><br>01790A |
|---|---|

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | $1,500 | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization<br>VA CENTRAL OFFICE<br>OFC OF INTERGOV AFFAIRS<br>WASHINGTON DC |
|---|---|

## EMPLOYEE DATA

| 23. Veterans Preference<br>1 – None  3 – 10–Point/Disability  5 – 10–Point/Other<br>2 – 5–Point  4 – 10–Point/Compensable  6 – 10–Point/Compensable/30%<br>6 | 24. Tenure<br>0 – None  2 – Conditional<br>1 – Permanent  3 – Indefinite<br>1 | 25. Agency Use | 26. Veterans Preference for RIF<br>X YES   NO |
|---|---|---|---|

| 27. FEGLI<br>C0  BASIC LIFE ONLY | 28. Annuitant Indicator<br>9  NOT APPLICABLE | 29. Pay Rate Determinant<br>0  REGULAR RATE |
|---|---|---|

| 30. Retirement Plan<br>K  FERS & FICA | 31. Service Comp. Date (Leave)<br>6/19/2007 | 32. Work Schedule<br>F  FULL-TIME | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|

## POSITION DATA

| 34. Position Occupied<br>1 – Competitive Service  3 – SES General<br>2 – Excepted Service  4 – SES Career Reserved<br>1 | 35. FLSA Category<br>E – Exempt  N – Nonexempt<br>E | 36. Appropriation Code<br>8009.0206 | 37. Bargaining Unit Status<br>8888 |
|---|---|---|---|

| 38. Duty Station Code<br>06–3260–073 | 39. Duty Station (City – County – State or Overseas Location)<br>SAN DIEGO–HRSS CA |
|---|---|

| 40. Agency Data<br>101RX | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks
CONTRIBUTION AWARD

| 46. Employing Department or Agency<br>DEPARTMENT OF VETERANS AFFAIRS | 50. Signature/Authentication and Title of Approving Official<br>AVIA PICHON-COSEY |
|---|---|
| 47. Agency Code<br>VA TA | 48. Personnel Office ID<br>1250 | 49. Approval Date<br>5/3/2016 | HUMAN RESOURCES OFFICER<br>ELECTRONICALLY SIGNED |

5–Part 50–316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540–01–333–6238

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| GILL,ALLISON M | | | 01/20/1974 | 12/27/2016 |

### FIRST ACTION / SECOND ACTION

| 5–A. Code | 5–B. Nature of Action | 6–A. Code | 6–B. Nature of Action |
|---|---|---|---|
| 840 | INDIVIDUAL CASH AWARD RB | | |
| 5–C. Code | 5–D. Legal Authority | 6–C. Code | 6–D. Legal Authority |
| | | | |
| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | HLTH SYS SPEC /SA/DIR/ |
| | PD: 01791A |
| | POSITION: 91317110 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | $600.00 | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | VETERANS HEALTH ADMINISTRATION |
| | OFC OF INTERGOV AFFAIRS |
| | WASHINGTON DC USA |

### EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 6 | 1 – None  3 – 10–Point/Disability  5 – 10–Point/Other<br>2 – 5–Point  4 – 10–Point/Compensable  6 – 10–Point/Compensable/30% | 1 | 0 – None  2 – Conditional<br>1 – Permanent  3 – Indefinite | | X YES   NO |

| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant | |
|---|---|---|---|---|---|
| C0 | BASIC ONLY | 9 | NOT APPLICABLE | 0 | REGULAR RATE |

| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|---|
| K | FERS AND FICA | 06/19/2007 | F | FULL TIME | |

### POSITION DATA

| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|
| 1 | 1 – Competitive Service  3 – SES General<br>2 – Excepted Service  4 – SES Career Reserved | E   E – Exempt  N – Nonexempt | 8009-0206 | 8888 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 06-3260-073 | SAN DIEGO-HRSS   CA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| 101RX | | | | |

45. Remarks

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| DEPARTMENT OF VETERANS AFFAIRS | ELECTRONICALLY SIGNED BY: |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | SHERRY RICE |
|---|---|---|---|
| VATA | 1250 | 12/27/2016 | HUMAN RESOURCES OFFICER |

5–Part 50–316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540–01–333–6238

USA_GILL_000070 Exhibit A
Page 010

**Department of Veterans Affairs**

## EXECUTIVE CAREER FIELD (ECF) PERFORMANCE APPRAISAL PROGRAM
## VETERANS HEALTH ADMINISTRATION (VHA)

### PERFORMANCE PLAN AND APPRAISAL OF

| EMPLOYEE'S NAME (Last, First, Middle Initial) | POSITION TITLE, SERIES AND NUMBER | GRADE/SALARY |
|---|---|---|
| Gill, Allison M. | Health Systems Specialist GS-0671 | GS-14 Step 2 $118,096 |

| DEPARTMENT/OFFICE | LOCATION |
|---|---|
| VA/DoD Medical Sharing Office 10P5C | TRICARE Regional Office - West 401 W. A Street Suite 2100 San Diego, CA 92101 |

| DATE ASSIGNED PRESENT POSITION | PERFORMANCE CYCLE COVERED BY THIS PERFORMANCE PLAN |
|---|---|
| 07/26/2015  *(MM/DD/YYYY)* | *(MM/DD/YYYY)*  FROM 10/01/2017  *(MM/DD/YYYY)*  TO 09/30/2018 |

### SECTION A - PERFORMANCE PLAN

Identify the elements (critical, non-critical, and additional) and performance standards for the position to be rated. Critical elements (i.e., those elements which contribute towards accomplishing organizational goals and objectives and are of such importance that unacceptable performance of them would result in unacceptable performance in the position) are to be identified with an asterisk. Each position must have at least one critical element and one non-critical element. Performance standards are statements of the individual's expectations and organizational expectations or requirements established by management for each element. There are usually three to five performance standards for each element. Attach Performance Plan.

### PERFORMANCE PLAN COMMUNICATED

| DATE COMMUNICATED | SIGNATURE OF RATER | SIGNATURE OF EMPLOYEE |
|---|---|---|
| 11/27/2017 | *[signature]* | Allison M. Gill 135249 *[digital signature]* |

### CHANGES TO PERFORMANCE PLAN

Attach changes to Performance Plan. Changes may be recorded anytime during the rating period. Communication of changes must be documented.

| DATE COMMUNICATED | SIGNATURE OF RATER | SIGNATURE OF EMPLOYEE |
|---|---|---|
| | | |

### SECTION B - PROGRESS REVIEW

At least one progress review is required during the appraisal year. Employee must be informed of his/her level of performance as measured against the performance plan.

A performance review was conducted and discussed, and the employee's performance as of this date:

☒ Is considered Fully Successful or better.

☐ Needs improvement to be Fully Successful or better.

| SIGNATURE OF RATER | DATE |
|---|---|
| Alejandro Barberena 209486 *Digitally signed by Alejandro Barberena 209486 Date: 2018.04.02 14:45:39 -04'00'* | 03/30/2018 |

| SIGNATURE OF EMPLOYEE | DATE |
|---|---|
| Allison M. Gill 135249 *Digitally signed by Allison M. Gill 135249 Date: 2018.03.28 09:37:11 -07'00'* | 03/28/2018 |

COMMENTS

VA FORM
JUN 2011  **3482e**

SUPERSEDES VA FORM 3482e, SEP 2008,
WHICH WILL NOT BE USED.

**Exhibit A**
**Page 011**

## SECTION C - ACTUAL ACHIEVEMENT

Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. **Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpassed. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.**

| ELEMENTS (Use the same keyword description for each element as in Section A) | *INDICATES CRITICAL ELEMENT | LEVELS OF ACHIEVEMENT | | |
|---|---|---|---|---|
| | | EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE |
| Change Management (10%: Non-critical) | ☐ | ☒ | ☐ | ☐ |
| Innovation and Creativity (10%: Non-critical) | ☐ | ☐ | ☒ | ☐ |
| Professional Accountability (30%: Critical) | ☒ | ☒ | ☐ | ☐ |
| Customer Service (20%: Critical) | ☒ | ☒ | ☐ | ☐ |
| Business Results (30%: Critical) | ☒ | ☒ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |

Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned. Specific achievements at the Fully Successful level may also be described.

ELEMENTS/ACHIEVEMENT(S)

This section may also be used to describe significant accomplishments not otherwise described in the appraisal, to comment on the potential for higher level positions, and/or to document VHA Personal Development Plans. Append additional pages as necessary.

**Exhibit A**
**Page 012**

## SECTION D - SUMMARY RATING

TYPE OF RATING

☒ ANNUAL RATING OF RECORD          ☐ SPECIAL RATING (Position Changes - Employee or Rater)

PERIOD COVERED BY THIS APPRAISAL

FROM   10/01/2017   *(MM/DD/YYYY)*          TO     09/30/2018   *(MM/DD/YYYY)*

**NOTE: Performance Rating** - Using achievement levels assigned in Section C (excluding additional elements if used) and the criteria described below, check the appropriate rating.

PERFORMANCE RATING

☐    **OUTSTANDING -** Achievement levels for all elements are designated as Exceptional.

☒    **EXCELLENT -** Achievement levels for all critical elements are designated as Exceptional.  Achievement levels for noncritical elements are designated as at least Fully Successful.  Some, but not all, noncritical elements may be designated as Exceptional.

☐    **FULLY SUCCESSFUL -** The achievement level for at least one critical element is designated as Fully Successful.  Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

☐    **MINIMALLY SATISFACTORY -** Achievement levels for all critical elements are designated as at least Fully Successful.  However, the achievement level(s) for one (or more) noncritical elements is (are) designated as Unacceptable.

☐    **UNACCEPTABLE -** The achievement level(s) for one (or more) critical element(s) is (are) designated as Unacceptable.

| SIGNATURE OF RATER | TITLE OF RATER | DATE *(MM/DD/YYYY)* |
|---|---|---|
| Barberena, Alejandro  *Digitally signed by Barberena, Alejandro Date: 2018.10.20 15:18:31 -04'00'* | Director, VA-DoD Medical Sharing Office | 10/20/2018 |

## SECTION E - HIGHER LEVEL APPROVAL

*NOTE:* Required *only* for Minimally Satisfactory and Unacceptable ratings of record.

☐    Concur with recommended rating.

☐    Do not concur with rating.  Approve rating of: _____ .

BASIS FOR PERFORMANCE RATING CHANGE

| SIGNATURE AND TITLE OF APPROVING OFFICIAL | | DATE *(MM/DD/YYYY)* |
|---|---|---|
| A copy of this performance appraisal was given to me.  ▶ | SIGNATURE OF EMPLOYEE  Allison M. Gill 135249  *Digitally signed by Allison M. Gill 135249 Date: 2018.11.05 15:16:52 -06'00'* | DATE *(MM/DD/YYYY)*  11/05/2018 |

VA FORM 3482e, JUN 2011

3

**Exhibit A
Page 013**

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|---|
| **GILL,ALLISON M** | | | | 01/20/1974 | 12/27/2017 |

| **FIRST ACTION** | | **SECOND ACTION** | |
|---|---|---|---|

| 5–A. Code | 5–B. Nature of Action | 6–A. Code | 6–B. Nature of Action |
|---|---|---|---|
| 840 | **INDIVIDUAL CASH AWARD RB** | | |

| 5–C. Code | 5–D. Legal Authority | 6–C. Code | 6–D. Legal Authority |
|---|---|---|---|
| | | | |

| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |
|---|---|---|---|
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | **HLTH SYS SPEC /SA/DIR/**<br>PD: 01791A<br>**POSITION: 91317110** |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | $465.00 | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | **VETERANS HEALTH ADMINISTRATION**<br>**VA/DOD HEALTH AFFAIRS**<br>**WASHINGTON DC USA** |

## EMPLOYEE DATA

| 23. Veterans Preference | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF | | |
|---|---|---|---|---|---|---|---|---|
| 6 | 1 – None<br>2 – 5-Point | 3 – 10-Point/Disability<br>4 – 10-Point/Compensable | 5 – 10-Point/Other<br>6 – 10-Point/Compensable/30% | 1 | 0 – None<br>1 – Permanent | 2 – Conditional<br>3 – Indefinite | | X | YES | | NO |

| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant | |
|---|---|---|---|---|---|
| C0 | **BASIC ONLY** | 9 | **NOT APPLICABLE** | 0 | **REGULAR RATE** |

| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | | 33. Part–Time Hours Per |
|---|---|---|---|---|---|
| K | **FERS AND FICA** | 06/19/2007 | F | **FULL TIME** | Biweekly<br>Pay Period |

## POSITION DATA

| 34. Position Occupied | | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|---|
| 1 | 1 – Competitive Service<br>2 – Excepted Service | 3 – SES General<br>4 – SES Career Reserved | E | E – Exempt<br>N – Nonexempt | 8009-0206 | 8888 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 06-3260-073 | **SAN DIEGO-HRSS    CA** |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| **101RX** | | | | |

45. Remarks

| 46. Employing Department or Agency | | | 50. Signature/Authentication and Title of Approving Official |
|---|---|---|---|
| **DEPARTMENT OF VETERANS AFFAIRS** | | | **ELECTRONICALLY SIGNED BY:** |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | **MATTHEW CARPENTER** |
| **VATA** | **1250** | **02/09/2018** | **HUMAN RESOURCES OFFICER** |

5–Part 50–316       2 - OPF Copy - Long-Term Record - DO NOT DESTROY       Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540–01–333–6238

# EXHIBIT B

Allison Gill, 11/13/2024

1           So, again, I won't read all those answers into          11:55
2    the record that you give there starting on line 7, but
3    I'll ask you to just look through that answer to that
4    Interrogatory No. 4 and just review that.

5           A    Okay.                                               11:55

6           Q    So directing your attention to No. 2, where you
7    answered, "Interrogating me (Patrick Grady) about what I
8    do on leave and my podcast without allowing me
9    representation (August 5th, 2019)."

10          I want to make sure I'm clear.  What do you            11:55
11   believe Patrick Grady was retaliating against you for
12   when he conducted that interrogation?

13          A    For the content of my podcast.

14          Q    Is there anything else that you believe he was
15   retaliating against you for when he conducted that        11:56
16   interrogation?  And I'll give you an example.  My
17   understanding is that at that point you had not yet
18   filed an EEO complaint, so he couldn't have been
19   retaliating against you for filing an experienced PTSD
20   EEO complaint, but are there any other activities aside   11:56
21   from the content of your podcast that he was -- that you
22   contend he was retaliating against you for when he
23   conducted that interrogation?

24          A    For taking leave for my PTSD.

25          Q    Are there any other activities or acts that you   11:57

                                                              64

Peterson Reporting Video & Litigation Services

**Exhibit B**
**Page 016**

Allison Gill, 11/13/2024

1    Q    Okay.  We've been going for about an hour and      03:38

2    20 minutes, I think if we take one more break I can

3    probably finish up the rest after the next break.  Are

4    we all okay with that?  So maybe --

5            MR. BEARMAN:  Yeah.                              03:39

6            MS. BOUTELLE:  -- five minutes?

7            MR. BEARMAN:  Five minutes is great.

8            THE WITNESS:  What time is it?  3:40?

9            THE VIDEOGRAPHER:  We are going off the record.

10   The time is 3:39 p.m.  This ends Media No. 3.            03:39

11           (A recess was taken.)

12           THE VIDEOGRAPHER:  We are going back on the

13   record.  The time is 3:48 p.m.  Counsel, you may

14   proceed.

15   BY MS. BOUTELLE:                                         03:49

16   Q    Dr. Gill, do you understand you're still under

17   oath?

18   A    Yes.

19   Q    I'm going to mark as Exhibit 27 a document of

20   several pages.  It's titled, "Fact finding/Employee       03:49

21   Allison Gill/ 6 August 2019 conducted by her supervisor

22   Patrick W. Grady."  The Bates stamp at the bottom is USA

23   GILL 311.

24           (Exhibit 27 was marked.)

25   ///

Peterson Reporting Video & Litigation Services

Allison Gill, 11/13/2024

| | | |
|---|---|---|
| 1 | BY MS. BOUTELLE: | 03:49 |

2      Q     Dr. Gill, you can take a moment to look through

3  this, but have you seen this document before?

4      A     Yes.

5      Q     What context have you seen this in before?     03:50

6      A     When I received the final report of my EEO

7  grievance, this was included in the evidence.

8      Q     Okay.

9      A     And it's the -- it looks like the script or the

10  transcript of the interrogation that I got on, I     03:50

11  believe, August 6.

12      Q     Okay.  I'll ask you to turn to page -- the page

13  that's Bates-stamped 314.

14      A     Okay.

15      Q     I realize it's a little bit blurry, but there's     03:50

16  a color photograph on this page.

17      A     Yes.

18      Q     Are you in that photograph?

19      A     Yes.

20      Q     Is that you at the lectern?     03:50

21      A     Yes.

22      Q     Is this the live show for "Mueller, She Wrote"

23  in Minneapolis?

24      A     It would appear so based on the link to Twitter

25  saying "The Parkway/MPLS."  We did play at Parkway     03:51

**163**

**Exhibit B**
**Page 018**

1 including identifying the dates on which YOU treated with each individual provider and the

2 condition for which YOU sought treatment.

3 **ANSWER:**

4 The multiple health or mental health care providers within the Department of Veterans

5 Affairs whose names and dates I do not recall, and Dr. Suzanne Lachmann. I began Seeing

6 Suzanne Lachmann in February 2020.

7 **INTERROGATORY NO. 3:**

8 DESCRIBE each act of disparate-treatment discrimination for which YOU seek relief in

9 THIS ACTION, as stated in the first cause of action to YOUR COMPLAINT. For purposes of

10 this interrogatory, "DESCRIBE" means, with regard to each act state the date or dates of the act;

11 set forth the details of the act; IDENTIFY each person who committed, aided or abetted the act;

12 describe the place the act occurred or, for omissions, should have occurred; any witnesses to

13 each act, and the type of discrimination you believe was the basis for the act.

14 **ANSWER:**

15 April 3, 2019, I was told I had to move from San Diego to DC to keep my job of over a

16 decade. There was no explanation - for example - the same thing happened to a colleague Mark

17 Goldstein the previous year, but that was because his TRICARE office was closed. My San

18 Diego TRICARE office remained open. There was no explanation for the move other than

19 "management restructuring." That was odd considering the position moved to San Diego

20 specifically because that's where the West Region TRICARE office is. The two men who

21 informed me on April 3 are Patrick Picardo and Patrick Grady. This triggered my PTSD and I

22 took 12 weeks of leave. August 6, 2019. Upon my return, I was ordered to join a teleconference

23 where I was interrogated and no allowed representation. This caused immense stress because it

24 reminded me of the interrogation I received in 1995 when I tried to report my rape at Naval

25 Nuclear Power Training Command in Orlando. In 2019, I was asked what I was doing with my

26 personal time and threatened with insubordination, just as I was in 1995 when I was threatened

27 with Court Martial for adultery because my rapist (not me) was married. I was told I could lose

28 my job and my veracity was questioned, much the same as it was in 2019. This left me in a

-5-

1  severe depression. I could no longer go into the office and wanted to work remotely - which

2  didn't seem like a problems since they had informed me a few months earlier that it was no

3  longer imperative that my job be in San Diego. I had to fight to get that telework just like I had to

4  fight to get the VA to adjudicate my sexual assault claim. The fight was incapacitating. I had to

5  do a lot of work to obtain the proper medical documentation for my condition just like I had to

6  do for my PTSD claim. A month later, I was granted the telework, but then sent extremely

7  punitive telework restrictions. I was the only person in the office that was subject to the

8  restrictions, so my lawyer advised me to refuse to sign them, and then ask for time off to speak to

9  an EEO counselor for the clear retaliation. Hours after I refused to sign, pointing out that I was

10 being singled out and asked for time to file an EEO complaint, Patrick Grady sent those

11 restrictions to all my colleagues to cover up the fact that he had in fact only sent them to me. We

12 also have a colleague that is 100% telework in Florida, who didn't have the same restrictions, and

13 was granted 100% telework not because of a medical accommodation, but simply because he

14 wanted to live in Florida where his family is (Mark Henius). Around October 2019, they began

15 assigning me retaliatory and punitive work. One example is when they asked me to compile a

16 spreadsheet of all 1,800 hospice care facilities that partner with VA nationwide. They wanted me

17 to include the address, emails of the directors, phone numbers, number of beds, etc. I informed

18 them that all of this information was available on the VA website using an interactive form. But

19 they insisted I complete this ridiculous and punitive task for them - a task well below my pay

20 grade of GS-14, and also unnecessary and redundant. After my 90 day telework accommodation

21 expired, I was told it was imperative I return to the physical San Diego office, but I only felt

22 comfortable working from the safety of my home at this point due to the PTSD. They would not

23 extend my telework, saying it was imperative I be in the office in San Diego (even though they

24 had moved my job to DC stating it was imperative that I be in DC), so I asked for Leave Without

25 Pay (LWOP). I could no longer work in the office with these people because they yanked my job

26 out from under me, and then interrogated me about what I did with my own free time. They

27 granted Leave Without Pay and then in March, 2020, fired me for being "medically unfit".

28 **INTERROGATORY NO. 4:**

**Approval of Interim Accommodation**

**Attachment for Section 4 of VA Form 0857c**

Employee:  Allison Gill

Interim Accommodation as follows is approved until November 23, 2019.  Effective pay
period (PP) # 16, a 100% telework agreement is approved for Allison Gill to telework 9
days per pay period (in addition to the already approved 1 day per PP CWS) beginning
Sunday, August 4, 2019 through Saturday, November 22, 2019.

Allison Gill must comply with the following requirements:

   a.  Employee must be telework ready (completed all mandatory requirements to
      telework).

   b.  Ensure an accurate home address and correct telephone number is on file in the
      office, at all times.

   c.  Log into Skype for Business at the beginning of daily tour and remain logged in until
      the end of the work day.  Be available to respond to instant messaging (IM) within 10
      minutes.

   d.  Email supervisor at the beginning and end of the workday.

   e.  Establish and provide your supervisor a standard daily lunch time between 11-1 pm
      and a morning and evening break time no later than Friday, August 16, 2019.

   f.  Answer telephone calls within 5 rings. Note: Calls should generally not go to voice
      mail during normal working hours, unless you're on another work-related call.

   g.  Outlook calendar must be up to date at all times.

   h.  Submit leave requests three (3) days prior to the date of the request.

   i.  All leaves must be requested and submitted in VATAS for approval and approved
      leaves must be put on the Office of VA/DoD Health Affairs Shared Calendar.

   j.  Attend all Office of VA/DoD Health Affairs, VA/DoD Medical Resource Sharing Office,
      and TRICARE liaison meetings as requested.

   k.  Respond to inquiries and requests received by email within two hours of receipt, cc:
      supervisor on issues requiring supervisor intervention or resolve.

   l.  Complete and send all assignments to the supervisor on or before assigned timelines.
      **Note:**  Extensions should be requested immediately after receiving an assignment, or
      no later than 3 days prior to the assigned due date.

   m.  Notify the Supervisor at (202) 461-4060 or (202) 873-5239 or if unavailable, notify Mr.
      Corey Ford at (202) 461-4179 of technical IT connectivity issues immediately. If there
      are technical issues where the employee is unable to log into the system from home
      for more than 10 minutes during the work day, employee should contact the OIT help
      desk for assistance, immediately. If the technical issues continue for 60 minutes, the
      employee should take leave for the remainder of the work day or report to the office
      so that computer can be placed directly on the network.

Allison Gill should resubmit a RA request with required medical documentation for
reconsideration prior to Friday, November 22, 2019.

Supervisor: **Patrick W Grady 1750246**
Digitally signed by
Patrick W Grady 1750246
Date: 2019.08.12
09:58:37 -04'00'

Date: 8/12/2019



EXHIBIT 4
Gill



**Grady, Patrick W.**

| | |
|---|---|
| **From:** | Grady, Patrick W. |
| **Sent:** | Friday, April 26, 2019 8:45 AM |
| **To:** | Allison M. Gill (Allison.Gill@va.gov) |
| **Cc:** | Bean, Jackie |
| **Subject:** | Reassignment and Telework Updates |

Wanted to give you a couple updates for your awareness:

1.  Reassignment Memorandum: I met with HR yesterday about the notification memo for the reassignment of your position to the Washington D.C. location. I'll be providing them some information they requested and then they will craft the notification memo. It appears it will be a couple weeks before we will be providing that to you for your review and decision to accept. With 1 October 19 as the effective date, that still leaves us with a lot of time to work through this. One of the things they requested was a copy of your government resume. Could you send - current or not - as soon as possible (by Monday /29 Apr 19 COB)?

2.  Telework: Your current work schedule includes one telework day and a CWS day per pay period. Management approves of adding two additional telework day opportunities per pay period (for a total of 3 telework days per pay period), maintaining your CWS day as well, to your work schedule. If you choose to accept these additional telework days, please let me know as we'll need to adjust your telework paperwork.

Will keep you posted if there are any further significant updates.

Patrick W. Grady
Director, VA/DoD Medical Sharing Office
Office of VA/DoD Health Affairs, Veterans Health Administration
1575 I Street NW, Room 622
Washington, DC 20420
O: 202.461.4060
C: 202. 873.5239
Patrick.Grady@VA.gov



**EXHIBIT 5**
Gill
11-13-2024
Reporter: J. Bartel, RPR,
CSR No. 12887

**Exhibit B**
USA_GILL_000322 **Page 022**



**Grady, Patrick W.**

| | |
|---|---|
| **From:** | Grady, Patrick W. |
| **Sent:** | Wednesday, May 1, 2019 3:30 PM |
| **To:** | Gill, Allison M. |
| **Subject:** | RE: Reassignment and Telework Updates |

Good afternoon, Allison. Following up on this message string;

The Reasonable Accommodation (RA) process is a time-sensitive program and in order to provided expeditious service, please direct all inquiries (encrypted) to the designated RA e-mail box at: VSHO_Reasonable_Accommodations@va.gov and one of the Reasonable Accommodation Coordinator (RAC) will promptly respond.

**From:** Grady, Patrick W.
**Sent:** Tuesday, April 30, 2019 8:50 AM
**To:** Gill, Allison M. <Allison.Gill@va.gov>
**Subject:** RE: Reassignment and Telework Updates

Good morning, Allison. Thanks for the resume. Will need to consult on the additional request but please, if you need to see medical, please don't hesitate. Thanks

**From:** Gill, Allison M.
**Sent:** Monday, April 29, 2019 5:08 PM
**To:** Grady, Patrick W. <Patrick.Grady@va.gov>
**Subject:** RE: Reassignment and Telework Updates

Attached are my job application documents as requested.

On the telework, I accept the additional days and thank you, however, I'm also requesting as a reasonable accommodation for my PTSD, full time telework. I'm working with my VA provider get documentation for that request. In the meantime, I'm requesting full time telework as an interim accommodation beginning tomorrow. I have leave Wednesday and Thursday of this week and am off Friday.

Thank you,



## Allison M. Gill, DHA, ACHE

VA/DoD Liaison, DHA J-10 West
VA/DoD Health Affairs (10P5)
401 West A Street Suite 2100
San Diego, CA 92101

Office: 
Mobile:

```
┌─────────────────────────┐
│      EXHIBIT 6          │
│        Gill            │
│     11-13-2024         │
│ Reporter: J. Bartel, RPR, │
│     CSR No. 12087       │
└─────────────────────────┘
```

Visit the TRICARE Procedure Guide at: http://vaww1.va.gov/CBO/apps/policyguides/index.asp?mode=contents&id=IV

https://www.tricare-west.com/content/hnfs/home/tw/prov/res/prov_manuals.html

USA_GILL_000328

**Exhibit B**
**Page 023**

**To:**        VHA HROO - VSHO Reasonable Accommodations[VHA_HROO_Reasonable_Accommodations@VA.GOV]
**Cc:**        Raiti, Segal (WMC)[Segal.Raiti@va.gov]; Gill, Allison M.[Allison.Gill@va.gov]
**From:**      Boykins, Celeste (WMC)
**Sent:**      2019-05-22T20:42:35Z
**Subject:**   FW: FMLA
**Received:**  2019-05-22T20:42:37Z
<u>Gill, A.pdf</u>

Good afternoon,
FMLA and reasonable accommodation are separate programs.  We will review your wh-380 for FMLA processing purposes.  I have included the reasonable accommodations mail group to assist you with understanding the process for applying for a reasonable accommodation.

**Celeste Boykins**
**Human Resources Specialist (ER/LR)**
**VHACO Servicing HR Office (VSHO) (10A2A6C)**
**Human Resources Operations & Oversight (HROO)**
**Workforce Management & Consulting (WMC)**
**Veterans Health Administration (VHA)**
**Cell:512-809-2166**


**VHA HROO- Working to support and honor our nations Veterans. Have you thanked a Veteran today?**
**How was my service today?  We value your feedback – please click on the link to take the** <u>*WMC Quick Card Survey*</u>.


**From:** Gill, Allison M.
**Sent:** Wednesday, May 22, 2019 3:35 PM
**To:** Raiti, Segal (WMC) <Segal.Raiti@va.gov>
**Cc:** Boykins, Celeste (WMC) <lda.Boykins@va.gov>
**Subject:** RE: FMLA

I have attached the FMLA forms. When I am approved to return to work, I am requesting full-time telework as an accommodation.
I have attached documentation from my doctor regarding the accommodation.

Thank you,



**Allison M. Gill, DHA, ACHE**
VA/DoD Liaison, DHA J-10 West
VA/DoD Health Affairs (10P5)
401 West A Street Suite 2100
San Diego, CA 92101

Office:  619-236-5329
Mobile:  858-568-8934

Visit the TRICARE Procedure Guide at: <u>http://vaww1.va.gov/CBO/apps/policyguides/index.asp?mode=contents&id=IV</u>
<u>https://www.tricare-west.com/content/hnfs/home/tw/prov/res/prov_manuals.html</u>

TRICARE West Region Provider Handbook <u>Jan. 1, 2018–Dec. 31, 2018 TRICARE West Region Provider Handbook</u>
VHA Intranet: <u>http://vaww.dodcoordination.va.gov</u>
DoD: <u>http://www.tricare.mil/DVPCO/default</u>

**From:** Raiti, Segal (WMC)
**Sent:** Monday, May 20, 2019 5:18 AM
**To:** Gill, Allison M. <Allison.Gill@va.gov>
**Cc:** Boykins, Celeste (WMC) <lda.Boykins@va.gov>
**Subject:** RE: FMLA

Good morning Allison,


EXHIBIT 8
Gill
11-13-2024
REPORTED BY: B. RPR,
CSR No. 12687
**Page 024**

I just wanted to give you a friendly reminder that you have until Friday, May 24, 2019 to submit your medical documentation that supports your request for FMLA. Please remember that without providing your medical documentation, any FMLA leave approved by your Supervisor during your provisional FMLA period may be changed to LWOP or AWOL. Although your FMLA case will be closed if I do not hear from you by Friday, please do not hesitate to reach out to me again if and when you are ready to reapply. Please let me know if you have any questions.

Best Regards,

**Segal Raiti**
**Human Resources Assistant**
**VHACO Servicing HR Office, VSHO (10A2A6C)**
**Human Resources Operations & Oversight, HROO (10A2A6)**
**Office of Workforce Management & Consulting, WMC (10A2A)**
**Veterans Health Administration (VHA)**
**US Department of Veterans Affairs**
**Phone: 518-475-8512**

*How was my service today? We value your feedback – please click on the link to take the* WMC Quick Card Survey.

**From:** Raiti, Segal (WMC)
**Sent:** Thursday, May 09, 2019 10:57 AM
**To:** Gill, Allison M. <Allison.Gill@va.gov>
**Cc:** Boykins, Celeste (WMC) <lda.Boykins@va.gov>
**Subject:** RE: FMLA

Good morning Allison,

I hope all is well. Please find your Provisional FMLA Approval Letter attached. As stated in the letter, you have 15 calendar days to provide supportive medical documentation. Per our discussion, I will stand by for you medical documentation or WH-380-E. Please let me know if you have any questions. Please provide your supervisor and timekeeper with a copy of this letter so that they are aware and may process your FMLA leave requests. I submitted this request to Payroll as well, so please allow them time to add FMLA leave to your VATAS account. If you would like to follow-up with Payroll regarding the status of this ticket, please call FSC Payroll at 512-460-5225 and reference ticket LEA-23366.

Also, please remember to send questions/requests/documentation to vsholeaveadministration@va.gov, so that your inquiries may still be worked on in my absence.

Have a great day!

**Segal Raiti**
**Human Resources Assistant**
**VHACO Servicing HR Office, VSHO (10A2A6C)**
**Human Resources Operations & Oversight, HROO (10A2A6)**
**Office of Workforce Management & Consulting, WMC (10A2A)**
**Veterans Health Administration (VHA)**
**US Department of Veterans Affairs**
**Phone: 518-475-8512**

*How was my service today? We value your feedback – please click on the link to take the* WMC Quick Card Survey.

**From:** Gill, Allison M.
**Sent:** Wednesday, May 08, 2019 5:03 PM
**To:** Raiti, Segal (WMC) <Segal.Raiti@va.gov>
**Subject:** RE: FMLA

**VA** Department of Veterans Affairs

## REQUEST FOR MEDICAL DOCUMENTATION

1. DATE 05/22/2019

2. Dear Health Care Provider:

Your patient Allison Gill              has requested an accommodation *(describe the requested accommodation here)*
full-time telework

because of functional limitations caused by his/her disability. Since the disability is not visible, and we do not have documentation on file, I would appreciate information that would allow me to determine whether this individual has a disability covered by the Rehabilitation Act of 1973. The information that you provide will also help me determine whether the requested accommodation will be effective in eliminating or minimizing the limitations caused by the disability.

3. The key duties that your patient has advised that he/she is unable to perform, or benefits and privileges of employment that he/ she is unable to enjoy are:

My PTSD is causing at least one, and usually a few panic attacks per day. This is exacerbated by insomnia. I've been unable to concentrate, my memory is diminished so I'm unable to track tasks and follow up with action plans. I'm not able to speak to people comfortably. I am having trouble with self care. The job itself and especially being in my office trigger the anxiety and panic attacks coupled with not being able to monitor my husband's compromised health at home. Being able to work from home would lessen the stress and diminish these symptoms such that I would be able to do my job.

4. I have been given the responsibility for determining if your patient is covered by the Rehabilitation Act. I cannot proceed until I receive the requested information. If you have any questions, please contact me at the telephone number below.

| 5. MY NAME IS | 6. MY PHONE NO. IS | 7. MY TITLE IS |
|---|---|---|
| Pamela Ballou-Moore | (202) 461-7568 | HR/LRAC |

8. Please return this form and the requested information to me at:
*(Enter complete mailing address and fax number.)*

VSHO_Reasonable_Accommodations@va.gov

9. **Please do NOT provide a copy of the patient's complete medical history.**
The Genetic Information Nondiscrimination Act of 2008 (GINA) prohibits employers and other entities covered by GINA Title II from requesting or requiring genetic information of an individual or family member of the individual, except as specifically allowed by this law. To comply with this law, we are asking that you not provide any genetic information when responding to this request for medical information. 'Genetic information' as defined by GINA, includes an individual's family medical history, the results of an individual's or family member's genetic tests, the fact that an individual or an individual's family member sought or received genetic services, and genetic information of a fetus carried by an individual or an individual's family member or an embryo lawfully held by an individual or family member receiving assistive reproductive services.

At present, we only need the following information:

(a) the nature, severity, and duration of the impairment;

Multiple, moderate to severe panic attacks and insomnia from PTSD resulting in the inability to concentrate and complete tasks caused by physically being in the office which triggers flare-ups

VA FORM
NOV 2013 **0857e**

EXHIBIT 9
Gill
11-13-2024
Reported by DANIEL RPR,
DCSR No. 077

(b) one or more of the activities the impairment limits (walking, reaching, breathing, etc.);

Difficulty concentrating, interacting with others, and household management tasks
including but not limited to paying bills, cooking, cleaning and driving requiring
assistance with ADL's and self care

(c) the extent or degree to which the impairment limits an activity;

Moderate to severe impairment

(d) the reason the individual requires accommodation or the particular accommodation requested, and/or

The office environment is triggering panic attacks and anxiety that telework could
improve and mitigate.

(e) how the accommodation will assist the individual in applying for a job, performing the essential functions of the job, or
to enjoy a benefits of employment.

Accommodation will allow for reduced panic attacks, optimal treatment and functioning
reducing further flare ups of condition.

| 10. NAME OF HEALTH CARE PROVIDER | 11. SIGNATURE OF HEALTH CARE PROVIDER | 12. DATE OF SIGNATURE |
|---|---|---|
| Michelle Kerouac | NP-C | 05/22/2019 |

13. MEDICAL/PROFESSIONAL LICENSE CATEGORY AND NUMBER

Nurse Practitioner 763720

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM 0857e, NOV 2013, back

**Exhibit B**
**Page 027**



**VA** | **U.S. Department of Veterans Affairs**
VA San Diego Healthcare System

3350 La Jolla Village Drive
San Diego, CA 92161
www.sandiego.va.gov

May 31, 2019

To Whom it May Concern:-

I am writing to affirm that Ms. Allison Gill (DOB   /74) is diagnosed with Major Depressive Disorder, Post Traumatic Stress Disorder, and Panic Disorder per my full diagnostic intake and chart review of 5/24/19. The most recent episode of Major Depressive Disorder which began in April 2019 is causing significant impairment in functioning including impairments in concentration, sleep, appetite, and mood regulation. Additionally, the patient's Panic Disorder has returned with symptoms occurring multiple times per day, causing the patient significant distress for extended periods. It is my opinion that these symptoms are exacerbated by the patient's previous diagnosis of PTSD related to military trauma.

The severity and nature of this combination of symptoms prevents the patient from meaningful engagement in employment. It is anticipated that the symptoms will last for at least 12 weeks. While the patient has sought treatment, our clinic has a 2-3 month wait list for what will be a 3-4 month course of therapy. Due to the time required to start and benefit adequately from treatment, it is not expected that the patient's symptoms will diminish to the extent that employment will be possible within this timeframe.

Respectfully,

Paul Krebs, PhD
Clinical Psychologist
619-855-7932
Paul.Krebs@va.gov

EXHIBIT 10
Gill
11-13-2024
REPORTED BY:    RPR.
CSR No.

EXHIBIT B
Page 028

**Department of
Veterans Affairs**

# Memorandum

Date: **AIN 12 2019**

From: **Acting Executive Director, Office of VA/DoD Health Affairs**

Subj: **Management Directed Reassignment**

To: **Allison M. Gill**

Thru: Deputy Under Secretary for Health for Policy & Services (10P) 

1. This is to inform you of the decision to reassign your position of <u>Health System Specialist GS-671-14</u>, located at VAMC San Diego, CA station #664, to VA Central Office Washington, DC station #101RB, located in Washington, DC effective August 4, 2019.

2. This action is necessary due to the modernization effort of the Defense Health Agency (DHA) TRICARE Health Plan which functionally reorganized, assigning the leadership of the administration and management of all TRICARE purchased care contracts primarily at the DHA Falls Church, Virginia location. As such, your position will be relocated to the VA/DoD Medical Sharing Office, VA/DoD Health Affairs in Washington, DC.

3. The position description and duties will remain the same. According to our records your reassignment address is 1575 I Street NW, Washington D.C. 20005. This is the address you will be assigned to report for duty and will be your new permanent duty location.

4. Your current rate of pay upon reassignment will change, as you will reside outside of a different Locality Area as your previous duty location. Your current pay rate is GS-14, step 3 Base- $95,328; Locality- $26,577; Total Salary-$ 121,905. Upon change of duty location your pay rate will change to GS-14, step 3 Base- $96,663; Locality-$28,342; Total Salary -$125,005. If you voluntarily request to relocate to another locality area in the future, you will be required to pay for any associated moving expenses; however, your pay will be adjusted to reflect the cost of living locality adjustment applied to Federal employees who work in the locality area you are directed to relocate to.

_____     JUN 12 2019
Patrick W. Grady                                              _____
VA/DoD Medical Sharing Office (10P5)                Date

_____     JUN 12 2019
Patrick W. Picardo                                            _____
Acting Executive Director                                   Date
Office of VA/DoD Health Affairs (10P5)

1



**EXHIBIT 11**
Gill
11-13-2024
RODRIGUEZ RPR
**Exhibit B**
**Page 029**

I, Allison M. Gill, acknowledge receipt of this Notice of Management Directed Reassignment and understand that I have 5 working days from the date of the notification to exercise my right to reply. If I do not exercise my right to reply, I understand that my reassignment will be effective on August 4, 2019.



SIGNATURE          6/24/19
                   DATE

I have read and understand the Management Directed Reassignment notice. I have indicated below whether I will or will not accept the reassignment to a new Permanent Duty Station.

_____ I will accept the Management Directed Reassignment.

___X___ I will not accept the Management Directed Reassignment.

I understand that I may be subject to notice of proposed removal from Federal service if I decline this Management Directed Reassignment.

Comments:

EMPLOYEE NAME: Allison M. Gill

SIGNATURE          6/24/19
                   DATE

**VA**  Department of Veterans Affairs

## APPROVAL OF INTERIM ACCOMMODATION

1. NAME OF EMPLOYEE

Allison M. Gill

2. THE PURPOSE OF THIS FORM IS TO CONFIRM THAT I AM APPROVING AN INTERIM ACCOMMODATION UNTIL:    08/05/2019

[X] THE REQUESTED ACCOMMODATION IS AVAILABLE

[ ] A COMPLETED VA FORM 0857e *(Medical Documentation)* IS SUBMITTED *(see explanation in 5 below)*

3. THE INTERIM ACCOMMODATION WILL BE PROVIDED BY THIS DATE Immediately

4. THE INTERIM ACCOMMODATION WILL BE:

Approved to telework 3 days per week telework (Week One: Monday, Tuesday and Wednesday Week Two: Monday, Wednesday and Friday) until 08/05/2019. This will allow you time to respond and submit documentation for the Agency to explore the possibility of job reassignment as an accommodation with duties that can be performed within your functionally limitations.

5. AT THIS TIME, WE DO NOT HAVE DOCUMENTATION TO VERIFY THAT YOU HAVE A DISABILITY, AND YOUR DISABILITY IS NOT VISIBLE. THEREFORE, BY GRANTING THIS INTERIM ACCOMMODATION, WE ARE NOT REGARDING YOU AS A PERSON WITH A DISABILITY COVERED BY THE REHABILITATION ACT. WHEN YOU SUBMIT THE COMPLETED VA FORM 0857e, THEN WE WILL BE ABLE TO MAKE A DETERMINATION.

YOU HAVE INDICATED THAT YOU CAN OBTAIN AN APPOINTMENT WITH YOUR TREATING PHYSICIAN BY _____. THEREFORE, I WILL EXPECT TO RECEIVE THE COMPLETED VA FORM 0857e BY _____. IF I DO NOT RECEIVE IT BY THAT DATE, YOUR INTERIM ACCOMMODATION WILL EXPIRE.

6. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT ME VIA THE EMAIL ADDRESS OR PHONE NUMBER PROVIDED BELOW. YOU MAY ALSO CONTACT THE LRAC OR ALRAC.

| 7. DMO EMAIL | 8. DMO PHONE NUMBER | Patrick W Grady 1750246 | Digitally signed by Patrick W Grady 1750246 Date: 2019.07.26 13:19:42 -04'00' |
|---|---|---|---|
| Patrick.Grady@va.gov | (202) 461-4060 | | |
| 9. LRAC EMAIL | 10. LRAC PHONE NUMBER | Pamela E Ballou-Moore 1009165 | Digitally signed by Pamela E Ballou-Moore 1009165 Date: 2019.07.26 12:28:49 -04'00' |
| VSHO_Reasonable_Accommodations@va.gov | 202-461-7568 | | |
| 11. ALRAC EMAIL | 12. ALRAC PHONE NUMBER | | |

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM
NOV 2013    **0857c**

**EXHIBIT 13**
Gill
11-13-2024
Reporter J. Bartel, RPR,
CSR No. 12687

**o.**
**rom:**     Gill, Allison M.
**ent:**     2019-08-12T17:47:31Z
**ubject:**  RE: RA Request for AG
**eceived:**     2019-08-12T17:47:34Z
G letter FMLA 2.pdf

**EXHIBIT 15**
Gill
11-13-2024
Reporter: J. Bartel, RPR,
CSR No. 12687

Good morning,

My supervisor Patrick Grady has directed me to send you this additional letter from my mental health provider, though I am confused as to why he is requesting it considering the RA request was already decided.

Additionally, I sent a signed reassignment form and current resume, along with other hiring documentation to you last week which were due today COB. I wanted to ensure you have everything you need.

Thank you,



## Allison M. Gill, DHA, ACHE

VA/DoD Liaison, DHA J-10 West
VA/DoD Health Affairs (10P5)
401 West A Street Suite 2100
San Diego, CA 92101

Office:   619-236-5329
Mobile:  858-568-8934

Visit the TRICARE Procedure Guide at: http://vaww1.va.gov/CBO/apps/policyguides/index.asp?mode=contents&id=IV
https://www.tricare-west.com/content/hnfs/home/tw/prov/res/prov_manuals.html

TRICARE West Region Provider Handbook Jan. 1, 2018–Dec. 31, 2018 TRICARE West Region Provider Handbook
HA Intranet: http://vaww.dodcoordination.va.gov
oD: http://www.tricare.mil/DVPCO/default

**From:** VHA HROO - VSHO Reasonable Accommodations
**ent:** Tuesday, August 06, 2019 11:48 AM
**o:** Gill, Allison M. <Allison.Gill@va.gov>; VHA HROO - VSHO Reasonable Accommodations
<VSHO_Reasonable_Accommodations@VA.GOV>
**c:** Grady, Patrick W. <Patrick.Grady@va.gov>
**ubject:** RE: RA Request for AG

Ms. Allison,

The RA mailbox is in receipt of your VA form 0857h Employee Limitations on Reassignment Options. However, the form must be digitally signed by you and you need to submit a current resume that will be used to assist me in my search for possible reassignment positions. Please submit both the signed form and your resume to me using the designated RA e-mail box at
VSHO_Reasonable_Accommodations@va.gov  NLT COB August 12th, 2019.  If I do not receive both the signed form and your resume from you by August 12th , I will administrative close your RA request until I receive them from you.
While I am aware that you were on FMLA leave through August 2, you did not provide me with an alternative means for contacting you during the period that you were on FMLA other than the email address you used to submit your request.  Therefore, to meet my obligation as the RAC to continuing processing your request regardless of your absence, I used the email address email you used when submitting your request as a means to reach out to you.
As for your job status, you are still in your current job position.  However, as indicated, management cannot continue to allow you to remain in that position permanently while teleworking full time. The reasons provided by management in my prior email to you.  Nevertheless, while the Agency wants for

**Department of Veterans Affairs**

## APPROVAL OF INTERIM ACCOMMODATION

| 1. NAME OF EMPLOYEE |
|---|
| Allison M. Gill |

| 2. THE PURPOSE OF THIS FORM IS TO CONFIRM THAT I AM APPROVING AN INTERIM ACCOMMODATION UNTIL: | 11/23/2019 |
|---|---|
| [X] THE REQUESTED ACCOMMODATION IS AVAILABLE | |
| [ ] A COMPLETED VA FORM 0857e *(Medical Documentation)* IS SUBMITTED *(see explanation in 5 below)* | |

3. THE INTERIM ACCOMMODATION WILL BE PROVIDED BY THIS DATE <u>Immediately</u>

4. THE INTERIM ACCOMMODATION WILL BE:
Approved to 100% telework from home until 11/23/2019 due to a medical issues. This will allow the Agency time to explore the possibility of job reassignment as an accommodation with duties that can be performed within your functionally limitations.

5. AT THIS TIME, WE DO NOT HAVE DOCUMENTATION TO VERIFY THAT YOU HAVE A DISABILITY, AND YOUR DISABILITY IS NOT VISIBLE. THEREFORE, BY GRANTING THIS INTERIM ACCOMMODATION, WE ARE NOT REGARDING YOU AS A PERSON WITH A DISABILITY COVERED BY THE REHABILITATION ACT. WHEN YOU SUBMIT THE COMPLETED VA FORM 0857e, THEN WE WILL BE ABLE TO MAKE A DETERMINATION.

YOU HAVE INDICATED THAT YOU CAN OBTAIN AN APPOINTMENT WITH YOUR TREATING PHYSICIAN BY _____. THEREFORE, I WILL EXPECT TO RECEIVE THE COMPLETED VA FORM 0857e BY _____. IF I DO NOT RECEIVE IT BY THAT DATE, YOUR INTERIM ACCOMMODATION WILL EXPIRE.

6. IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT ME VIA THE EMAIL ADDRESS OR PHONE NUMBER PROVIDED BELOW. YOU MAY ALSO CONTACT THE LRAC OR ALRAC.

| 7. DMO EMAIL | 8. DMO PHONE NUMBER | Patrick W Grady 1750246 | Digitally signed by Patrick W Grady 1750246 Date: 2019.08.15 13:41:03 -04'00' |
|---|---|---|---|
| Patrick.Grady@va.gov | (202) 461-4060 | | |

| 9. LRAC EMAIL | 10. LRAC PHONE NUMBER | Pamela E Ballou-Moore 1009165 | Digitally signed by Pamela E Ballou-Moore 1009165 Date: 2019.08.09 15:05:28 -04'00' |
|---|---|---|---|
| VSHO_Reasonable_Accommodations@va.gov | 202-461-7568 | | |

| 11. ALRAC EMAIL | 12. ALRAC PHONE NUMBER | |
|---|---|---|
| | | |

EXHIBIT 16
Gill
11-13-2024
Reporter: J. Bartel, RPR,
CSR No. 12687

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM
NOV 2013    **0857c**



**U.S. Department of Veterans Affairs**

VA San Diego Healthcare System

3350 La Jolla Village Drive
San Diego, CA 92161
www.sandiego.va.gov

22 Aug, 2019

To Whom it May Concern:

I am writing to affirm that Ms. Allison Gill (DOB       /74) is diagnosed with Major Depressive
Disorder, Post Traumatic Stress Disorder, and Panic Disorder as of our most recent visit on
8/21/19. As is common in those with a history of Post Traumatic Stress Disorder, recent events
related to original triggers have exacerbated PTSD-related symptoms. Triggers can be an
event, person, or circumstance that serves as a reminder of the original trauma. Given Ms. Gill's
military-related trauma, her VA and DOD-related work and situation function as direct triggers of
the trauma and create symptoms of panic, re-experiencing, and difficulty with concentration.

While Ms. Gill attempted to mitigate symptoms by teleworking, the strict conditions which were
stipulated have exacerbated her anxiety such that the situation has resulted in flashbacks, re-
experiencing, and panic attacks which are characteristic of PTSD. Ms. Gill is scheduled to begin
psychotherapy in Sept; in the meantime removing herself from triggering situations is clinically
indicated to reduce distress and improve ability to function.

Respectfully,

*Paul Krebs*

Paul Krebs, PhD
Clinical Psychologist
619-855-7932
Paul.Krebs@va.gov



**EXHIBIT 17**
Gill
11-13-2024
Reporter: J. Bartel, RPR,
CSR No. 12687

To:     Cathy Harris[charris@katorparks.com]; Allison Gill[agill03@gmail.com]
Cc:     Kerrie Riggs[kriggs@katorparks.com]; VHA HROO - VSHO Reasonable
Accommodations[VSHO_Reasonable_Accommodations@VA.GOV]
From:    VHA HROO - VSHO Reasonable Accommodations
Sent:    2019-09-13T19:35:58Z
Subject:  RE: RA Request for AG
Received:      2019-09-13T19:35:00Z



EXHIBIT 18
Gill
11-13-2024
Reporter: J. Bartel, RPR,
CSR No. 12687

Ms. Harris,

Based on the new medical documentation provided, management has agreed to allow Ms. Gill to 100% telework without the previous restrictions as I continue the search for a job reassignment position.

As of today (Friday, September 13, 2019) the Agency has not been successful in securing a suitable job reassignment as an accommodation with duties that can be performed within Ms. Gill's functionally limitations. A second request was sent out to identified a suitable position. To ensure optimum results, please have Ms. Gill advise the RAC if she become aware of a job vacancy that she believe might be suitable for reassignment. The Agency is required to search for a possible reassignment position for up to ninety (90) calendar days.

v/r

# Pamela
202 461-7568

**From:** Cathy Harris <charris@katorparks.com>
**Sent:** Thursday, September 12, 2019 4:45 PM
**To:** Ballou-Moore, Pamela (WMC) <Pamela.Ballou-Moore@va.gov>; VHA HROO - VSHO Reasonable Accommodations <VSHO_Reasonable_Accommodations@VA.GOV>
**Cc:** Kerrie Riggs <kriggs@katorparks.com>; Allison Gill <agill03@gmail.com>
**Subject:** [EXTERNAL] FW: RA Request for AG

Dear Ms. Ballou-Moore:

Attached is information from Allison Gill's medical provider that responds to the inquiry below from Mr. Grady.

Please provide us with an update regarding your search for a position that would afford Ms. Gill 100% telework without the stringent, new telework restrictions that Mr. Grady created after-the-fact and which we contend are in retaliation for Ms. Gill's requests for accommodation. Your search has now been ongoing for over a month and we have not received any options from you for consideration. If you have exhausted your search, please let us know. If your search is continuing, please provide me with an estimate as to how long it will take.

Although we were hopeful that the 100% telework accommodation would be workable in the interim while you conducted your search, Mr. Grady's decision to impose new telework restrictions render that unworkable for the reasons described in the attached letter. For these reasons, Ms. Gill had no choice but to request LWOP. Because this is obviously burdensome upon her, we request that you have the 100% telework be restored with the provisions that applied to Ms. Gill prior to Mr. Grady's changes.

In addition, when Ms. Gill was informed many months ago that she would be reassigned to work physically in DC, and she could accept or decline that reassignment, she was told that in the event she declined the reassignment, she would be provided a CTAP notice. We request such a notice be issued if the Agency will not afford Ms. Gill 100% telework under the prior conditions to which

Exhibit 5.1
Page 035

she was working before she requested reasonable accommodation. If that notice has been delayed due to this reasonable accommodation process, we request that it be issued nonetheless and the reasonable accommodation process could continue in tandem.

We again request that all correspondence regarding this reasonable accommodation process be directed to us, as Ms. Gill's counsel. Directing such correspondence to Ms. Gill alone, particularly because she is on LWOP, is only going to delay matters.

Sincerely,


Cathy Harris
Kator, Parks, Weiser & Harris, PLLC
1200 18th Street NW, Suite 1000
Washington DC 20036
(202) 898-4800
Fax (202) 289-1389
charris@katorparks.com
www.katorparks.com


Begin forwarded message:

> **From:** "Grady, Patrick W." <Patrick.Grady@va.gov>
> **Date:** September 12, 2019 at 6:26:58 AM PDT
> **To:** "Gill, Allison M." <Allison.Gill@va.gov>, "ag@muellershewrote.com" <ag@muellershewrote.com>, "agill03@gmail.com" <agill03@gmail.com>
> **Cc:** VHA HROO - VSHO Reasonable Accommodations <VSHO_Reasonable_Accommodations@VA.GOV>, "Ballou-Moore, Pamela (WMC)" <Pamela.Ballou-Moore@va.gov>
> **Subject: RE: RA Request for AG**
>
> Allison, please submit additional medical documentation to support your LWOP request to the POC you have been working with in the Reasonable Accommodation Office.  The documentation should explain why the telework parameters are not appropriate for your medical restrictions.  Please provide by 1500 EST, 17 September, 2019.
>
>
> **From:** Grady, Patrick W.
> **Sent:** Tuesday, August 20, 2019 1:06 PM
> **To:** Gill, Allison M. <Allison.Gill@va.gov>
> **Subject:** RE: RA Request for AG
>
> No, I will inform him.  LWOP beginning today following your Admin/EEO leave.
>
>
> **From:** Gill, Allison M.
> **Sent:** Tuesday, August 20, 2019 12:59 PM
> **To:** Grady, Patrick W. <Patrick.Grady@va.gov>
> **Subject:** RE: RA Request for AG
>
> Thank you,
>
> Do I need to notify Corey?
>
> <image001.png>
>
> Visit the TRICARE Procedure Guide at: http://vavw1.va.gov/CBO/apps/policyguides/index.asp?mode=contents&id=IV
> https://www.tricare-west.com/content/hnfs/home/tw/prov/res/prov_manuals.html
> TRICARE West Region Provider Handbook Jan. 1, 2018–Dec. 31, 2018 TRICARE West Region Provider Handbook
> VHA Intranet: http://vavw.dodcoordination.va.gov
> DoD: http://www.tricare.mil/DVPCO/default

**From:** Grady, Patrick W.
**Sent:** Tuesday, August 20, 2019 9:23 AM
**To:** Gill, Allison M. <Allison.Gill@va.gov>
**Subject:** RE: RA Request for AG

LWOP is approved.

**From:** Grady, Patrick W.
**Sent:** Tuesday, August 20, 2019 12:22 PM
**To:** Gill, Allison M. <Allison.Gill@va.gov>
**Subject:** RE: RA Request for AG

I wasn't tracking a request in your previous email. Are you requesting LWOP?

**From:** Gill, Allison M.
**Sent:** Tuesday, August 20, 2019 12:19 PM
**To:** Grady, Patrick W. <Patrick.Grady@va.gov>
**Subject:** RE: RA Request for AG

Patrick,

Regardless of your position on the appropriateness of these requirements, my doctor has recommended that I take leave until a permanent accommodation can be provided. As I stated in my email, I have an appointment with him tomorrow morning to get a note. I also have a call with an EEO counselor this morning at 10:00 PST for which I will need an hour, perhaps 1.5 hours depending on the call, of administrative or EEO leave. Because you have not responded regarding my doctor recommended request for LWOP, I am working today. However, I am requesting LWOP starting tomorrow.

Thanks,

<image002.png>

Visit the TRICARE Procedure Guide at: http://vawww1.va.gov/CBO/apps/policyguides/index.asp?mode=contents&id=IV
https://www.tricare-west.com/content/hnfs/home/tw/prov/res/prov_manuals.html
TRICARE West Region Provider Handbook Jan. 1, 2018–Dec. 31, 2018 TRICARE West Region Provider Handbook
VHA Intranet: http://vawww.dodcoordination.va.gov
DoD: http://www.tricare.mil/DVPCO/default

**From:** Grady, Patrick W.
**Sent:** Tuesday, August 20, 2019 6:04 AM
**To:** Gill, Allison M. <Allison.Gill@va.gov>
**Subject:** RE: RA Request for AG

Ms. Gill,

Despite your claim that management is harassing you by setting certain parameters associated with granting you 100% telework as an interim accommodation, such is not the case. The requirements set forth as to your telework arrangement are simply to ensure that you are available during your core work hours and are available to meet the client's needs.

Patrick W. Grady
Director, VA/DoD Medical Sharing Office
Office of VA/DoD Health Affairs, Veterans Health Administration
1575 I Street NW, Room 622
Washington, DC 20420

Exhibit 3
Page 037

O: 202.461.4060
C: 202. 873.5239
Patrick.Grady@VA.gov

**From:** Gill, Allison M.
**Sent:** Monday, August 19, 2019 4:33 PM
**To:** Grady, Patrick W. <Patrick.Grady@va.gov>
**Subject:** RE: RA Request for AG

Patrick:

I received the telework forms including the Attachment for Section 4 of VA Form 0857c which contain additional
requirements for the telework agreement. I do not agree to these additional terms for several reasons. First, I
previously teleworked without such restrictions and limitations. Now that I have requested telework as an
accommodation for my disability you have imposed strict deadlines for answering emails and calls that were never
required of me under my prior agreement. This is harassing and discriminatory in nature. Second, given the nature
of my disability, these strict timeframes and restrictions only serve to exacerbate my condition, which is entirely
counterproductive. My doctor has advised that I not work under such conditions and has recommended that I take
additional leave. As a result, I will need to take additional LWOP starting tomorrow while the accommodation process
is ongoing. My doctor will provide a note. I have an appointment with him on Wednesday at 10:30 am.

Separately, as my position has been reassigned to DC and I declined the Management Directed Reassignment, I
understand that I should be receiving a Notice regarding the next steps in that process. Can you please let me know
when I can expect to receive that Notice?

Thanks,

<image003.png>

Visit the TRICARE Procedure Guide at: http://vaww1.va.gov/CBO/apps/policyguides/index.asp?mode=contents&id=IV
https://www.tricare-west.com/content/hnfs/home/tw/prov/res/prov_manuals.html
    TRICARE West Region Provider Handbook Jan. 1, 2018–Dec. 31, 2018 TRICARE West Region Provider Handbook
VHA Intranet: http://vaww.dodcoordination.va.gov
DoD: http://www.tricare.mil/DVPCO/default

**From:** Grady, Patrick W.
**Sent:** Monday, August 19, 2019 12:51 PM
**To:** Gill, Allison M. <Allison.Gill@va.gov>
**Cc:** VHA HROO - VSHO Reasonable Accommodations <VSHO_Reasonable_Accommodations@VA.GOV>
**Subject:** RE: RA Request for AG

Allison, please put in an IT help ticket. Telework agreement done today – the other docs, NLT 1500 EST this
Wednesday. thanks

**From:** Gill, Allison M.
**Sent:** Monday, August 19, 2019 2:30 PM
**To:** Grady, Patrick W. <Patrick.Grady@va.gov>
**Cc:** VHA HROO - VSHO Reasonable Accommodations <VSHO_Reasonable_Accommodations@VA.GOV>
**Subject:** RE: RA Request for AG

Good morning,

I am able to digitally sign the telework agreement, but not the interim agreement or the 0857c: the option to sign the
document in the signature panel is grayed out. Mr. Grady's signature on those two documents is "invalid", so perhaps
I am unable to sign it because of that. Please advise.

Exhibit 54
Page 038

Thank you,

<image002.png>

Visit the TRICARE Procedure Guide at: http://vaww1.va.gov/CBO/apps/policyguides/index.asp?mode=contents&id=IV
https://www.tricare-west.com/content/hnfs/home/tw/prov/res/prov_manuals.html

TRICARE West Region Provider Handbook Jan. 1, 2018–Dec. 31, 2018 TRICARE West Region Provider Handbook
VHA Intranet: http://vaww.dodcoordination.va.gov
DoD: http://www.tricare.mil/DVPCO/default

**From:** Grady, Patrick W.
**Sent:** Thursday, August 15, 2019 10:50 AM
**To:** Gill, Allison M. <Allison.Gill@va.gov>
**Cc:** VHA HROO - VSHO Reasonable Accommodations <VSHO_Reasonable_Accommodations@VA.GOV>
**Subject:** RA Request for AG

Ms. Gill,

1. Attached is VA Form 0857c "Approval of Interim Agreement" (attachment #1) and interim accommodation requirements (attachment#2). This interim agreement is effective Sunday, August 4, 2019 until Saturday, November 23, 2019.
2. Please complete a new telework agreement (VA Form 0740, dated Jan 2019) (attachment #3) to include Section VI-Disability and Medical Conditions and return the document to me.

Patrick W. Grady
Director, VA/DoD Medical Sharing Office
Office of VA/DoD Health Affairs, Veterans Health Administration
1575 I Street NW, Room 622
Washington, DC 20420
O: 202.461.4060
C: 202. 873.5239
Patrick.Grady@VA.gov

Exhibit 5 035
Page 039



**U.S. Department of Veterans Affairs**

VA San Diego Healthcare System

3350 La Jolla Village Drive
San Diego, CA 92161
www.sandiego.va.gov

18 Sept, 2019

To Whom it May Concern:

I am writing to affirm that Ms. Allison Gill (DOB        '74) is diagnosed with Major Depressive
Disorder, Post Traumatic Stress Disorder, and P⎽ ⎽ic Disorder as of our most recent visit on
8/21/19. As is common in those with a history of Post Traumatic Stress Disorder, recent events
related to original triggers have exacerbated PTSD-related symptoms. Triggers can be an
event, person, or circumstance that serves as a reminder of the original trauma. Given Ms. Gill's
military-related trauma, her VA and DOD-related work and situation function as direct triggers of
the trauma and create symptoms of panic, re-experiencing, and difficulty with concentration.

Ms. Gill has begun psychotherapy which is a 12-week evidence-based protocol; in the
meantime removing herself from triggering situations, such as her military-related employment,
is clinically indicated.

Respectfully,

*paul f. krebs*

Paul Krebs, PhD
Clinical Psychologist
619-855-7932
Paul.Krebs@va.gov



**EXHIBIT 19**
Gill
11-13-2024
Reporter: J. Bartel, RPR,
CSR No. 12687
Exhibit B
**Page 040**

**Department of Veterans Affairs**

# ACCOMMODATION REQUEST DETERMINATION

**1. NAME OF EMPLOYEE MAKING THE REQUEST**
Allison M. Gill

The purpose of this form is to inform you of our decision regarding your request for accommodation and to provide information to you. If our information is incorrect, please inform me as soon as possible.

**2. I AM THE DESIGNATED MANAGEMENT OFFICIAL (DMO) FOR THIS REQUEST. MY CONTACT INFORMATION IS BELOW..**

| 3. MY NAME IS | 4. MY PHONE NO. IS | 5. MY EMAIL IS |
|---|---|---|
| Patrick Grady | (202) 461-4060 | Patrick.Grady@va.gov |

**6. YOUR REQUEST WAS MADE TO ENABLE YOU TO**

☐ APPLY/INTERVIEW FOR A JOB,

☒ PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR

☐ ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

**7. YOU REQUESTED THE FOLLOWING ACCOMMODATION** *(Describe briefly)*
You requested that you be granted the reasonable accommodation of 100% telework because you contend that the functional limitation created by your medical condition are exacerbated by working in an office environment.

**8. YOUR REQUEST IS APPROVED, AND WILL BEGIN ON** *(Date)*

**9. ALTHOUGH WE ARE NOT PROVIDING THE ACCOMMODATION REQUESTED, WE ARE OFFERING AN ACCOMMODATION WHICH WE BELIEVE WOULD BE EFFECTIVE** *(Describe the alternative accommodation)*

**10. WE BELIEVE THIS ACCOMMODATION WOULD BE EFFECTIVE BECAUSE** *(Describe why you believe it will be effective)*

**11. YOUR ORIGINAL REQUEST WAS DENIED BECAUSE:**

☐ YOU DO NOT HAVE A DISABILITY COVERED BY THE REHABILITATION ACT

☐ THE ACCOMMODATION REQUESTED WOULD NOT BE EFFECTIVE

☒ THE ACCOMMODATION WOULD REQUIRE REMOVAL OF AN ESSTENTIAL FUNCTION OF THE JOB

☐ THE MEDICAL DOCUMENTATION PROVIDED DID NOT SUPPORT THE REQUEST

☐ THE ACCOMMODATION WOULD REQUIRE LOWERING OF A PERFORMANCE STANDARD OR PRODUCTION STANDARD

☒ THE ACCOMMODATION WOULD CAUSE AN UNDUE HARDSHIP TO THE OPERATION OF THE UNIT

☐ ALLOWING YOU TO WORK WOULD CREATE A DIRECT THREAT FOR YOU AND/OR OTHERS

VA FORM
MAY 2013    **0857f**

**EXHIBIT 21**
Gill
11-13-2024
Reporter: J. Bartel, RPR,
CSR No. 12887

12. DETAILED REASONS FOR THE DENIAL OF THE ORIGINAL REQUEST: *(Be specific, e.g. why the accommodation would not be effective)*
Recent reorganization of your office has created a requirement for staff to be in Washington, D.C. to carry out certain essential job functions. For example, some face-to-face interaction between you and the organization's clients is needed to build an effective relationship with the organization's clients. Your physical presence in the office is required to provide some of the training you are tasked with providing. Granting your request for 100% telework would greatly increase the workload of those employees present in the office by requiring them to take on more assignments that require presence in the office, in addition to negatively impacting the organization's ability to carry out its mission.

13. YOUR REQUEST WAS ADMINISTRATIVELY CLOSED BECAUSE OF NO RESPONSE FROM YOU TO INQUIRIES MADE ON THE

FOLLOWING DATES: _____   _____   _____   _____

WHEN YOU WISH TO PURSUE THIS REQUEST, PLEASE CONTACT ME AND I WILL RE-OPEN IT

14. YOU WILL HAVE A WEEK FROM THE DATE OF THIS NOTICE TO DECIDE WHETHER TO ACCEPT THE ALTERNATIVE ACCOMMODATION OFFERED. IF YOU DECIDE NOT TO ACCEPT, YOUR OPTIONS ARE LISTED BELOW.

15. IF YOU WISH TO REQUEST RECONSIDERATION OF THIS DECISION, YOU MUST:

Within seven (7) calendar days of receipt of this denial, request reconsideration by the second level Designated Management Official (DMO). After receiving a request for reconsideration, the DMO has 14 calendar days to render a decision and notify the requester, in writing.

16. IF YOU WISH TO FILE AN EEO COMPLAINT, PURSUE A MERIT SYSTEMS PROTECTION BOARD COMPLAINT OR A UNION GRIEVANCE, GUIDANCE IS PROVIDED BELOW:

- To file an EEO complaint. applicants for employment or employees must contact an EEO counselor within forty-five (45) days of notice of the denial, pursuant to 29 C.F.R. Part 1614. Contact your local Office of Resolution Management for further information.

- Non-Bargaining Unit Employees may file an Administrative Grievance within 15 calendar days of receiving the denial. Contact your local Human Resources Office for further information.

- Bargaining Unit Employees may file a grievance in accordance with applicable Collective Bargaining Agreements. Contact you local union representative for further information.

- For a collective bargaining claim, file a written grievance in accordance with the provisions of the Collective Bargaining Agreement; or

- Initiate an appeal to the Merit Systems Protection Board within 30 days of an appealable adverse action as defined in 5 C.F.R. §1201.3.

- Employees and applicants are encouraged to participate in information resolution processes available to address the reasonable accommodation outcome. The ADR process is outlines in VA Directive 5978: Alternative Dispute Resolution. Individuals may participate in ADR as part of the above avenues of redress or independently. If participation in independent of the above avenues of redress, it does not meet the requirements for filing claims under the aforementioned processes. If the employee believe she or he may also want to pursue other avenues of redress, the employee should check with the appropriate EEO/Union/HR office to ensure that time requirements are met. Contact your local ADR Coordinator at http://www1.va.gov/adr/docs/ADR_Coordinators_List.pdf for further information.

**Reconsideration, review, and the use of alternative resources does not affect the time limits for initiating statutory and collective-bargaining claims. Your participating in VA's information alternative dispute resolution process will neither satisfy nor delay time restrictions of the formal processes indicated above.**

| 17. DMO SIGNATURE | 18. DATE |
|---|---|
| Patrick W Grady 1750246   Digitally signed by Patrick W Grady 1750246 Date: 2019.11.26 15:24:11 -05'00' | 11/26/2019 |
| 19. I (REQUESTOR) CERTIFY THAT I RECEIVED THIS FORM REQUESTOR SIGNATURE<br>Allison Gill by KDR | 20. DATE<br><br>12/3/2019 |
| 21. I (REQUESTOR) CERTIFY THAT I ACCEPT THE ALTERNATIVE ACCOMMODATION OFFERED (IF ONE IS OFFERED) REQUESTOR SIGNATURE | 22. DATE |

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM 0857f, MAY 2013, page 2



**DEPARTMENT OF VETERANS AFFAIRS**
**Veterans Benefits Administration**
**-Regional Office**

**ALLISON GILL**

**VA File Number**
**600 56 1691**

**Represented By:**
**VETERANS OF FOREIGN WARS OF THE US**
**Rating Decision**
**03/30/2021**

## INTRODUCTION

The records reflect that you are a Veteran of the Gulf War Era. You served in the Navy from February 9, 1995 to September 20, 1996. You filed a claim for increased evaluation that was received on March 9, 2021. Based on a review of the evidence listed below, we have made the following decision(s) on your claim.

## DECISION

1. Evaluation of post traumatic stress disorder (PTSD), major depressive disorder, recurrent, severe with psychotic features, panic disorder without agoraphobia, which is currently 70 percent disabling, is increased to 100 percent effective April 16, 2020.

2. Basic eligibility to Dependents' Educational Assistance is established from April 16, 2020.

3. A finding of incompetency is proposed.

## EVIDENCE



**EXHIBIT 23**
Gill
11-13-2024
Reporter: J. Bartel, RPR,
CSR No. 12687





**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**PACIFIC DISTRICT**
**COUNSELOR REPORT**



**CASE NUMBER: 200P-0010-2019104998**
**COUNSELOR NAME: Mendez, Claudia**

| Name of Aggrieved Party: | Ms. Allison Gill | | | | |
|---|---|---|---|---|---|
| Home and/or Alternate Address: | ███████████ San Diego, CA ███ | | | | |
| Home Telephone Number: | ████████ | | | | |
| Cellular/Mobile Number | | | | | |
| Business Address: | 810 Vermont Ave., NW Washington, DC 20420 | | | | |
| Business Telephone Number: | 202-461-7022 | | | | |
| Email Address: | ████████ | | | | |
| Position Title/Grade: | Health System Specialist / GS 14 | | | | |
| Employee | X | Former Employee | Applicant | | |
| VHA | X | VBA | NCA | Canteen | Other |
| Title 5 | | Title 38 | Hybrid T38 | Full-time | X | Part-time |
| Probationary | | Career | X | Career Conditional | Temporary | Term |
| Name of Facility: | VETERANS HEALTH ADMINISTRATION | | | | |
| Address of Facility: | 810 Vermont Ave., NW Washington, DC 20420 | | | | |
| Facility Telephone Number: | 202-461-7022 | | | | |
| Name of Representative: | Kerrie Riggs | | | Attorney True | |
| Representative's Address: | 1200 18th Street NW, Suite 1000, Washington, DC 20036 | | | | |
| Representative's Telephone: | 202-898-4800 x562 | | | | |

**NOTIFICATION OF PROCEDURAL RIGHTS**

| Initial Contact: | Telephone | | Date: | 08/06/2019 |
|---|---|---|---|---|
| Initial Interview | Telephone | | Date: | 08/20/2019 |
| Rights & Responsibilities/Notices: | E-Mail | 08/08/2019 | Rec'd: | 08/08/2019 |
| Notice to Unreachable Aggrieved: | UPS/Cert Mail: | | Rec'd: | N/A |
| Agreed to Waive Anonymity: | YES [X] | NO [] | Date | 08/20/2019 |
| Notification to Facility Director | E-Mail | 08/28/2019 | Date: | 08/28/2019 |
| ADR offered by facility [  ] MOU [  ]: | YES[X] | NO[] | Date: | 08/06/2019 |
| Facility Returned Signed Refusal | YES[] | NO[X] | Date | N/A |
| ADR Agreed to by Aggrieved: | YES[X] | NO[] | Date: | 08/20/2019 |
| Settlement (SA) [] | Withdrawal (WD) []: | | Date: | N/A |
| Notice of Closure (for SA/WD): | Regular Mail: | | Rec'd: | N/A |
| Notice of Right to File: | Certified Mail | 11/04/2019 | Rec'd: | 11/18/2019 |



**EXHIBIT 29**
Gill
11-13-2024
Reporter: J. Bartel, RPR,
CSR No. 12887

**Exhibit B**
**Page 044**

USA_GILL_000010

# EXHIBIT C

Exhibit C
Page 045

```
 1   B says progress review, and that's the section

 2   that you signed.

 3            Can -- what, what do you think is

 4   the reason you signed part of it and your

 5   predecessor signed section A?

 6       A.    So he would have been the supervisor

 7   for part of that performance period.  So when it

 8   began, Alex would have been Allison's supervisor

 9   and then Alex left and then I came in.

10       Q.    Okay.

11            And down in the bottom, the comments

12   of section B it says, "The director of medical

13   share office, Mr. Alejandro Barberena retired on

14   February 9, 2019.  On February 17, 2019,

15   Mr. Patrick Grady was selected as the director of

16   medical sharing office.  Mr. Grady will perform

17   the staff's mid-year review and final rating at

18   the end of FY2019."

19            Do you see that at the bottom there?

20       A.    Yes.

21       Q.    So this says February 17, 2019 was

22   when you were selected as the director.

23            Does that date look accurate to you?

24       A.    Again, I don't remember exact dates.

25   I -- it could be.  I think it was February that I
```

1    joined the VA, so that could be correct.  So I

2    don't know.  I can't remember the exact date.

3          Q.    Do you have any reason to dispute

4    that date?

5          A.    I don't think so.

6          Q.    Okay.

7                And it says FY2019.

8                Does FY mean fiscal year?

9          A.    That would be my understanding of

10   that.

11         Q.    Thank you.

12               So you and Allison Gill in section B

13   there signed on April 10th of 2019; is that

14   right?

15         A.    It looks like it.

16         Q.    Okay.

17               And then, so would you have filled

18   out section C, actual achievement?

19         A.    I believe I must have, yes.

20         Q.    Okay.

21               And there are five items that were

22   rated here.  Three of which are marked critical

23   element and all five are marked fully successful

24   under levels of achievement; is that accurate?

25         A.    That's the way, that's the way I

PATRICK GRADY
DECEMBER 05, 2024                                              JOB NO. 1302869

 1   understand that, yes.

 2         Q.     Okay.

 3                So when you fill out a form like

 4   this that says levels of achievement, there are

 5   three levels:  Exceptional, fully successful and

 6   unacceptable are the three columns here, correct?

 7         A.     Yes.

 8         Q.     So you would have checked all five

 9   boxes that said fully successful?

10         A.     Yes, yes.

11         Q.     Okay.

12                And does fully successful, when you

13   fill this out, what does fully successful mean to

14   you when, when, meant to you when you checked

15   these five boxes as fully accessible?

16         A.     I mean, it would have meant to me

17   that the employee met the expectations of the

18   position.

19         Q.     Okay.

20                And so on those five measurements,

21   Dr. Gill was a -- using the title of the column,

22   a fully successful employee; is that accurate?

23         A.     Yep, that would have been my

24   assessment.

25         Q.     Okay.

Exhibit C
Page 048

```
 1                  And that assessment was on April

 2    10th of 2019, correct?

 3         A.     That, that appears to be the date.

 4         Q.     Okay.

 5                  This next page is page 3, which is

 6    Bates stamped ending in 1035 is Section D,

 7    summary rating, and it says "annual rating of

 8    record."  That's the box that is checked.

 9                  What does that checkbox mean?

10         A.     That of the two options a special

11    rating or an annual, annual would have been the

12    year.

13                  Special rating I believe are like

14    cases where maybe it's shorter than a year or

15    there's other locations that warrant a special

16    type rating, but the box checked though would

17    indicate to me that it's the annual, a year.

18         Q.     And it says period covered is

19    October 1, 2018 to September 30th of 2019,

20    correct?

21         A.     Sure, yes.

22         Q.     And, and so is this the type of

23    performance review, this is a standard every year

24    we give the employee a performance review on this

25    form; is that accurate?
```

```
 1            A.      That's how it was back then, yes.

 2            Q.      Okay.

 3                    And, again, there's a performance

 4      rating here.  In this case there are five checked

 5      boxes:  Outstanding, excellent, fully successful,

 6      minimally satisfactory and unacceptable.

 7                    And it appears that you checked the

 8      fully successful box; is that correct?

 9            A.      Right.

10            Q.      So that, again, that mean -- would

11      that mean for the purposes of this review

12      Dr. Gill was a -- fully successful, meaning she

13      did her job?

14            A.      She would have -- right.  So she

15      would have met all the, the standards put forward

16      in her performance plan, yes.  So fully

17      successful met those.

18            Q.      Great.

19                    And I'm going to zoom in a little

20      bit here because that signature line is really

21      hard to read, but it does say signature of rater

22      Patrick W. Grady.  You can't really see the

23      digital signature mark there; but it says your

24      title, director medical sharing office, and this

25      is now dated January 27th of 2020; is that
```

**Exhibit C**
**Page 050**

```
 1   and in box one it says name Allison M. Gill.  Box

 2   4 says effective date of 12/10/2018 and Box 20

 3   says $750.

 4              (Plaintiff's Exhibit 17 marked for

 5   identification.)

 6        Q.    Do you recognize not necessarily

 7   this specific document but what kind of document

 8   this is, sir?

 9        A.    I do.

10        Q.    Okay.

11              And from our prior conversation

12   today, if this says effective date of

13   December 10, 2018, this would have been before

14   your tenure as director, correct?

15        A.    Correct.

16        Q.    But just on your understanding of

17   these documents, a notification personnel action,

18   it says in Box 5 individual cash award and in Box

19   20 it says $750.

20              Based upon your knowledge of these

21   types of documents, would that mean that this is

22   a, like a cash award or bonus of $750?

23        A.    That, that would be my

24   understanding.

25        Q.    Okay.
```

PATRICK GRADY                                          JOB NO. 1302869
DECEMBER 05, 2024

1            And this is for Allison Gill on

2    December 10th of 2018, correct?

3         A.    It looks like it, yes.

4         Q.    Okay.

5                Well, just, again, as you were

6    supervising these Tricare liaisons, did you ever

7    award one of these cash bonuses to your

8    employees?

9         A.    Yes, I would have -- I can't recall

10   specifically, but I, I did provide awards to

11   employees, yes.

12        Q.    Do you recall if you ever awarded

13   Dr. Gill while she worked for you?

14        A.    I'm sorry.  I don't remember if I

15   did or not.

16        Q.    Thank you.

17               I'm going to start just to help you

18   understand, we're going to start kind of walking

19   through your time being Dr. Gill's supervisor

20   now, and I want to introduce another exhibit.

21        MR. BEARMAN:  And you're going to

22        forgive me, Mr. Court Reporter and opposing

23        counsel, I'm going to be numbering some of

24        these in a slightly different order.

25        Q.    So I'm introducing into the record

Exhibit C
Page 052

PATRICK GRADY                                                    JOB NO. 1302869
DECEMBER 05, 2024

```
 1   but you were a director, correct?
 2          A.      That was in that job, yes, the
 3   director of medical sharing office, yes.
 4          Q.      Okay.
 5                  So then it appears in this thread
 6   that less than, just three minutes less than four
 7   hours later Dr. Gill responded to you saying "As
 8   an FYI I have never served as acting director
 9   before and do not know what it entails though I'm
10   happy to provide coverage"; is that accurate?
11          A.      Yeah, probably.
12          Q.      And your response -- we must have
13   had some time zone differences here because you
14   sent this three minutes later probably from the
15   Eastern time zone; would that be accurate?
16   Allison was in, Dr. Gill was in a Pacific time
17   zone and you were in the Eastern time frame; is
18   that correct?
19          A.      I think that probably explains it,
20   yeah.
21          Q.      Okay.
22          A.      Yeah.
23          Q.      And you responded "Generally be
24   available for anything that pops up especially
25   from Pat and take any meetings.  We'll send that
```

**Exhibit C**
**Page 053**

```
 1   schedule out later to all that are covering.
 2   Thanks again."
 3                 So you, you just responded saying
 4   this is, this is what you would do if you're
 5   covering for me as acting director, correct?
 6        A.     It looks like it, yes.
 7        Q.     Okay.
 8                 And then, again, with the time zone
 9   difference, it looks like Allison responded eight
10   min- -- Dr. Gill responded eight minutes after
11   you saying "Sounds great.  I think the main
12   reason they wouldn't tap me was because of the
13   time difference as opposed to capability, but
14   I'll make sure I'm available.  Travel safely
15   tomorrow."
16                 So that looks like her agreeing to
17   be acting director?
18        A.     Yes.
19        Q.     Do you recall if she was acting
20   director while you traveled?
21        A.     I don't.  I'm sorry.
22        Q.     Okay.
23                 So that was Tuesday, April 2, 2019.
24                 Do you recall where you were
25   traveling to?
```

1    employees files to kind of maybe get to know them

2    or understand their background with the agency

3    before you had first met them?  Did you do any of

4    that kind of background on your employees?

5          A.    Did I review any files before I took

6    the job?  I don't believe I had access to any of

7    their files before I took the job.

8                Afterwards, you know, once in the

9    position, it would have been the, you know, it

10   would have been the files that Alex had, which I

11   don't, I don't remember specifically doing that.

12   Again, I would be speculating but I don't -- I

13   don't recall specifically doing that.

14         Q.    At the time of your meeting in San

15   Diego with Dr. Gill, were you aware that she had

16   PTSD?

17         A.    PTSD?  So I don't, I don't remember

18   knowing that before or after.  I believe Allison

19   shared that with me at some point, but I don't

20   know when that -- when she shared that with me.

21               So to answer your question, I don't,

22   I don't know when, when I was informed that

23   Allison had PTSD, yes.

24         Q.    Okay.  Give me one second.

25         A.    Sure.

PATRICK GRADY                                                    JOB NO. 1302869
DECEMBER 05, 2024

```
 1        A.      So.
 2        Q.      But you're familiar with what PTSD
 3   is.
 4                I'm not asking you as a clinician.
 5   I am asking you as an officer of, in charge of
 6   soldiers in a combat zone and afterwards.
 7        A.      Right.  And what was the question
 8   again, if I have experienced conversations with
 9   my soldiers about PTSD; is that your question?
10        Q.      Right.
11                Are you aware -- let me rephrase it
12   for you.
13                Do you know of any of your soldiers
14   under your command getting a PTSD diagnosis after
15   combat, for example?
16        A.      I'm not aware of that.
17        Q.      Was that the type of thing that you
18   would have -- you, sorry, that would have been
19   communicated to you in one form or another that
20   they had PTSD?
21        A.      I would believe so.
22        Q.      Did you ever receive any training
23   regarding PTSD in the United States Army?
24        A.      Yes.
25        Q.      When was that?
```

```
 1        A.      Probably throughout my career.

 2        Q.      Okay.

 3                So you had many trainings regarding

 4   PTSD in your career in the United States Army,

 5   correct?

 6        A.      I was aware of what PTSD was, the

 7   frequency of the training, I don't know how often

 8   the training was, but I'm assuming that that was

 9   part of the usual line-up of training that we as

10   soldiers did.  We paused for training quite

11   often, so.

12                Yes, I'm aware of PTSD.

13        Q.      So you were a deputy chief of

14   Tricare and then chief of Tricare for the

15   Department of Defense.

16                In your time as deputy chief and

17   chief of Tricare, was PTSD something that was

18   part of the conversations, the meetings, the

19   documents during your time as deputy chief and

20   chief of Tricare?

21        A.      Certainly PTSD was a topic of

22   relevance and, as I served in the Tricare

23   capacity, it would have been part of

24   conversations.

25                So, yes, if the question is was I
```

1   that she did have that.  So I can't calibrate

2   from that point forward other than to, to, to

3   suggest that, yeah, sad that anybody has that;

4   and I think we, you know, we attempted to

5   accommodate the best we could with work, work

6   arrangements.  So I think that's how I'd answer

7   that.

8        Q.    Okay.

9              I'm going to introduce in to the

10  record Exhibit No. 20.  This is a one-page

11  document.  That is Bates stamp USA_Gill_000984.

12  It is a form 0857A, as in Alpha, and the caption

13  is Department of Veterans Affairs Written

14  Confirmation of Request for Accommodation, and it

15  is, it says the date of request is April 29,

16  2019.  The date of the form is May 6, 2016.  The

17  name of the employee is Allison Marie Gill, and

18  the supervisor's name is Patrick W. Grady.

19             (Plaintiff's Exhibit 20 marked for

20  identification.)

21        Q.    Do you see that this document here,

22  sir?

23        A.    I do see it.

24        Q.    Did I identify it accurately?

25        A.    I think so.

PATRICK GRADY                                                JOB NO. 1302869
DECEMBER 05, 2024

 1        Q.      Can you read into the record for me
 2   please number 10 says, reasons for request.
 3        A.      Can you enlarge that, please.
 4        Q.      Absolutely.  Happy to.
 5        A.      You want me to read Box 10?
 6                It says --
 7        Q.      Box 10, please.  Yes, sir.
 8        A.      You bet.  Moderate to severe PTSD
 9   symptoms including panic attacks, high blood
10   pressure, insomnia are triggered by the office
11   environment.  That's it in the box.
12        Q.      Okay.
13                And have you seen this document
14   before, sir?
15        A.      I don't know.  I can't remember
16   specifically this document.  I would assume I
17   have.
18        Q.      So the date of the request is listed
19   as April 29th of 2019.  The date of the document
20   is May 6th of 2019.  It states in very clear
21   language that Dr. Gill has moderate to severe
22   PTSD symptoms, correct?
23        A.      That's what it says.
24        Q.      So does that help you understand
25   when or help you narrow the time frame of maybe

PATRICK GRADY                                    JOB NO. 1302869
DECEMBER 05, 2024

1  when you first learned that your direct report,

2  Allison Marie Gill, had PTSD?

3        A.     That helps, yes.

4        Q.     Do you have a new opinion of when

5  you might have first learned of her PTSD?

6        A.     Well, as I shared before, I didn't

7  -- I don't -- I didn't remember when I was told

8  about PSTD.

9              This document, if I had seen it, has

10  a date of May 6th.  So if I was given this

11  document, which, I, again, you know, this is four

12  or five years ago.

13              I don't know when I was given this

14  document or seen this document, but, yeah, this

15  would have helped me understand the situation

16  clearly.

17        Q.     And when you say it would have

18  helped you understand the situation, what does

19  that mean to you?

20        A.     It would have meant that I

21  understood that Allison had PTSD or suffered the

22  symptoms of PTSD.

23        Q.     I just have one more question and

24  then maybe we'll take a break because it's been a

25  little over an hour that we've been back on the

Exhibit C
Page 060

PATRICK GRADY                                          JOB NO. 1302869
DECEMBER 05, 2024

```
 1              Okay.  Thank you.  Okay.  Just a
 2   second.  I have some more exhibits.  Forgive my
 3   pause while I organize.  Too many texts.  Too
 4   small.  Okay.
 5              I'm going to introduce into the
 6   record Exhibit No. 24.
 7              Oops.  Where did it go?  Come on.
 8   Okay.  There it is, Exhibit 24.  It's a two-page
 9   document.  It is Bates Stamp USA_Gill_002558
10   through 2559.  This is an email thread between
11   Patrick W. Grady and Pamela that we'll discuss
12   here in a moment.
13              (Plaintiff's Exhibit 24 marked for
14   identification.)
15        Q.    Do you, do you see this, sir?
16        A.    I do see it.
17        Q.    Okay.
18              And does it appear to be an email
19   thread between you, it looks like reasonable
20   accommodations and somebody named Pamela; is that
21   accurate?
22        A.    It does appear to be that, yes.
23        Q.    Okay.
24              So this one is the first email in
25   the thread.  Of course, it's all listed on the
```

PATRICK GRADY
DECEMBER 05, 2024

JOB NO. 1302869

```
 1   bottom, right.

 2              So Monday, May 6th, it's from Pamela

 3   at the reasonable accommodations to you.

 4              Who is Pamela?

 5        A.     Pamela was the reasonable

 6   accommodation point of contact that helped us

 7   with all these actions.

 8        Q.     Okay.

 9              Do you happen to recall her last

10   name?

11        A.     I think that was the one we had

12   challenged properly pronouncing in the beginning,

13   Pamela Bellou, Belunian -- I don't know how to

14   pronounce her last name, yeah.

15        Q.     Thank you.

16              So that's who we think we're talking

17   about, though, is that same person?

18        A.     It is.

19        Q.     Okay.

20              So she sent you an email saying,

21   "Hey, I'm the reasonable accommodation

22   coordinators."  I guess -- I'm not sure why

23   that's plural -- "for VHRRO within work force

24   management."  I won't read this whole thing.

25              She's acknowledging that they had
```

Exhibit C
Page 062

PATRICK GRADY                                              JOB NO. 1302869
DECEMBER 05, 2024

1    me know when you're ready.

2              A.    Okay.  I've gone through it.

3              Q.    Okay.

4                    It says that Dr. Gill completed the

5    form on May 7, 2019, and it says that you, your

6    date of request, is May 29, 2019.  So that's 22

7    days later.

8                    How would you explain the gap of 22

9    days there?

10                   MS. BOUTELLE:  I'm going to object

11           that this misstates the document.  It's not

12           entirely clear to me which boxes apply to

13           which requests, but you can go ahead and

14           answer if you understand, Patrick.

15             A.    I understand the question.  I don't,

16    again, it's been four to five years since this

17    document was signed.  So I don't have a

18    recollection of what transpired during those

19    specific dates.

20             Q.    In May of 2019, was it your standard

21    practice to complete forms quickly or to -- or

22    something else?

23                   MS. BOUTELLE:  Objection.  Vague.

24             Q.    Right.

25                   I can, if you want, I can clarify

1   the question, sir, or you can answer it.

2          A.     I typically stayed on top of

3   actions.

4          Q.     So in this box that says next steps,

5   when you look at that information that's filled

6   out there, do you think that was Pamela

7   Bellou-Moore who filled in next steps or do you

8   think that was you that filled in next steps?

9          A.     So I think ultimately it was my

10  decision to approve accommodations.  So I would

11  assume that those, that block probably applied to

12  me.

13         Q.     Okay.

14                Did you approve Dr. Gill's request

15  for permanent telework?

16         A.     So permanent telework, as I remember

17  now, at this point, there were a series of

18  requests as I remember, but a request for 100

19  percent telework was something that wasn't

20  approved.

21         Q.     And you made that decision, correct?

22         A.     As supervisor, yeah, yes.  I was

23  the, I was the deciding person there.

24         Q.     Okay.

25                Do you recall, in 2019 do you recall

```
 1                   Again, I'm speculating there.  I

 2    don't know, again, I just want to reiterate I

 3    don't know the exact time when I was told she was

 4    or when it was shared that she had a podcast.

 5         Q.     Who shared with you that she had a

 6    podcast?

 7         A.     Right, so Miss Edie Bean.

 8         Q.     What did she tell you about the

 9    podcast?

10         A.     If I remember what Edie said, she

11    came by my office in D.C. and said something to

12    the effect that -- I don't know specifically what

13    Edie said -- but something to the effect, you

14    know, you probably need to check this out,

15    something like that, so.

16         Q.     How did you respond when you were

17    told?

18         A.     Probably took the information, and I

19    don't know what I said to Edie in return but,

20    yup.  That's how -- she told me that.  I said --

21    I assume I said okay and that's how I think it

22    went.

23         Q.     Did she say anything of her own

24    personal commentary when she informed you about

25    Dr. Gill having a podcast?
```

PATRICK GRADY                                          JOB NO. 1302869
DECEMBER 05, 2024

```
1        A.     I don't remember that.  Her
2   description of what it was I don't even know if
3   the word "podcast" was mentioned, but that was
4   the first time I was, I was made aware of, I
5   forget what it was called.  Mueller she wrote I
6   think was the name of the program.
7        Q.     Okay.
8               So you just said you didn't think
9   that Edith used the word "podcast."
10              How did she describe it?
11       A.     Like she just said something like
12  you probably need to check this out.  She, yeah,
13  she must have conveyed the name of it because
14  otherwise I wouldn't know where to go, so, yeah.
15       Q.     And when people are employed by the
16  VA, let's speak specifically to you and your
17  direct reports, are you allowed to have outside
18  activities?
19       A.     Sure.
20       Q.     Are you allowed to have hobbies
21  outside of the job?
22       A.     Sure, yes.
23       Q.     Okay.
24              So why did you think you had to
25  check it out when Edith Bean brought this to your
```

                                                      **Exhibit C**
                                                      **Page 066**

PATRICK GRADY                                    JOB NO. 1302869
DECEMBER 05, 2024

```
 1   attention?
 2        A.    I don't know.  I just took her --
 3   she said here check it out.  I said okay.  I
 4   checked it out and there it is.
 5        Q.    Pardon me, sir.
 6              Full bird colonel, director, chief,
 7   and you're going to take an order from a
 8   subordinate?
 9              MS. BOUTELLE:  Objection.  Misstates
10        testimony.
11        Q.    Go ahead and answer, sir.
12        A.    No, I don't, I don't, I didn't -- I
13   didn't view it as an order.  It was like she was
14   offering information about one of her fellow
15   employees, so.
16        Q.    So I want to understand your state
17   of mind when you heard that because you're giving
18   me a dry response, and you're not telling me why
19   would you take that and go investigate her
20   podcast.
21              Why would you do that?
22        A.    So somebody had just shared with me
23   a piece of information and, you know, trying to
24   get all the information to make a, you know, to
25   understand situations I thought was important to
```

Exhibit C
Page 067

```
 1   know.  I guess that's how I would, that's kind of
 2   how I would characterize how I received the
 3   information, okay.
 4             Somebody had just given me
 5   something, okay.  What does that mean to the
 6   situation and, yeah, so the state of mind would
 7   be that, okay.  What does that mean?  What does
 8   that mean?
 9        Q.    Right.
10             So a piece of information came in.
11   You have the choice of not act or act.  You chose
12   to act.
13             What about this information guided
14   you to act?
15        A.    Well, probably because it was
16   offered in such a random way.  Why would somebody
17   be come into my office, poke their head in and
18   say you probably need to check this out Mr.
19   Grady.  Oh, really, okay.
20             So that was probably an element of
21   the decision to, as you phrased it, to act, to
22   explore what, what that was that Miss Bean had
23   just told me, okay.
24             What is that?  You just told me
25   something that was shared and, yup.  That
```

 1   probably was the rationale I came to to figure

 2   out, okay, what is it, so.

 3        Q.    So did Edith Bean in 2019 share any

 4   other information with you other than Allison

 5   Gill had this show?

 6        A.    Well, Allison or Edie was the senior

 7   Tricare liaison.  So she shared information with

 8   me all the time about the happenings of Tricare

 9   liaison work, so.

10        Q.    But is a podcast Tricare liaison

11   work?

12        A.    No, it's the oddity of it.  It's not

13   typically in the line of normal business, so.

14        Q.    Right.

15              So does -- do you know if any of

16   your direct reports in 2019 had any hobbies?

17              MS. BOUTELLE:  Objection.  Vague as

18        to hobbies.

19        Q.    I think we all know what a hobby is.

20   I don't have to define the term.  Go ahead and

21   answer it, please, sir.

22        A.    I don't know of too many hobbies.  I

23   know Edie golfs, I believe.  I know another

24   employee likes to watch comedy.

25              These are things you kind of pick up

**Exhibit C**
**Page 069**

1   in conversations across the office, but I'm not

2   aware of each, each employee's hobbies, no.

3        Q.    So you didn't investigate any other

4   employees' hobbies, only Dr. Gill, correct?

5        A.    Well, I didn't know what it was; it

6   was a hobby or not.  All I did was she pointed me

7   in that direction.  I said okay.  There you go.

8        Q.    So when you say there you go, does

9   that mean -- what did you do next?  What did you

10  do with that information?

11            You used the word "investigation."

12            What did you do as your first step

13  after getting that information?

14       A.    Well, as with all of this, I would

15  have consulted with legal advisor, HR.  I don't

16  know, you know, I would have let Mr. Picardo know

17  the situation because I think it was in the

18  context of an occasion where the employee wasn't

19  able to come in to work and do the work and the

20  podcast indicated that she was able to perform,

21  you know, at these events.

22            And so that was I think what I

23  attempted to reconcile that, you know, okay.

24            We've got a situation here where the

25  employee has indicated she's not able to do the

```
1   the time. Anthony Graves would have been aware

2   of, would have been aware of it as well.  He's

3   the HR side of things, and I'm not sure if Pamela

4   was, was made aware or not but, certainly, for

5   certain it would have been Angela, so.

6       Q.    Okay.

7             So after consulting with your

8   advisors -- let me rephrase.

9             What did your advisors tell you when

10  you consulted with them about your direct report,

11  Dr. Gill, having a podcast?

12      A.    I think they advised to do, I forget

13  how they call it, but an investigation or find

14  out additional information which kind of

15  coordinated with Allison and had a conversation

16  about that and asked Allison a series of

17  questions; and I think he probably have as

18  documents, but that's, that's transpired after

19  that.

20      Q.    Okay.

21            We need to get details.  So you

22  talked to your advisors.  They said go do this.

23  I'm going to use your word, I think you said

24  investigation; is that correct?

25      A.    That's what I believe they called
```

```
1   it, yeah, so for me to obtain additional

2   information on the situation.

3        Q.     And how did you go about obtaining

4   information about the situation?

5        A.     By having a conversation with

6   Allison where I asked her some questions.

7        Q.     You didn't do anything before

8   talking to Dr. Gill.  You just met with your

9   advisors only and then you talked with Dr. Gill,

10  nothing in between.

11             That's your testimony today?

12       A.     Well, I obviously saw the site, so,

13  you know, after Edie told me.  I went to the

14  site, saw the site.  Let, let people know about

15  it and then was advised, okay, well, do the

16  investigation or do the conversation with Allison

17  and ask these questions, okay, and that's what I

18  did.

19       Q.     So you only visited the site is what

20  you said.  That was the only action to determine

21  anything about this podcast was to go to the

22  site.  That's the only thing you just described

23  to me.  That's all you did.

24       A.     I don't know what else I could have

25  done.
```

```
 1        Q.    Did you listen to an episode?

 2        A.    I listened to some of the episode.

 3        Q.    So you didn't tell me that a moment

 4   ago.

 5              We're not -- this isn't a game.  I'm

 6   going to have to get answers from you whether it

 7   takes me all day and we come back another day.

 8              So what did you do -- Edith Bean

 9   told you this.  What was your reaction?  I need

10   to know what you thought in that moment.

11        A.    Yeah, so, I went to the site, pulled

12   up.  I think there were shows there as I remember

13   the site.  I watched the shows.  I didn't know

14   how much detail.  Okay, I understand now you want

15   all the detail, okay.

16              I went to the site, viewed I don't

17   know if it was the entire show, one of the entire

18   shows.  I don't know if they had entire shows on

19   the site.

20              The thought was, you know, what's

21   prompting me is, you know, an employee has just

22   told me that they can't work in a certain

23   environment; but then it seems to be that the

24   employee was able to perform in these pretty, as

25   I think they were theatres, and they were able to
```

```
 1    perform there, but then how do you reconcile that
 2    with not being able to perform in a workplace.
 3    So that was my thought, you know.
 4                I'm the supervisor.  I want to make
 5    sure, you know, work gets done for the
 6    government; but the employee is telling me that
 7    she can't do the work because she can't, she
 8    can't interact with people effectively, but when
 9    I go to the site and I watch the episode she's
10    clearly interacting with people.
11        Q.    Was she interacting with office
12    workers from the VA when she was on stage?
13        A.    I don't, no.  I -- it wasn't, it
14    wasn't in the office setting.  As I said, it
15    appeared to be like in theatres.
16                She was on a stage.  She had an
17    audience and, yeah, those were the shows at --
18    that were on the site.
19                So when I say I went to the
20    site, yeah.  I looked at the shows and that's,
21    that's, you know, you kind of point to your head,
22    but that what was going through my head as a
23    government supervisor responsible for work just,
24    okay.
25                Hopefully, I laid that out.  I mean,
```

```
 1    that's what I was thinking.
 2         Q.    So before your meeting with Dr. Gill
 3    on April 3rd with Mr. Picardo and potentially an
 4    additional person, was Dr. Gill getting her work
 5    done?
 6         A.    Yes.  I had no reason to think that
 7    she wasn't.
 8         Q.    Okay.
 9               So when we go back and we take a
10    look at Exhibit No. 16, which we reviewed earlier
11    today, you can bring it back up on the screen.
12               You said that you marked on this
13    page fully successful.
14               MS. BOUTELLE:  Objection.  Asked and
15         answered.
16               MR. BEARMAN:  Right.
17         Q.    You said this and this was dated
18    April 10th of 2019.
19               So up until that point, at least
20    until April 10th of 2019, you thought she was a
21    fully successful employee, correct?
22         A.    Can you scroll, scroll up a minute,
23    please.
24         Q.    Yes, sir.
25         A.    Okay.  Then scroll down for a
```

```
 1   second.  I just wanted to clarify, is what you're

 2   showing me here the annual or is this the mid

 3   year assessment?

 4          Q.    So, as we reviewed earlier, this is

 5   performance cycle covered by this performance

 6   plan October 1, 2018 to September 30, 2019.

 7          A.    Yeah, yeah, okay.  Good.

 8          Q.    And you said --

 9          A.    Fully successful.  Yes, sir.  Oh,

10   there's --

11          Q.    And then --

12          A.    Another annual, fully successful,

13   right.

14          Q.    Right.

15                So on January 27th of 2020,

16   according to this document that we validated

17   earlier, USA Gill 1035 you marked annual rating

18   of record fully successful, correct?

19          A.    Correct.

20          Q.    So now you're telling me that Edith

21   Bean at some unknown time frame, maybe spring or

22   summer you said came to you with this

23   information, and you just described to me that I

24   need to make sure my employee, I'm paraphrasing

25   for a moment, you wanted to make sure your
```

```
 1   employee gets their work done it; but according

 2   to your performance review she was fully

 3   successful, wasn't she?

 4            MS. BOUTELLE:  Objection.  Misstates

 5      testimony.

 6      Q.    Go ahead and answer, sir.

 7      A.    So it was in the context of

 8   information that the employee was saying that she

 9   could not -- she could not interact with people.

10            So I had that information in my mind

11   that I've got an employee that just said they

12   can't work with people; and it seems to be, it

13   seems I, you know, we've got instances where she

14   appears to be effectively interacting with

15   people.

16            So, you know, the tension there

17   between the two is something that I sought

18   guidance on that, okay.  I've got something that

19   says this, you know.  That she's, she's not able

20   to interact; and then I have an employee that

21   said, hey, go check -- you probably need to check

22   this out.  That website indicates that she was

23   effectively interacting with people.

24            So, you know, I was trying to

25   reconcile that situation.
```

1   part of a, to visit the staff, the Tricare staff

2   and when that was I don't know.  I don't know the

3   exact date, but it was during my period as either

4   acting chief or chief of Tricare plan.

5        Q.    So you had a visit before the

6   meeting with Dr. Gill on April 3rd --

7        A.    Yes.

8        Q.    '19?

9              And in that visit did you inquire

10  about the VA Tricare liaison?

11       A.    Did I inquire, no, but I think as I

12  toured as part of that was, as I remember, part

13  of was just to walk around the office; and I do

14  remember saying, hey, this is for, we've got a VA

15  rep in there is what I remember, and I don't know

16  if Allison was there or not.  I can't remember.

17       Q.    When you were at -- when you were

18  the chief or assistant chief on that visit to San

19  Diego, so we have to think back to that time,

20  what did you know about the job or what the

21  Tricare VA liaison did in that office?

22       A.    You know, I don't think much.  I

23  did, I did, obviously, did not know as much until

24  I became their direct supervisor what the Tricare

25  liaison did, but there were because my office was

```
 1   in the D.C. area, and I do remember meeting Edie

 2   Bean because she had an office space that she was

 3   at sometimes in my office area.

 4              I do remember meeting her while I

 5   was functioning as the chief of Tricare, so, you

 6   know.

 7              You know, did I know what the

 8   Tricare, the VA Tricare liaisons specifically did

 9   when I visited, I would say I didn't have a full

10   understanding of what they did, no.

11        Q.    Well, at that time, what was your

12   understanding of what they did?

13        A.    Oh, yeah, I would assume it was as

14   the name suggests, if there were any issues that

15   the Tricare plan had with the VA, they would

16   function as the liaison between the two

17   departments and work through those because the VA

18   is part of the Tricare health care health plan

19   network.

20              So they would help us resolve any

21   issues that related to that.

22        Q.    Did you ever observe Dr. Gill

23   liaising with the DOD in the San Diego office?

24        A.    I mean, I think I -- personally, no.

25   As I just recounted to you that my visit was kind
```

1        A.      Again, my reaction was, hey, wait a

2    minute.  I thought interacting with people was

3    problematic and what I saw was, was not that and,

4    and, that was my first reaction.

5              Hey, wait a minute.  Allison seems

6    to be, you know, pretty good at, at standing on a

7    stage in front of people, which I get nervous,

8    you know, well, anyways.

9              She seemed to be pretty good at

10   that, and yet I'm being told reasonable

11   accommodation is needed because I know we already

12   addressed this, but my memory is that one of the

13   limitations was that, you know, the interaction

14   with the people was problematic or not

15   problematic.  There were challenges with

16   interactions with people.  So that's what I

17   thought, so.

18       Q.      Were you aware that she had done

19   stand up comedy for many, many years while

20   working at the VA?

21       A.      So that was something Carol I think

22   told me.  She might, she might have mentioned

23   that on the trip to San Diego that she, that

24   Allison I think they were good friends, Carol and

25   Allison.  I think on that trip she said she did,

```
 1        A.    Yes.

 2        Q.    What, what, what do you remember is

 3   the cause of Dr. Gill's PTSD?

 4        A.    From what I remember it was sexual

 5   trauma.

 6        Q.    That's the only part of it that you

 7   remember?  Was she in San Diego?  Was she surfing

 8   in Hawaii?

 9        A.    No.

10        Q.    Yeah.

11        A.    No, I think, I think it was her time

12   in the service that, that something occurred, you

13   know, or occurred to her and that's my

14   understanding.  That's what I know about it.

15        Q.    And that's all you can recall at

16   this time?

17        A.    It is.  It's all I can recall.  I

18   believe it was, I believe Allison was in the

19   Navy, I think, and it happened while she was in

20   the Navy and, yeah, that's what I know about it.

21        Q.    Okay.

22              I'm going to introduce in to the

23   record Exhibit No. 31.  This is a seven-page

24   document.  It is Bates stamped USA_Gill_000311,

25   and that goes through 317.
```

PATRICK GRADY                                    JOB NO. 1302869
DECEMBER 05, 2024

1              At the top it is dated 8,

2    August 2019, and it is captioned Fact

3    Finding/Employee:  Allison Gill/6 August 2019

4    Conducted by her Supervisor:  Patrick W. Grady.

5              (Plaintiff's Exhibit 31 marked for

6    identification.)

7         Q.    Sir, do you recognize this document?

8         A.    I do, yes.

9         Q.    What is this document?

10        A.    Yeah, I think these were the notes

11   from the discussion I had with Allison about, you

12   know, obtaining additional information about the,

13   about the situation there.

14        Q.    Okay.

15              So question one says, "Ask.  You

16   provided physical limitation for justification

17   for FMLA and RA consideration."

18              Does that mean that you asked her

19   that question?

20        A.    That's what I remember.  That would

21   be the first question I asked her.

22        Q.    Okay.

23              In her answer here did she say that

24   she couldn't work with people?

25              MS. BOUTELLE:  I'm going to object

**Exhibit C**
**Page 082**

1         to the extent the document speaks for

2         itself, but you can answer.

3         A.      Yeah, I mean, so if you look at

4    that, it's been, what, since 2019, but I'm

5    looking at bullet A under one it says inability

6    to concentrate, focus, speak and interact with

7    others.  So I, you know, I would say, to answer

8    your question, you interact with people.

9         Q.      Okay.

10        So let's read the third sentence of

11   what you wrote for her answer: "She stated she's

12   not able to be in the office," so, and then you

13   listed three limitations and asked her to confirm

14   that these were, indeed, her limitations.

15        So bullet point A is addressing that

16   she stated she's not able to be in the office,

17   does it not?

18        A.      I would assume that would be the

19   rationale for not being able to be in the office,

20   but, I mean, these were the limitations that were

21   provided to me as her supervisor.

22        So I've got an employee that has

23   these limitations to do the work assigned, so.

24        Q.      So you, if I have this correct, you

25   sat down and met with her in one form or another,

1   to answer that, but I was given these

2   limitations.  I'm, I'm, I'm interested in her

3   performing functions in the office, which she

4   then did on Mueller, She Wrote.

5               Again, I've attempted to explain how

6   I, how I and others I think that were advising me

7   saw the disconnect.

8               She was clearly able to speak and

9   interact with others in this setting but not able

10   to do it here.  That's, that's, that's kind of

11   the framework that I had.

12       Q.    So I'll depose those others later.

13               You and I are talking today, and I'm

14   asking for your thoughts, your personal

15   observances about what happened here, and earlier

16   you said I had to investigate because she

17   couldn't work with people.

18               You never qualified that, and here

19   it says that she said she's not able to be in the

20   office, and then these are the limitations

21   regarding her saying she's not able to be in the

22   office.

23               Do you see the difference between

24   interacting with people in the office and

25   interacting with people?

PATRICK GRADY                                    JOB NO. 1302869
DECEMBER 05, 2024

```
 1   Limitations.  She didn't respond with specifics.
 2   She stated she's not able to be in the office,
 3   and then you listed three limitations and asked
 4   her to confirm that these were, indeed, her
 5   limitations.
 6                 So you were talking about her
 7   physical limitations in the office, and this is
 8   the only place where it says, inability to
 9   concentrate, focus, speak and interact with
10   others, yet you're justifying an investigation of
11   her personal time, her personal activities, by
12   saying, you know, she can't interact with people
13   without any limitation and saying how do I
14   reconcile that.
15                 Well, what are you basing she can't
16   interact with people on?
17                 That's a very, very broad statement.
18    Here it's very specific.
19                 So why -- on what basis are you
20   saying she can't interact with people?
21        A.    The basis of the first bullet there
22   that says inability to concentrate, focus, speak
23   and interact with others, so I supplant the word
24   "others" with people.
25        Q.    Right, and that's in the context of
```

PATRICK GRADY                                             JOB NO. 1302869
DECEMBER 05, 2024

1   included what I was tracking at the time, these

2   three things that I understood that she was --

3   there was this difficulty there with her

4   interacting with others.  That's all.

5                   And that's, that's, again, what

6   prompted this, this discussion that I captured in

7   these notes that you now see, so.

8                   I'm sorry.  I don't -- I think I'm

9   answering your question and maybe I'm not.  I'm

10  sorry, but that's --

11      Q.     It's not answering my question.

12                  On what basis did you find it

13  appropriate to investigate Dr. Gill's personal

14  time?

15                  MS. BOUTELLE:  I'm going to object

16      that this asked and answered again.  You

17      can try to answer it again, Mr. Grady.

18      A.     Yeah.  So I was, I was told by one

19  of my employees that you should look into this

20  and I did, and it was, again, knowing, knowing

21  the limitations that I understood, I just saw a,

22  you know, there appears to be the employee's

23  ability to do this here but not here.

24                  I didn't stop there.  I then sought

25  advice from others and they thought that, thought

PATRICK GRADY                                              JOB NO. 1302869
DECEMBER 05, 2024

```
1    that as well.  So it was a reasonable kind of
2    okay, you know.  All right.
3              So that's why they directed me to,
4    okay, have a discussion, conduct the
5    investigation and see what additional information
6    you could obtain.  That's, that's that, yup.
7         Q.    Number 2, when did those
8    restrictions limitations begin?  Your note says
9    April started, continued since April.
10             Are there aspects of this you didn't
11   take notes on?
12        A.    I, I don't remember the note, every
13   word that was mentioned in the conversation.  I
14   would assume I captured the essence of what was
15   talked about in these, in these areas.
16        Q.    Did Dr. Gill tell you that it was
17   because of her meeting with you and Mr. Picardo
18   when you told her her job was being moved to
19   Washington, D.C. and it was happening on October
20   1st of 2019.
21             Did she tell you that?
22        A.    She may have.  I don't remember.
23        Q.    So if she may have, if she did,
24   which according to her testimony she did, isn't
25   that an important fact?
```

```
 1   her the job was being moved she may have told you
 2   that that's what triggered her PTSD, correct?
 3        A.    I don't remember.  It could have
 4   been.  Again, this is a conversation that
 5   happened four or five years.  I don't --
 6        Q.    Well, if nobody has ever told you
 7   that the had PTSD, and this is your first time,
 8   maybe it would be something that's memorable, I
 9   think.
10              Do you agree?
11        A.    You know, yes.  I mean, I'm not
12   saying that Allison didn't tell me.  I just can't
13   remember specifically, you know, what words, if
14   she used to describe that, and she -- I'm not
15   saying she didn't.  She probably, she probably
16   could have.
17              I just -- they're not in these
18   notes, which doesn't encapsualize every word that
19   was mentioned in that meeting but she couldn't
20   have.
21        Q.    And then number three says you
22   directed her to the following web pages, and the
23   first one that you sent to was Mueller, She
24   Wrote.com.  I'm not going it read the full URL.
25   I think we all understand when -- I'm going to
```

1    event happened in May, that she -- as you went

2    over the timeline.  I agree with that, and then

3    this was placed in there; but this was based on

4    the fact that she was not at work for a period of

5    time without an explanation.

6               And so, you know, as you're issuing

7    100 percent telework, how do you ensure a

8    government employee is responsive to the work

9    when they've demonstrated that they've been

10   absent from work.

11              So again, I'm sorry.  That's how I

12   would respond to that.

13        Q.    Does that demonstrate a single

14   instance qualifies as demonstrating to you?

15        A.    It happened.  So it does demonstrate

16   that there was an occasion in my short history as

17   being in the office that an employee didn't show

18   up for a meeting and didn't let me know; and so I

19   had to reach out and find out what's going on,

20   you know.

21        Q.    Did you ever check her prior job

22   evaluations, her being Dr. Gill in her position

23   at the VA?

24        A.    Her position at this VA, so in the

25   evaluation system there would have been -- I

PATRICK GRADY
DECEMBER 05, 2024

JOB NO. 1302869

1  would assume there's previous evaluations there,

2  so I don't know.  I may have.  I don't know.

3          Q.    So you don't recall if -- when this

4  happened on May 9th, you didn't think to

5  yourself, gee, I wonder if this has happened

6  before?  That didn't happen to you?

7          A.    I don't know if that realization

8  came to my mind or not.  I know it just happened.

9  So I was trying to deal with it then.

10         Q.    But doesn't a prior performance

11  evaluation provide information that would tell

12  you that this is a problem that's been talked

13  about with her supervisor before?

14         A.    It could but not always.  I don't,

15  you know, I don't think every incident is

16  captured in an annual performance write-up.

17         Q.    So did you check her discipline

18  record in the VA?

19         A.    I don't, I don't know what that is,

20  discipline record.  I don't think there's a

21  separate system that tracks discipline.

22         Q.    Oh, would it be in her employee

23  file?

24         A.    I would think so.  I don't know if

25  that's still in the office or not.

PATRICK GRADY
DECEMBER 05, 2024                                                JOB NO. 1302869

1    comfortable using, you know, good vocabulary with

2    you if that's okay.

3            So this was just a neutral objective

4    analysis even though May 9th played a big

5    decision or big part, I'm slightly paraphrasing

6    here, and you didn't check any other discipline

7    records on Dr. Gill; is that accurate?

8        A.    To the best of my knowledge, I, I

9    wasn't aware of any other discipline that Allison

10   had.  Yeah, I just wasn't aware of that.

11       Q.    So a single incident on May 9th was

12   a major part of you deciding to implement or

13   offer or sign this list on August 12th; is that

14   accurate?

15       A.    That, that would be accurate.

16       Q.    But you felt -- was your feeling

17   neutral regarding Dr. Gill?

18       A.    So it was a situation -- I don't

19   want to -- in your description of me being

20   evasive, I'm just trying to remember that back

21   then; and when you talk about feelings and

22   things, I, you know, I can't recollect

23   day-to-day, you know, the feelings.

24            All I know I was faced with a

25   situation where I knew of an occasion where the

```
 1    employee wasn't responsive.

 2                 Now we're generating an allowance

 3    for the employee to be 100 percent virtual, which

 4    is in the environment where responsiveness issue

 5    was, you know, happened.

 6                 I was given the examples, took those

 7    examples and put those forwarded to a frame that

 8    telework agreement in a way that had been shown

 9    in the department that others had used for

10    similar occasions.

11                 So that's, that's how it happened;

12    that's what I remember, you know.

13         Q.    Now I'm asking about your emotion.

14    How you felt.  What you felt.

15                 I believe you're, you know, a flesh

16    and blood human being; is that accurate?

17         A.    Yes.

18         Q.    You're a flesh and blood human being

19    and you have feelings and emotions; is that

20    correct, in general?

21         A.    Yes, yes.

22         Q.    So you had feelings and emotions

23    around this telework and these restrictions that

24    you signed on August 12th.

25                 What were those?
```

PATRICK GRADY
DECEMBER 05, 2024                                                JOB NO. 1302869

```
 1        A.     You know, it was probably

 2   frustrating that I, you know.  I had to do that

 3   on top of all the, you know, the other

 4   responsibilities of the day.  So there was

 5   probably an element of frustration then.

 6              It required the additional work to

 7   do and, yeah, so I think if you're looking for an

 8   emotion, I don't know if frustration would be

 9   characterized as an emotion but a feeling.  Yeah,

10   I mean, I was likely frustrated that that was

11   required and necessary.

12        Q.     Right.

13              Out of that frustration feeling, did

14   that direct any of your actions toward Dr. Gill

15   at that time?

16        A.     I was just trying to do, again, I

17   was trying to do things in accord with what I was

18   supposed to do as a supervisor and not exceed

19   that; and, again, leveraging expertise to help me

20   do that, frame it in a way there wasn't out of

21   bounds but addressed the situation that, you

22   know, how do we issue 100 percent virtual, you

23   know.  What are the guidelines that we ought to

24   provide the employee, and Pamela offered those

25   examples that from her experience other VA
```

 1   maybe he's suggesting that he, maybe I understood

 2   that he wanted people to use Skype.

 3          Q.     Okay.

 4                 Let's look at this line:  "Is this

 5   just a shotgun blast to your folks or are you

 6   having an issue with someone?"

 7                 Was it just the shotgun blast to

 8   your folks or were you having an issue with

 9   someone?

10          A.     So, as I remember, OGC, so after I

11   provided these guidelines to Allison, OCG

12   recommended, okay, well, you probably ought to do

13   it for your whole team.  So that's, that's how

14   this happened.

15          Q.     Let me make sure I understand what

16   you just told me.

17          A.     Yeah.

18          Q.     So you did them, these, this list of

19   13, let's just call it that, the list of 13.

20          A.     Yes.

21          Q.     The list of 13 was only for Allison

22   Gill when you signed it on August 12th; is that

23   correct, 2019?

24          A.     That's right.  She was the only one

25   on it at the time.

 1      A.    I don't remember any other reason

 2   other than being consistent in that.  I think

 3   that's, that's, that's the way the OGC couched

 4   it, as I remember, yeah.

 5      Q.    Is there a problem with being

 6   inconsistent with it at that time?

 7      A.    Well, I had Allison on one side of

 8   requirements and then the others, the ones that

 9   were in place during that time period for all the

10   employees, so.

11      Q.    So before you signed the August 12th

12   document with the list of 13 for Allison Gill,

13   did OGC know that you were only sending that to

14   Dr. Gill?

15      A.    I don't remember OGC's specific role

16   in that.  I think -- I don't know the answer to

17   that question.

18      Q.    Well, earlier you did testify under

19   oath here that you had many meetings whether it

20   was just on the telephone, in person, web

21   conference, whatever, with OGC as you were

22   creating the list.

23            So in any of those conversations do

24   you recall bringing up that this was only being

25   sent to Dr. Gill?

 1        A.      So I, I thought I explained it I

 2    worked with Pamela to generate those things.

 3              OGC might have been involved in the

 4    review of those, but it was Pamela because she

 5    was the one with the reasonable accommodations

 6    that provided examples of that.

 7              When OGC became aware of, well, you

 8    didn't have these same restrictions or guidelines

 9    to all MSO employees, I, I would submit that that

10    conversation happened after that, those

11    requirements were issued to Allison.

12              I don't know if Angela was involved

13    specifically on the generation of these because,

14    again, these were templated things that I got.

15              She would have been aware, in my

16    opinion, she would have been aware that we were

17    doing the combination; but I can't remember to

18    what extent Angela, the lawyer, would have been

19    aware specifically of these, of these 13, 12 or

20    13.

21        Q.      Right.

22              We'll, call it the list of 13

23    because it was A through M and it goes 1 through

24    13, correct?

25        A.      Right, yeah, yeah.

**Exhibit C**
**Page 096**

PATRICK GRADY                                          JOB NO. 1302869
DECEMBER 05, 2024

```
 1          Q.      So I want to make sure that I

 2    understand something.

 3                  You created the list that you signed

 4    on August 12th where Dr. Gill's, they call it the

 5    incident on May 9th, was a major or substantial

 6    factor, is that, is that part accurate?  You said

 7    that a little while ago.

 8          A.      Yes, yes.

 9          Q.      And then, so something that you

10    created specifically for Dr. Gill because of an

11    incident that happened on May 9th then had to be

12    sent to everyone on August 20th.

13                  Do I have that right?

14          A.      It sounds right to me.

15          Q.      Now, again, I'm asking for your

16    personal thoughts and feelings.

17                  Did you at that time when OGC said

18    you have to send this to everyone, did you think

19    or feel that OGC was saying that as a, I'll use a

20    three letter acronym now, my turn, CYA, to cover

21    your tokus, after sending this only to Allison

22    Gill?

23          A.      No, I -- it could be to address the

24    consistency thing.  Maybe they saw that as an

25    issue.  So, to answer your question, probably
```

1   regarding the next steps in that process.  Can

2   you please let me know when I can expect to

3   receive that notice."

4                   So do you understand that first

5   paragraph that I read to mean that she did not

6   accept the additional telework restrictions that

7   we looked at in Exhibit 29?

8        A.     Yes.

9        Q.     So your next email in reply to Dr.

10  Gill was Tuesday August 20th at 06 -- I don't

11  even remember how to say 6:04 a.m. anymore.  I'm

12  tired.

13                  And it says, "Miss Gill, despite

14  your claim that management is harassing you by

15  setting certain parameters associated with

16  granting you 100 percent telework, as an interim

17  accommodation, such is not the case.  The

18  requirements set forth as to your telework

19  agreement are simply to ensure that you are

20  available during your core work hours and are

21  available to meet the client's needs."

22                  So that was Tuesday morning in reply

23  to Dr. Gill's email.

24                  Is this an accurate representation

25  of your position at that time?

```
 1        A.     It was.

 2        Q.     Were you frustrated that she was

 3   refusing the list of 13?

 4        A.     It was just the next step in the

 5   process, so.

 6        Q.     Wasn't it more paperwork though that

 7   you would have to do now by that rejection?

 8        A.     I mean, there's certainly more

 9   things to do, but I guess I didn't perceive it as

10   harassing, as I put forward there; but if you're

11   asking for how I felt, yeah, I mean, the, the

12   allowance, for the 100 percent telework and I

13   then my attempt to explain why those additional

14   requirements were placed on the telework

15   agreement was just as I stated here, hey, we just

16   need to make sure you're there available for

17   work.

18        Q.     So that was the only reason the

19   requirements were set forth was to simply ensure

20   that she was available during her core work

21   hours?  There was no other reason?

22        A.     That, that, you know, that's -- what

23   was my intent, you know?  To grant 100 percent

24   telework.  What were the additional requirements

25   that were put in place and then that's what,
```

PATRICK GRADY
DECEMBER 05, 2024

JOB NO. 1302869

```
1   again, being advised, this is the right, right
2   approach to pursue here to go forward with 100
3   percent telework, so.
4        Q.    Sorry, sorry, please, please.
5        A.    No, no.  I was paused.  You probably
6   thought I was done.
7             That simply was, yeah, maybe not,
8   maybe not the word I probably should have used
9   there, but.
10       Q.    So, so when you look at this email
11  today you don't agree with the use of the word
12  "simply"?
13       A.    Yeah, probably not, no.
14       Q.    So there was more to it than just to
15  ensure that she was available during her core
16  work hours and was available to meet the client's
17  need?
18       A.    No, I'm not suggesting that.  I
19  think that is, you know, I think I keep going
20  back on the same ground that I've already shared
21  before, but, again, there was an incident, as you
22  called it.  We granted 100 percent telework.
23            Knowing that there was an incident
24  in those discussions, it was recommended, okay,
25  well, here are the things that you could put in
```

Exhibit C
Page 100

```
 1   there.  I agree to them and sign off on it and
 2   that's how it went down as I remember.
 3         Q.     And earlier you said that, like, the
 4   additional paperwork was frustrating to you,
 5   right?
 6         A.     No, I think you asked for, you know,
 7   you asked for an emotion or feeling, so that I
 8   think it's a reasonable response, yeah.
 9               I understand it's my duty.  I got it
10   and yeah, needed.  It was needed, but given the
11   situation that, that was -- I'm sorry.  That was
12   the, yeah, I don't even know how to finish that
13   part of that sentence but sorry.
14         Q.     Perfectly fine, but you just said it
15   was needed.
16               So there was no other way to
17   implement a functional set of requirements other
18   than these 13 in your, in your decision at that
19   time?  That was the only way to accomplish this;
20   is that correct?
21         A.     That's how it happened, yes.
22         Q.     Well, how it happened is a passive
23   statement, right?
24               So either you thought, yeah, this
25   is, this is what is needed and there wasn't
```

PATRICK GRADY
DECEMBER 05, 2024                                    JOB NO. 1302869

1    another way to do this and it needed to be this

2    strict, correct?

3            A.      Correct, correct.

4            Q.      And it needed to be that strict

5    because this May 9th incident, you were

6    frustrated and did you want to give a little

7    extra squeeze, meaning, it could have been seven

8    rings on the phone, couldn't it have been instead

9    of five?

10           A.      Sure.  It could have been seven.

11           Q.      Right.

12                   But you didn't choose seven.  You

13   chose five, right?

14           A.      Five was chosen, yes.

15           Q.      Because five is a little, that's

16   tougher to answer in five rings than seven,

17   right?

18           A.      Five is less than seven, yes.

19           Q.      Is it tougher to answer a phone in

20   five rings than seven, for example, if I've

21   stepped across the room for a moment?

22           A.      Yes, I would agree with you.

23           Q.      After you received this email from

24   Dr. Gill on Monday, August 19, 2019 at 4:33 p.m.

25   when she did not agree to the additional terms,

**VA** Department of Veterans Affairs

## EXECUTIVE CAREER FIELD (ECF) PERFORMANCE APPRAISAL PROGRAM
### VETERANS HEALTH ADMINISTRATION (VHA)

### PERFORMANCE PLAN AND APPRAISAL OF

| EMPLOYEE'S NAME *(Last, First, Middle Initial)*<br><br>Gill, Allison M. | POSITION TITLE, SERIES AND NUMBER<br>Health Systems Specialist GS-0671 | GRADE/SALARY<br>GS-14 Step 3<br>$121,907 |
|---|---|---|

| DEPARTMENT/OFFICE<br>VA/DoD Medical Sharing Office 10P5C | LOCATION<br>TRICARE Health Plan West<br>401 West A Street Ste 2100<br>San Diego, CA 92101 |
|---|---|

| DATE ASSIGNED PRESENT POSITION<br>07/26/2015 *(MM/DD/YYYY)* | PERFORMANCE CYCLE COVERED BY THIS PERFORMANCE PLAN<br>*(MM/DD/YYYY)* FROM 10/01/2018 TO *(MM/DD/YYYY)* 09/30/2019 |
|---|---|

### SECTION A - PERFORMANCE PLAN

Identify the elements (critical, non-critical, and additional) and performance standards for the position to be rated. Critical elements (i.e., those elements which contribute towards accomplishing organizational goals and objectives and are of such importance that unacceptable performance of them would result in unacceptable performance in the position) are to be identified with an asterisk. Each position must have at least one critical element and one non-critical element. Performance standards are statements of the individual's expectations and organizational expectations or requirements established by management for each element. There are usually three to five performance standards for each element. Attach Performance Plan.

### PERFORMANCE PLAN COMMUNICATED

| DATE COMMUNICATED<br>11/29/2108 | SIGNATURE OF RATER<br>Alejandro Barberena 209486<br>Digitally signed by Alejandro Barberena 209486<br>Date: 2018.11.28 21:24:41 -05'00' | SIGNATURE OF EMPLOYEE<br>Allison M. Gill 135249<br>Digitally signed by Allison M. Gill 135249<br>Date: 2018.11.28 16:45:25 -08'00' |
|---|---|---|

### CHANGES TO PERFORMANCE PLAN

Attach changes to Performance Plan. Changes may be recorded anytime during the rating period. Communication of changes must be documented.

| DATE COMMUNICATED | SIGNATURE OF RATER | SIGNATURE OF EMPLOYEE |
|---|---|---|
| | | |

### SECTION B - PROGRESS REVIEW

At least one progress review is required during the appraisal year. Employee must be informed of his/her level of performance as measured against the performance plan.

A performance review was conducted and discussed, and the employee's performance as of this date:

☒ Is considered Fully Successful or better.

☐ Needs improvement to be Fully Successful or better.

| SIGNATURE OF RATER<br>Patrick W Grady 1750246<br>Digitally signed by Patrick W Grady 1750246<br>Date: 2019.04.10 15:35:16 -04'00' | DATE<br>04/10/2019 |
|---|---|
| SIGNATURE OF EMPLOYEE<br>Allison M. Gill 135249<br>Digitally signed by Allison M. Gill 135249<br>Date: 2019.04.10 12:45:46 -07'00' | DATE<br>04/10/2019 |

COMMENTS
The Director, Medical Sharing Office, Mr. Alejandro Barberena retired on February 9, 2019. On February 17, 2019, Mr. Patrick Grady was selected as the Director, Medical Sharing Office. Mr. Grady will perform the staff's mid-year review and final rating at the end of FY 2019.

VA FORM
JUN 2011 **3482e**    SUPERSEDES VA FORM 3482e, SEP 2008.
WHICH WILL NOT BE USED

**Exhibit C**
USA Page 1001033

## SECTION C - ACTUAL ACHIEVEMENT

Indicate the single, overall level of achievement that best describes the employee's performance for each ELEMENT shown in Section A. Do not indicate achievement for each individual standard. Specific examples of performance must be provided in the space below for each element where a level of achievement other than Fully Successful has been assigned. **Assignment of the Exceptional level means that Fully Successful performance standards have been significantly surpassed. This level is reserved for employees whose performance in the element far exceeds normal expectations and results in major contributions to the accomplishment of organizational goals.**

| ELEMENTS *(Use the same keyword description for each element as in Section A)* | *INDICATES CRITICAL ELEMENT | LEVELS OF ACHIEVEMENT | | |
|---|---|---|---|---|
| | | EXCEPTIONAL | FULLY SUCCESSFUL | UNACCEPTABLE |
| Change Management (10%: non-critical) | ☐ | ☐ | ☒ | ☐ |
| Innovation and Creativity (10%: non-critical) | ☐ | ☐ | ☒ | ☐ |
| Professional Accountability (30%: critical) | ☒ | ☐ | ☒ | ☐ |
| Customer Service (20%: critical) | ☒ | ☐ | ☒ | ☐ |
| Business Results (30%: critical) | ☒ | ☐ | ☒ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ | ☐ |

Describe specific examples of performance for each element where a level of achievement other than Fully Successful has been assigned. Specific achievements at the Fully Successful level may also be described.

ELEMENTS/ACHIEVEMENT(S)

This section may also be used to describe significant accomplishments not otherwise described in the appraisal, to comment on the potential for higher level positions, and/or to document VHA Personal Development Plans. Append additional pages as necessary.

VA FORM 3482e, JUN 2011                    2

**Exhibit C**
USA PageID.1034

## SECTION D - SUMMARY RATING

TYPE OF RATING

☒ ANNUAL RATING OF RECORD    ☐ SPECIAL RATING (Position Changes - Employee or Rater)

PERIOD COVERED BY THIS APPRAISAL

FROM    10/01/2018    *(MM/DD/YYYY)*    TO    09/30/2019    *(MM/DD/YYYY)*

**NOTE: Performance Rating** - Using achievement levels assigned in Section C (excluding additional elements if used) and the criteria described below, check the appropriate rating.

PERFORMANCE RATING

☐ **OUTSTANDING** - Achievement levels for all elements are designated as Exceptional.

☐ **EXCELLENT** - Achievement levels for all critical elements are designated as Exceptional. Achievement levels for noncritical elements are designated as at least Fully Successful. Some, but not all, noncritical elements may be designated as Exceptional.

☒ **FULLY SUCCESSFUL** - The achievement level for at least one critical element is designated as Fully Successful. Achievement levels for other critical and noncritical elements are designated as at least Fully Successful or higher.

☐ **MINIMALLY SATISFACTORY** - Achievement levels for all critical elements are designated as at least Fully Successful. However, the achievement level(s) for one (or more) noncritical elements is (are) designated as Unacceptable.

☐ **UNACCEPTABLE** - The achievement level(s) for one (or more) critical element(s) is (are) designated as Unacceptable.

| SIGNATURE OF RATER | TITLE OF RATER | DATE *(MM/DD/YYYY)* |
|---|---|---|
| Patrick W Grady 1750246 | Director, Medical Sharing Office | 01/27/2020 |

### SECTION E - HIGHER LEVEL APPROVAL

*NOTE: Required only for Minimally Satisfactory and Unacceptable ratings of record.*

☐ Concur with recommended rating.

☐ Do not concur with rating. Approve rating of: _____ .

BASIS FOR PERFORMANCE RATING CHANGE

| SIGNATURE AND TITLE OF APPROVING OFFICIAL | | DATE *(MM/DD/YYYY)* |
|---|---|---|
| A copy of this performance appraisal was given to me. ▶ | SIGNATURE OF EMPLOYEE  Employee unavailable  For Signature | DATE *(MM/DD/YYYY)* |

VA FORM 3482e, JUN 2011

3

**Exhibit C**
USA_Page_001035

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| GILL, ALLISON M | | 01/20/1974 | 12/10/2018 |

| **FIRST ACTION** | | **SECOND ACTION** | |
|---|---|---|---|
| 5–A. Code **840** | 5–B. Nature of Action **INDIVIDUAL CASH AWARD RB** | 6–A. Code | 6–B. Nature of Action |
| 5–C. Code | 5–D. Legal Authority | 6–C. Code | 6–D. Legal Authority |
| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | HLTH SYS SPEC /SA/DIR/ PD: 01791A POSITION: 91317110 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | $750.00 | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | VETERANS HEALTH ADMINISTRATION VA/DOD HEALTH AFFAIRS WASHINGTON DC USA |

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 – None    3 – 10-Point/Disability    5 – 10-Point/Other<br>2 – 5-Point    4 – 10-Point/Compensable    6 – 10-Point/Compensable/30%<br>**6** | 0 – None    2 – Conditional<br>1 – Permanent    3 – Indefinite<br>**1** | | **X** YES    NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| **C0    BASIC ONLY** | **9    NOT APPLICABLE** | **0    REGULAR RATE** |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| **K    FERS AND FICA** | **06/19/2007** | **F    FULL TIME** | |

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 – Competitive Service    3 – SES General<br>2 – Excepted Service    4 – SES Career Reserved<br>**1** | **E**    E – Exempt<br>N – Nonexempt | **8009-0206** | **8888** |

| 38. Duty Station Code **06-3260-073** | 39. Duty Station (City – County – State or Overseas Location) **SAN DIEGO-HRSS    CA** |
|---|---|

| 40. Agency Data **101RX** | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks

| 46. Employing Department or Agency **DEPARTMENT OF VETERANS AFFAIRS** | 50. Signature/Authentication and Title of Approving Official **ELECTRONICALLY SIGNED BY:** |
|---|---|
| 47. Agency Code **VATA** | 48. Personnel Office ID **1250** | 49. Approval Date **12/18/2018** | **MATTHEW CARPENTER**<br>**HUMAN RESOURCES OFFICER** |

5–Part 50-316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540–01–333–6238

OMB Number: 2900-0767
Respondent Burden: 10 minutes

**VA** Department of Veterans Affairs

## WRITTEN CONFIRMATION OF REQUEST FOR ACCOMMODATION

An oral request from an employee is sufficient to begin the reasonable accommodation process. Completion of this form is voluntary. However, individuals who have requested an accommodation are asked to fill out this form for record-keeping purposes.

The Paperwork Reduction Act (PRA) of 1995 requires us to notify you that this information collection is in accordance with the clearance requirements of Section 3507 of the PRA. We cannot sponsor or require you to respond to a collection of information unless it displays a valid OMB number. We anticipate that the time expended by all individuals who must complete this form will average ten minutes including the time it will take to read the instructions, gather the necessary facts, and fill out the form.

Privacy Act Information: The information requested on this form is solicited under the authority of Executive Order 13164 that requires the collection of data that will allow measurement and evaluation of the efficiency and appropriateness of the actions taken by the Department of Veterans Affairs in processing accommodation requests. Information from the data collection will become part of a System of Records that complies with the Privacy Act of 1974. This System of Records is identified as "Reasonable Accommodation Processing Records" as set forth in the Compilation of Privacy Act issuances via online GPO access at http://www.gpoaccess.gov/privacyact/index.html.

If you need assistance in completing this form, please contact the Local Reasonable Accommodation Coordinator.

| 1. NAME OF EMPLOYEE | 2. PHONE NUMBER OF EMPLOYEE *(Include Area Code)* | 3. DATE OF REQUEST | 4. TODAY'S DATE |
|---|---|---|---|
| ALLISON MARIE GILL | 619-665-2254 | 04/29/2019 | 05/06/2019 |

| 5. EMAIL ADDRESS OF EMPLOYEE | 6. OFFICE OF EMPLOYEE |
|---|---|
| ALLISON.GILL@VA.GOV | MEDICAL SHARING OFFICE |

| 7. SUPERVISOR'S NAME | 8. SUPERVISOR'S PHONE NUMBER |
|---|---|
| PATRICK W. GRADY | 202-461-4060 |

**9. ACCOMMODATION REQUESTED** *(Be as specific as possible)*

PERMANENT TELEWORK. POSITION IS TELEWORK APPROVED.

**10. REASON FOR REQUEST**

MODERATE TO SEVERE PTSD SYMPTOMS INCLUDING PANIC ATTACKS, HIGH BLOOD PRESSURE, AND INSOMNIA ARE TRIGGERED BY THE OFFICE ENVIRONMENT

**11. IF ACCOMMODATION IS TIME SENSITIVE, PLEASE EXPLAIN BELOW**

YES. IMMIDIATE INTERIM TELEWORK WAS REQUESTED 4/29/2019 DUE TO THE SEVERE NATURE OF THE ISSUE, HOWEVER ONLY ONE ADDITIONAL TELEWORK DAY PER WEEK WAS APPROVED AND THERE HAS BEEN NO RULING ON THE INTERIM REQUEST. EMPLOYEE IS STILL IN OFFICE WHICH IS EXACERBATING THE CONDITION.

Employees should give this form to their immediate supervisor or the LRAC.

| 12. NAME OF LRAC | 13. PHONE NUMBER OF LRAC | 14. LOG NUMBER ASSIGNED |
|---|---|---|
| | | |

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM
MAY 2013    **0857A**

**Exhibit C**

USA Gill 000984

| | |
|---|---|
| **From:** | VHA HROO - VSHO Reasonable Accommodations |
| **To:** | Grady, Patrick W.; Gill, Allison M. |
| **Subject:** | RE: Acknowledgement of Receipt of Request |
| **Date:** | Tuesday, May 7, 2019 10:55:00 AM |

*Thank you!*

**From:** Grady, Patrick W.
**Sent:** Tuesday, May 07, 2019 10:53 AM
**To:** Gill, Allison M. <Allison.Gill@va.gov>
**Cc:** VHA HROO - VSHO Reasonable Accommodations
<VSHO_Reasonable_Accommodations@VA.GOV>
**Subject:** Acknowledgement of Receipt of Request

Ms. Gill, attached is the VA Form 0857b – Acknowledgement of Receipt of Request.  Please let me know if you have any questions.

Patrick W. Grady
Director, VA/DoD Medical Sharing Office
Office of VA/DoD Health Affairs, Veterans Health Administration
1575 I Street NW, Room 622
Washington, DC 20420
O: 202.461.4060
C: 202. 873.5239
Patrick.Grady@VA.gov

**Exhibit C**
USA_Gill_000913
Page 108

**VA** Department of Veterans Affairs

# ACKNOWLEDGEMENT OF RECEIPT OF REQUEST

| 1. NAME OF EMPLOYEE | 2. DATE FORM COMPLETED |
|---|---|
| Allison M. Gill | 5/7/2019 |

The purpose of this form is to confirm that your request for accommodation was received and to provide information to you.  If our information regarding your request is incorrect, please contact me as soon as possible.

I will be the Designated Management Official (DMO) for this request.

| 3. MY NAME IS | 4. MY PHONE NO. IS | 5. MY EMAIL IS | 6. DATE OF REQUEST |
|---|---|---|---|
| Patrick W. Grady | 202 461-4060 | patrick.grady@va.gov | 5/29/2019 |

| 7. MY ALTERNATE IS | 8. ALTERNATES PHONE NO. | 9. ALTERNATES EMAIL |
|---|---|---|
| | 202 873-5239 | |

**10. YOU REQUESTED THE FOLLOWING ACCOMMODATION(S)**

Request permanent telework.

**11. THIS ACCOMMODATION WILL ALLOW YOU TO**

- [ ] ACCESS THE APPLICATION/INTERVIEW PROCESS
- [x] PERFORM ESSENTIAL JOB FUNCTIONS OR ACCESS THE WORK ENVIRONMENT
- [ ] ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT *(e.g., attend a training program or a social event)*

**12. OUR RECORDS SHOW THAT THIS REQUEST**

- [ ] IS TIME SENSITIVE
- [x] IS NOT TIME SENSITIVE; IF IT IS TIME SENSITIVE, PLEASE NOTIFY ME IMMEDIATELY

NEXT STEPS:

I will meet with you to discuss your request and any options for providing an effective accommodation.  If necessary, I will consult with the Local Reasonable Accommodation Coordinator (LRAC), VA's National Reasonable Accommodation Coordinator, and/or the Job Accommodation Network.  I will keep you informed as to my progress.  It is my goal to decide on your request and provide the accommodation, if approved, within less than 30 calendar days.  Time sensitive requests will be processed as soon as possible to meet the deadline.

If you have any questions, please contact me via the email address or phone number provided above.  You may also contact the LRAC identified below.

| 13. NAME OF LRAC | 14. PHONE NUMBER OF LRAC | 15. EMAIL ADDRESS OF LRAC |
|---|---|---|
| Pamela Ballou-Moore | 202 461-7568 | VSHO_Reasonable_Accommodations@va.g |

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM
NOV 2013    **0857b**

**Exhibit C**
USA Page 109 000981

Exhibit C
USA_Gill_000971

# Approval of Interim Accommodation

## Attachment for Section 4 of VA Form 0857c

Employee:  Allison Gill

Interim Accommodation as follows is approved until November 23, 2019.  Effective pay period (PP) # 16, a 100% telework agreement is approved for Allison Gill to telework 9 days per pay period (in addition to the already approved 1 day per PP CWS) beginning Sunday, August 4, 2019 through Saturday, November 22, 2019.

Allison Gill must comply with the following requirements:

a.  Employee must be telework ready (completed all mandatory requirements to telework).

b.  Ensure an accurate home address and correct telephone number is on file in the office, at all times.

c.  Log into Skype for Business at the beginning of daily tour and remain logged in until the end of the work day.  Be available to respond to instant messaging (IM) within 10 minutes.

d.  Email supervisor at the beginning and end of the workday.

e.  Establish and provide your supervisor a standard daily lunch time between 11-1 pm and a morning and evening break time no later than Friday, Augsut 16, 2019.

f.  Answer telephone calls within 5 rings. Note: Calls should generally not go to voice mail during normal working hours, unless you're on another work-related call.

g.  Outlook calendar must be up to date at all times.

h.  Submit leave requests three (3) days prior to the date of the request.

i.  All leaves must be requested and submitted in VATAS for approval and approved leaves must be put on the Office of VA/DoD Health Affairs Shared Calendar.

j.  Attend all Office of VA/DoD Health Affairs, VA/DoD Medical Resource Sharing Office, and TRICARE liaison meetings as requested.

k.  Respond to inquiries and requests received by email within two hours of receipt, cc: supervisor on issues requiring supervisor intervention or resolve.

l.  Complete and send all assignments to the supervisor on or before assigned timelines.  **Note:**  Extensions should be requested immediately after receiving an assignment, or no later than 3 days prior to the assigned due date.

m.  Notify the Supervisor at (202) 461-0960 or (202) 873-5239 or if unavailable, notify Mr. Corey Ford at (202) 461-4179 of technical IT connectivity issues immediately. If there are technical issues where the employee is unable to log into the system from home for more than 10 minutes during the work day, employee should contact the OIT help desk for assistance, immediately. If the technical issues continue for 60 minutes, the employee should take leave for the remainder of the work day or report to the office so that computer can be placed directly on the network.

Allison Gill should resubmit a RA request with required medical documentation for reconsideration prior to Friday, November 22, 2019.

Patrick W
Grady 1750246

Digitally signed by
Patrick W Grady 1750246
Date: 2019.08.12
09:58:37 -04'00'

Supervisor:  Grady 1750246                                               Date: 8/12/2019



8 August 2019

### Fact Finding / Employee: Allison Gill / 6 Aug 2019
### Conducted by her Supervisor: Patrick W. Grady

**1. Ask: You provided physical limitations for justification for FMLA and RA consideration?**

I asked about her limitations. She didn't respond with specifics. She stated she's not able to be
in the office. I proceeded to list three limitations and asked her to confirm that these were
indeed her limitations, they included:
   a. Inability to concentrate, focus, speak and interact with others. She confirmed that this
      was a limitation for her.
   b. Unable to hold conversations or interact with others in a meaningful way. She
      confirmed that this was a limitation for her.
   c. Symptoms prevent meaningful engagement in employment. She confirmed that this
      was a limitation for her.

**2. Ask: When did those restrictions/limitations begin?**

   • April – started
   • Continued since April

**3. Directed her to the following webpages:**

I asked if she had access to a computer, she responded she did to her government computer. I
directed her to these webpages:
   a. https://www.muellershewrote.com/about/ : I asked her to confirm that the photo and
      the associated profile paragraph was her. She paused, did not respond to my direct
      question, and then stated something to the effect that she thought she should have
      someone else on the call. I responded that as a Federal employee, she needed to
      answer my questions. She then proceeded to answer and confirmed that it was her on
      the webpage and that it was her hobby.
   b. https://twitter.com/britabee/status/1139959037624295425 : I asked her to watch the
      video. She said she couldn't hear the sound. I asked her if that was her in the video.
      She said yes.
   c. https://twitter.com/TheParkwayMPLS : I asked her if that was her in the pictures and if
      she attended the event on 14 June. She confirmed it was her and that she did attend
      the event in Minneapolis on 14 June. I stated that it appears to be her government
      identification card (ID) she is wearing around her neck in one of the photos. She
      confirmed that it was her government ID and that she wears it when she travels.
   d. https://twitter.com/tweetjaleesa : I asked her if that was her in the photos. She stated
      that the twitter account she was viewing only went back to 5 July so she couldn't see
      the photos I was referencing. I explained the photos were of her at the 14 June event

**Exhibit C**

and some posing with groups of people in front of the stage. Asked if she took pictures with groups of people at the event in front of the stage, she confirmed that she had.

4. **Ask: explain how it was possible to participate in the tour while being unable to communicate/concentrate etc. Specifically ask about the June stop in Minneapolis and any other specific dates that can be pinned down.**

She responded that she was able to do events as these are a hobby that she enjoys, and they do not exacerbate PTS. These events are not linked to trauma. Symptoms are triggered/take place in the office or with DoD and VA...take place in DoD or VA facilities.

5. **Ask: about the tour, how often she participates, if it's other employment, is she paid a salary, how many hours a week did she participate, and who her supervisor is or who is in charge of the tour and their contact information.**

Asked about other events, she could not provide details but generally agreed that there were other events. When asked if she gets paid, she replied she didn't. Did she get a salary, her response, no. When asked about how many hours she spends on these, she replied a couple hours; 30 minutes prep before the event and then 1:30 for the show and that these take place on the weekend. When asked about who organizes the tour, a manager, and that person's contact information, she didn't offer one and understood her to say there was no manager and that she didn't think she was allowed to give out other contact information.

6. **Ask: what dates and cities the tour stopped at and ask about each stop, to see if she was present.**

She confirmed there were other event(s) but didn't remember dates of these other event(s).

7. **If she refuses to be answer questions, remind her that she has a duty (as a Federal employee) to be forthcoming in a fact-finding interview, or she could face potential discipline for failure to cooperate.**

As discussed in 3.a. above.

8. **End by requiring her to submit a written explanation by COB the next day.**
I outlined 4 due outs:
   1) Summary of our conversation
   2) Statement she offered to provide that outlines how she's able to do these events but not function in the office.
   3) List of dates and locations of other events
   4) Contact info for tour organizer/manager
Due outs and suspense date of COB tomorrow (8/7/2019) were communicated to her.
////////////////////////////////////////End of Notes/////////////////////////////////////////

**Exhibit C**
USA_GILL_0003**Page 112**



## Memo for the Record

### Tuesday, August 06, 2019

### Fact Finding Meeting with Patrick Grady & Allison Gill

- The meeting opened with Pat describing the purpose of the meeting and asked Allison if she had a computer or laptop with her.
    - o Allison said, yes and was logged on to it.
- Allison was asked to provide a list of her physical limitations she provided for her justification for FMLA and Reasonable Accommodation RA request.
    - o Allison stated that she would have her provider explain her inability to concentrate in the office and that this was outlined in the FMLA request.
- Patrick asked when those restrictions she was having begun.
    - o Allison replied April of this year.
- She was then directed to four websites and twitter sites that contained her performing on stage.  They were: https://www.muellershewrote.com/about/
    - o **1. Mueller, She Wrote & The Daily Beans – A Podcast which contained the following:**
        - Mueller She Wrote is a <u>binder full of women</u> unraveling the mysteries of the Mueller investigation.  Join us each week as your hosts simplify the absurd amount of Mueller news and wrap it up into informative, hilarious bites. MSW is committed to separating the facts from conjecture with just the right amount of snark.
        - **Come for the news, stay for the fantasy indictment draft!**
        - Three women unraveling the mysteries of the Mueller investigation each week as alt government employee and anonymous host, AG simplifies the absurd amount of Trump Russia news and wraps it up into tasty bites for human consumption. Mueller, She Wrote is committed to reporting facts and conjecture with just the right amount of snark. Come for the news, stay for the Fantasy Indictment Draft!
        - 
        - News          Politic          News & Politics
        - 
        - 1 Peter Strzok Gold 43 min
        - 2 Drag Queen Advocates 53 min
        - 3Mancaves of Hatred 44 min
        - 4 A Hymen-Coup (Feat. Seth Abramson) 109 min
        - 5 Ratcliffe Sucks Already 34 min
        - 6 Mueller Report Pt. 11 55 min

**Exhibit C**
USA_GILL_000348
**Page 113**



- 7 Eww-genics 50 min
    - 8 Moscow Mitch 32 min
- About the Host of this PodCast:
- Hello, everyone! I'm AG. In addition to being a veteran, PhD, and a federal government executive, I'm a comedian, author, and staunch advocate for the resistance. My mission as the executive producer and host of Mueller, She Wrote is to employ my expertise in the absurd amount of Trump Russia news and wrap it up into tasty bites for human consumption; and I am committed to do this weekly until House Trump falls. Additionally, I'm very dedicated to the separation of facts and theory, and I work hard to make sure you know which is which. The truth is the goal, and facts are the tools. Thank you for listening!



2. https://twitter.com/britabee/status/1139959037624295425

3. https://twitter.com/Theparkway/MPLS

4. https://twitter.com/tweetjaleesa

**Exhibit C**
USA_GILL_0008 **Page 114**



- Patrick asked her if that was indeed her in the four Performing websites
  - Allison confirmed they were her at a live show at the Parkway on June 14th, and that she was in the pictures with two other cast mates in front of a stage.
- At this point Allison stated that she wasn't sure she wanted to answer these questions without her representative.
- Patrick then informed her that as a Federal employee she must be forthcoming during this fact-finding interview or could face potential discipline for failure to cooperate.
- She then began answering the questions that were asked of her.
- Patrick asked her if she was in a picture in a kitchen in one of the four websites with her official VA Badge on.
  - Allison responded she was wearing her official VA ID Badge, that she always wears it when she travels.

**Exhibit C**
USA_GILL_0005 **Page 115**





- Patrick asked if this was another job she worked at where she was paid?
  - She stated that she does all of this without getting any type of payment.
  - She said that it was not another job.

https muellershewrote.com calendar/ | Calendar - Mueller, She Wr...

Convert ▾ Select

USA Staffing - Sign Out (2) | USA Staffing - Sign Out | ConcurGov SSO | Free Hotmail | Web Slice Gallery ▾

**Tour: Mueller, She Wrote LIVE!**

**08/30/19** San Francisco, CA — The Independent

Time: 7:00pm
Age restrictions: 21+ Only
Address: 628 Divisadero St
Admission: $30-$60
Box office: (415) 771-1421
Venue phone: 415.771.1421

**DOORS AT 7PM, SHOW AT 8PM**

$30 general, $60 VIP (Pre-Show Meet & Greet + Reserved Seating)

BUY TICKETS

More info

**09/13/19** Seattle, Washington — The Triple Door

Time: 8:00pm
Age restrictions: 21+ Only
Address: 216 Union Street
Admission: $30 general/$60 VIP
Box office: 206-838-4333
Venue phone: 206-838-4333

**THIS IS A DINNER THEATER!**

**DINNER SEATING BEGINS AT 6:30pm, SHOW AT 8PM**

When experiencing live music at The Triple Door, you'll enjoy full dinner and drink service right from your seats in the Theatre. The menu adds an exciting and delicious cultural dimension to the live show experience.

BUY TICKETS

More info

**11/07/19** Boston, MA — City Winery

Time: 8:00pm
Age restrictions: All Ages
Address: 80 Beverly
Admission: $30.00
Box office: 617-933-8047
Venue phone: 617-933-8047

**DOORS AT 7PM, SHOW AT 8PM**

Pre-Sale tickets go on sale 7/24 at 3pm EST

Public tickets on sale 7/26 at 3:00pm ET

BUY TICKETS

-



- Patrick asked how many hours a week did she perform over the weekend.
  - o Allison stated that she attends these events on the weekends in her spare time.
  - o She stated that when she performs these acts on stage she said it's usually a one-and-a-half-hour show.
  - o Allison said it takes about a half hour prep to prepare to perform on stage.
- Patrick then asked if she had a manager?
  - o She replied that she didn't that she was the manager and a friend also managed the act.
- Patrick asked if she had attended other events in different cities in the past couple of months.
  - o She stated, she had attended other events in other cities.
- Patrick asked for stage co-workers and managers of clubs contact information.
  - o She stated she wasn't sure if it was okay to give out that information.
- Patrick asked how it was possible to participate in a standup tour while being unable to communicate or concentrate at work for the VA.
  - o She stated the show events are not linked to her trauma.
  - o She said these events do not affect her on the stage, since they do not take place in a VA or DoD facility.
- Patrick asked how often she tours and the dates and cities the tours were in during the past couple of months.
  - o She stated that she would have to look back in her paperwork to get that information.
- Patrick then told her to submit by COB tomorrow, Wednesday, August 7, 2019 the following 4 things:
  1. Written explanation of how she can tour and perform on stage however, not be able to work at a VA or DoD facility.
  2. The dates and times and places she had performed on stage or on Twitter over the past couple of months.
  3. List of what her physical and mental restrictions are that make it hard for her to come to work.
  4. List of names of tour cast members, managers of clubs she works with to include phone numbers and names of the theaters or venues.
- ➢ Allison repeated the four things that were asked of her.
- ➢ Patrick confirmed the four taskings and thanked her for her cooperation.

**Exhibit C**

USA_GILL_0008100

# EXHIBIT D

```
 1                  Let me ask it a different way.  Let
 2     me help you here.
 3                  So you were in the Army.  Were you
 4     ever deployed to a combat zone?
 5          A.     Yes.
 6          Q.     Okay.
 7                  So there's guidance to soldiers with
 8     weapons, whatever form they might be in, could be
 9     a rifle, could be mortars, could be any variety
10     of weapons.
11                  They are guided on when they can
12     engage their fire arms, correct?
13          A.     Correct.
14          Q.     Who makes that decision when they
15     actually pull the trigger?
16          A.     The soldier.
17          Q.     Right.
18                  So you won't put on the record that
19     Patrick Grady made the decision to do it, the
20     fact finding, after being advised and guided by
21     the people up his chain of command.  He didn't do
22     that?
23          A.     He's the one that conducted the fact
24     finding, yes.
25          Q.     Right.  Thank you.
```

```
 1   described?

 2        A.     Participated in or been, how do you

 3   call it, a -- have I ever undergone an EEO

 4   investigation?  If that's the question, the

 5   answer is no, not in my military or my VA career.

 6        Q.     And thank you for that answer.

 7               How many EEO investigations did you

 8   participate in like the Allison Gill EEO

 9   investigation?

10        A.     Actually, none, either my military

11   or civilian career.

12        Q.     Allison Gill was the only EEO

13   investigation?

14        A.     Yes.

15        Q.     Okay.

16               But you don't remember any of the

17   specifics of what you did as part of the EEO

18   investigation?

19        A.     I don't.  It was a busy time and,

20   like I said, it was not that in depth from my

21   perspective for me.

22        Q.     In 2018 do you recall if you were

23   aware of Allison Gill hosting a podcast?

24        A.     No.

25        Q.     Today are you aware that Allison
```

**VA** Department of Veterans Affairs

# ACCOMMODATION REQUEST DETERMINATION

| 1. NAME OF EMPLOYEE MAKING THE REQUEST |  |
|---|---|
| Allison M. Gill | |

The purpose of this form is to inform you of our decision regarding your request for accommodation and to provide information to you.  If your information is incorrect, please inform me as soon as possible.

2. I AM THE DESIGNATED MANAGEMENT OFFICIAL (DMO) FOR THIS REQUEST.  MY CONTACT INFORMATION IS BELOW..

| 3. MY NAME IS | 4. MY PHONE NO. IS | 5. MY EMAIL IS |
|---|---|---|
| Patrick Picardo | 202-461-4103 | patrick.picardo@va.go |

6. YOUR REQUEST WAS MADE TO ENABLE YOU TO

☐ APPLY/INTERVIEW FOR A JOB,

☒ PERFORM THE ESSENTIAL FUNCTIONS OF YOUR POSITION, OR

☐ ACCESS A BENEFIT OR PRIVILEGE OF EMPLOYMENT.

7. YOU REQUESTED THE FOLLOWING ACCOMMODATION *(Describe briefly)*

Requested reconsideration of accommodation request.

8. YOUR REQUEST IS APPROVED, AND WILL BEGIN ON *(Date)* _____

9. ALTHOUGH WE ARE NOT PROVIDING THE ACCOMMODATION REQUESTED, WE ARE OFFERING AN ACCOMMODATION WHICH WE BELIEVE WOULD BE EFFECTIVE *(Describe the alternative accommodation)*

N/A

10. WE BELIEVE THIS ACCOMMODATION WOULD BE EFFECTIVE BECAUSE *(Describe why you believe it will be effective)*

N/A

11. YOUR ORIGINAL REQUEST WAS DENIED BECAUSE:

☐ YOU DO NOT HAVE A DISABILITY COVERED BY THE REHABILITATION ACT

☐ THE ACCOMMODATION REQUESTED WOULD NOT BE EFFECTIVE

☒ THE ACCOMMODATION WOULD REQUIRE REMOVAL OF AN ESSENTIAL FUNCTION OF THE JOB

☐ THE MEDICAL DOCUMENTATION PROVIDED DID NOT SUPPORT THE REQUEST

☐ THE ACCOMMODATION WOULD REQUIRE LOWERING OF A PERFORMANCE STANDARD OR PRODUCTION STANDARD

☐ THE ACCOMMODATION WOULD CAUSE AN UNDUE HARDSHIP TO THE OPERATION OF THE UNIT

☐ ALLOWING YOU TO WORK WOULD CREATE A DIRECT THREAT FOR YOU AND/OR OTHERS

VA FORM
MAY 2013   **0857f**

**Exhibit D**
USA_Gill_000995

12. DETAILED REASONS FOR THE DENIAL OF THE ORIGINAL REQUEST: *(Be specific, e.g. why the accommodation would not be effective)*

Your physical presence in the Washington DC office is required to provide the essential liaison functions, such as: interfacing with DoD, building relationships, representing the VA in face-to-face engagements, and conducting training. Additionally, granting your request for 100% telework would increase the workload of those employees present in the office by requiring them to take on more assignments that require physical presence.

13. YOUR REQUEST WAS ADMINISTRATIVELY CLOSED BECAUSE OF NO RESPONSE FROM YOU TO INQUIRIES MADE ON THE

FOLLOWING DATES: _____  _____  _____  _____

WHEN YOU WISH TO PURSUE THIS REQUEST, PLEASE CONTACT ME AND I WILL RE-OPEN IT

14. YOU WILL HAVE A WEEK FROM THE DATE OF THIS NOTICE TO DECIDE WHETHER TO ACCEPT THE ALTERNATIVE ACCOMMODATION OFFERED. IF YOU DECIDE NOT TO ACCEPT, YOUR OPTIONS ARE LISTED BELOW.

15. IF YOU WISH TO REQUEST RECONSIDERATION OF THIS DECISION, YOU MUST:

Within seven (7) calendar days of receipt of this denial, request reconsideration by the second level Designated Management Official (DMO). After receiving a request for reconsideration, the DMO has 14 calendar days to render a decision and notify the requester, in writing.

16. IF YOU WISH TO FILE AN EEO COMPLAINT, PURSUE A MERIT SYSTEMS PROTECTION BOARD COMPLAINT OR A UNION GRIEVANCE, GUIDANCE IS PROVIDED BELOW:

- To file an EEO complaint, applicants for employment or employees must contact an EEO counselor within forty-five (45) days of notice of the denial, pursuant to 29 C.F.R. Part 1614. Contact your local Office of Resolution Management for further information.

- Non-Bargaining Unit Employees may file an Administrative Grievance within 15 calendar days of receiving the denial. Contact your local Human Resources Office for further information.

- Bargaining Unit Employees may file a grievance in accordance with applicable Collective Bargaining Agreements. Contact you local union representative for further information.

- For a collective bargaining claim, file a written grievance in accordance with the provisions of the Collective Bargaining Agreement; or

- Initiate an appeal to the Merit Systems Protection Board within 30 days of an appealable adverse action as defined in 5 C.F.R. §1201.3.

- Employees and applicants are encouraged to participate in information resolution processes available to address the reasonable accommodation outcome. The ADR process is outlines in VA Directive 5978: Alternative Dispute Resolution. Individuals may participate in ADR as part of the above avenues of redress or independently. If participation in independent of the above avenues of redress, it does not meet the requirements for filing claims under the aforementioned processes. If the employee believe she or he may also want to pursue other avenues of redress, the employee should check with the appropriate EEO/Union/HR office to ensure that time requirements are met. Contact your local ADR Coordinator at http://www1.va.gov/adr/docs/ADR_Coordinators_List.pdf for further information.

**Reconsideration, review, and the use of alternative resources does not affect the time limits for initiating statutory and collective-bargaining claims. Your participating in VA's information alterative dispute resolution process will neither satisfy nor delay time restrictions of the formal processes indicated above.**

| 17. DMO SIGNATURE<br>*Patrick Picardo* | 18. DATE<br>12/20/2019 |
|---|---|
| 19. I (REQUESTOR) CERTIFY THAT I RECEIVED THIS FORM<br>REQUESTOR SIGNATURE | 20. DATE<br>12/20/19 |
| 21. I (REQUESTOR) CERTIFY THAT I ACCEPT THE ALTERNATIVE ACCOMMODATION OFFERED (IF ONE IS OFFERED)<br>REQUESTOR SIGNATURE | 22. DATE |

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM 0857f, MAY 2013, page 2

**Exhibit D**

# EXHIBIT E

1. What is your disability?

   **I have post traumatic stress disorder. The Agency does not dispute that I have this condition.  It is a service-related disability, and I have a VA disability rating of 70% for my PTSD.  As such, Questions 2-14 below seek medical information beyond what is necessary or required under the ADAAA to determine whether I am a qualified individual under the law.**

2. Please identify the clinical name or diagnosis?  PTSD

3. When did the disability develop?  n/a

4. When was the disability diagnosed?  n/a

5. What caused the disability?  n/a

6. How long is the disability expected to last?  n/a

7. Is the disability permanent?  n/a

8.  What was your healthcare provider's assessment of your condition at the time of the incident that caused you to file this complaint?

    See my response to Question 25 below.

9. Do you have medical documentation about your disability? n/a

10. Does the disability limit anything you would do normally in everyday life?

    **Yes.**

    If so,

    10a: What normal life functions are limited and how are they limited?

    **See my response to Question 25 below**.

11. What are the major duties you are required to carry out in your position?

    n/a

12. Are you able to perform these major duties as someone else would normally be able to perform the duties?

    n/a



Affiant's Initials_____  Date:_____                    PAGE 3

# EXHIBIT F

**VA** | Department of Veterans Affairs

## APPROVAL OF INTERIM ACCOMMODATION

**1. NAME OF EMPLOYEE**

Allison M. Gill

**2. THE PURPOSE OF THIS FORM IS TO CONFIRM THAT I AM APPROVING AN INTERIM ACCOMMODATION UNTIL:**

11/23/2019

[X] THE REQUESTED ACCOMMODATION IS AVAILABLE

[ ] A COMPLETED VA FORM 0857e *(Medical Documentation)* IS SUBMITTED *(see explanation in 5 below)*

**3. THE INTERIM ACCOMMODATION WILL BE PROVIDED BY THIS DATE** 9/16/2019

**4. THE INTERIM ACCOMMODATION WILL BE:**

Approved to use Leave Without Pay (LWOP) until 11/23/2019 due to a medical issues. This will allow the Agency time to continue to explore the possibility of job reassignment as an accommodation with duties that can be performed within your functionally limitations.

**5.** AT THIS TIME, WE DO NOT HAVE DOCUMENTATION TO VERIFY THAT YOU HAVE A DISABILITY, AND YOUR DISABILITY IS NOT VISIBLE. THEREFORE, BY GRANTING THIS INTERIM ACCOMMODATION, WE ARE NOT REGARDING YOU AS A PERSON WITH A DISABILITY COVERED BY THE REHABILITATION ACT. WHEN YOU SUBMIT THE COMPLETED VA FORM 0857e, THEN WE WILL BE ABLE TO MAKE A DETERMINATION.

YOU HAVE INDICATED THAT YOU CAN OBTAIN AN APPOINTMENT WITH YOUR TREATING PHYSICIAN BY _____. THEREFORE, I WILL EXPECT TO RECEIVE THE COMPLETED VA FORM 0857e BY _____ . IF I DO NOT RECEIVE IT BY THAT DATE, YOUR INTERIM ACCOMMODATION WILL EXPIRE.

**6.** IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT ME VIA THE EMAIL ADDRESS OR PHONE NUMBER PROVIDED BELOW. YOU MAY ALSO CONTACT THE LRAC OR ALRAC.

| **7. DMO EMAIL** | **8. DMO PHONE NUMBER** | |
|---|---|---|
| Patrick.Grady@va.gov | (202) 461-4060 | Patrick W Grady 1750246 — Digitally signed by Patrick W Grady 1750246 Date: 2019.09.25 15:05:59 -04'00' |
| **9. LRAC EMAIL** | **10. LRAC PHONE NUMBER** | |
| VSHO_Reasonable_Accommodations@va.gov | 202-461-7568 | Pamela E Ballou-Moore 1009165 — Digitally signed by Pamela E Ballou-Moore 1009165 Date: 2019.09.25 14:24:34 -04'00' |
| **11. ALRAC EMAIL** | **12. ALRAC PHONE NUMBER** | |
| | | |

This form should be retained separately from the employee's Official Personnel Folder.

VA FORM
NOV 2013    **0857c**



3350 La Jolla Village Drive
San Diego, CA 92161
www.sandiego.va.gov

22 Aug, 2019

To Whom it May Concern:

I am writing to affirm that Ms. Allison Gill (DOB ██/74) is diagnosed with Major Depressive Disorder, Post Traumatic Stress Disorder, and Panic Disorder as of our most recent visit on 8/21/19. As is common in those with a history of Post Traumatic Stress Disorder, recent events related to original triggers have exacerbated PTSD-related symptoms. Triggers can be an event, person, or circumstance that serves as a reminder of the original trauma. Given Ms. Gill's military-related trauma, her VA and DOD-related work and situation function as direct triggers of the trauma and create symptoms of panic, re-experiencing, and difficulty with concentration.

While Ms. Gill attempted to mitigate symptoms by teleworking, the strict conditions which were stipulated have exacerbated her anxiety such that the situation has resulted in flashbacks, re-experiencing, and panic attacks which are characteristic of PTSD. Ms. Gill is scheduled to begin psychotherapy in Sept; in the meantime removing herself from triggering situations is clinically indicated to reduce distress and improve ability to function.


Respectfully,

*Paul Krebs*

Paul Krebs, PhD
Clinical Psychologist
619-855-7932
Paul.Krebs@va.gov

**Exhibit F**

| | |
|---|---|
| ![VA logo] **Department of Veterans Affairs** | **TELEWORK REQUEST/AGREEMENT** |

**1. DATE OF REQUEST**
10/01/2020

### PRIVACY ACT STATEMENT
**AUTHORITY:** Public Law 111-292, Telework Enhancement Act of 2010, and VA Handbook 5011, Part II, Chapter 4.
**PRINCIPAL PURPOSE(S):** Information is collected to register individuals as participants in the VA Alternative Workplace Arrangement (Telework) Program; to manage and document the duties of participants; and to fund, evaluate and report on program activity. The records may be used by Information Technology offices to determine equipment and software needs, for ensuring appropriate system safeguards are in place to protect information, and for assessing and managing technological risks and vulnerabilities. Provisions of 5 U.S.C. § 552a will apply if the completed agreement retrieved by individual identifies such as the participant's name or social security number.
**DISCLOSURE:** Disclosure is voluntary. However, failure to provide the requested information will result in our inability to include you as a participant in the VA Alternative Workplace (Telework) Program.

### SECTION I - EMPLOYEE INFORMATION

| 1. NAME OF EMPLOYEE *(Last, First, Middle Initial)*<br>Bean, Edith A | 3. NAME AND ADDRESS OF OFFICIAL DUTY STATION<br>*(Street, Suite Number, City, State and Zip Code)*<br>TRICARE Health Plan Division<br>8111 Gatehouse Rd<br>Falls Church, VA 22042 | 4. ORGANIZATION/DIVISION *(Include Mail Code)*<br>Medical Sharing Office<br>VHA, Office of VA/DoD Health<br>Affairs (10P5) |
|---|---|---|
| 2. POSITION TITLE, SERIES, AND GRADE<br>Health Systems Specialist/0671/14 | | |
| 5. STATION NUMBER<br>101 | 6. ADMINISTRATION/STAFF OFFICE<br>(10) VHA | |

7. [✓] The employee's official duty station is documented on the most recent Standard Form (SF) 50, *Notification of Personnel Action*, for such purposes as determining special salary rates, locality pay adjustments, and travel.

### SECTION II - PROPOSAL

**1. NAME AND ADDRESS OF APPROVED ALTERNATIVE WORKSITE** *(Street, Suite Number, City, State and Zip Code)*

Crofton, MD ▉▉▉▉

**2. TYPE OF ARRANGEMENT** *(Check all that apply)*

[✓] **REGULAR AND RECURRING** *(Employees who telework on regularly scheduled days each biweekly pay period, and have completed required telework training and telework agreement.) (Portion of day acceptable)*

[✓] **AD-HOC** *(Employees who telework on an occasional, episodic, or short-term basis, and have completed required telework training and telework agreement.) (Portion of day acceptable)*

[✓] **PARTIAL DAYS** *(Can be used in combination with AD-HOC or Regular and Recurring)*

**3. TYPE OF ALTERNATIVE WORKPLACE (TELEWORK) ARRANGEMENT PROPOSED** *(the alpha prefix reflects the designated PAID Code)*

[✓] **A - AD-HOC**

[✓] **P - REGULARLY TELEWORKS 3 OR MORE DAYS A PAY PERIOD**

[✓] **W - REMOTE WORK** *(Employee works 100% of the time in non-VA-owned or leased space within the local commuting area of parent station)*

[ ] **S - REGULARLYTELEWORKS ONCE PER MONTH**

[ ] **E - REGULARLY TELEWORKS 3 OR MORE DAYS PER WORKWEEK**

[ ] **M - REMOTE WORK** *(Employee works 100% of the time in non-VA-owned or leased space outside the local commuting area of parent station)*

[ ] **R - REGULARLY TELEWORKS 1 OR 2 DAYS A PAY PERIOD**

[ ] **V - VIRTUAL** *(Employee works outside of original hiring duty station at VA-owned or leased space)*

| 4. ACTUAL LENGTH OF AGREEMENT<br>[ ] 1 - 3 MONTHS  [✓] 7 - 12 MONTHS<br>[ ] 4 - 6 MONTHS  [ ] 12 MONTHS + | 5. POSITION TELEWORK SUITABLE<br>[✓] YES  [ ] NO | 6. EMPLOYEE TELEWORK ELIGIBLE<br>[✓] YES  [ ] NO |
|---|---|---|
| 7. FULLY SUCCESSFUL OR HIGHER PERFORMANCE RATING<br>[✓] YES  [ ] NO | 8. MANDATORY TELEWORK TRAINING COMPLETED<br>[✓] YES  [ ] NO | 9. MANDATORY PRIVACY ACT TRAINING COMPLETED<br>[✓] YES  [ ] NO |
| 10. EMPLOYEE SIGNED RULES OF BEHAVIOR<br>[✓] YES  [ ] NO | 11. TYPE OF WORK SCHEDULE *(Check only one)*<br>[ ] BASIC  [ ] FLEXIBLE  [✓] COMPRESSED | |

### SECTION III - TYPE OF ALTERNATIVE WORKPLACE (TELEWORK) ARRANGEMENT APPROVED
*(Complete Section XI if the employee's Telework request is denied)*

| 1. [✓] **REGULAR AND RECURRING** *(Employees who telework on regularly scheduled days each biweekly pay period, and have completed required Telework Training and Telework Request/Agreement. A portion of a day is acceptable. Indicate the number of days approved to telework per week, pay period or month (i.e. approved to telework 1 day per week).* | 2. [✓] **AD-HOC** *(Employees who telework on an occasional, episodic, or short-term basis, and have completed required telework training and telework agreement.) (A portion of a day is acceptable)* |
|---|---|

### SECTION IV - WORK SCHEDULE AND TOUR OF DUTY

**1. APPROVED BI-WEEKLY TOUR OF DUTY:** *(Indicate AWS for Alternative Worksite or ODS for Official Duty Station)*

| | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| **WEEK 1** | | | | | | | |
| HOURS | | 0700 - 1630 | 0700 - 1630 | 0700 - 1630 | 0700 - 1630 | 0700 - 1530 | |
| LOCATION AWS/ODS | | ODS | AWS | ODS | AWS | ODS | |
| **WEEK 2** | | | | | | | |
| HOURS | | 0700 - 1630 | 0700 - 1630 | 0700 - 1630 | 0700 - 1630 | CWS | |
| LOCATION AWS/ODS | | ODS | AWS | ODS | ODS | | |

VA FORM
JAN 2019 **0740**
PREVIOUS VERSIONS OF THIS FORM WILL NOT BE USED

**Exhibit F**

| ![VA] **Department of Veterans Affairs** | **TELEWORK REQUEST/AGREEMENT** | 1. DATE OF REQUEST 10/01/2019 |
|---|---|---|

### PRIVACY ACT STATEMENT

**AUTHORITY:** Public Law 111-292, Telework Enhancement Act of 2010, and VA Handbook 5011, Part II, Chapter 4.

**PRINCIPAL PURPOSE(S):** Information is collected to register individuals as participants in the VA Alternative Workplace Arrangement (Telework) Program; to manage and document the duties of participants; and to fund, evaluate and report on program activity. The records may be used by Information Technology offices to determine equipment and software needs, for ensuring appropriate system safeguards are in place to protect information, and for assessing and managing technological risks and vulnerabilities. Provisions of 5 U.S.C. § 552a will apply if the completed agreement retrieved by individual identifies such as the participant's name or social security number.

**DISCLOSURE:** Disclosure is voluntary. However, failure to provide the requested information will result in our inability to include you as a participant in the VA Alternative Workplace (Telework) Program.

#### SECTION I - EMPLOYEE INFORMATION

| 1. NAME OF EMPLOYEE *(Last, First, Middle Initial)*<br>Bean, Edith A | 3. NAME AND ADDRESS OF OFFICIAL DUTY STATION *(Street, Suite Number, City, State and Zip Code)*<br>TRICARE Regional Office East<br>8111 Gatehouse Rd<br>Falls Church, VA 22042 | 4. ORGANIZATION/DIVISION *(Include Mail Code)*<br>Medical Sharing Office<br>VHA, Office of VA/DoD Health<br>Affairs (10P5) |
|---|---|---|
| 2. POSITION TITLE, SERIES, AND GRADE<br>Health Systems Specialist/0671/14 | | |
| 5. STATION NUMBER<br>101 | 6. ADMINISTRATION/STAFF OFFICE<br>(10) VHA | |

7. [✓] The employee's official duty station is documented on the most recent Standard Form (SF) 50, *Notification of Personnel Action*, for such purposes as determining special salary rates, locality pay adjustments, and travel.

#### SECTION II - PROPOSAL

| 1. NAME AND ADDRESS OF APPROVED ALTERNATIVE WORKSITE *(Street, Suite Number, City, State and Zip Code)*<br>Crofton, MD ▓▓▓ | 2. TYPE OF ARRANGEMENT *(Check all that apply)*<br>[✓] REGULAR AND RECURRING *(Employees who telework on regularly scheduled days each biweekly pay period, and have completed required telework training and telework agreement.) (Portion of day acceptable)*<br>[✓] AD-HOC *(Employees who telework on an occasional, episodic, or short-term basis, and have completed required telework training and telework agreement.) (Portion of day acceptable)*<br>[✓] PARTIAL DAYS *(Can be used in combination with AD-HOC or Regular and Recurring)* |
|---|---|

3. TYPE OF ALTERNATIVE WORKPLACE (TELEWORK) ARRANGEMENT PROPOSED *(the alpha prefix reflects the designated Telework PAID Code)*

| | | |
|---|---|---|
| [✓] A - AD-HOC | [ ] P - REGULARLY TELEWORKS 3 OR MORE DAYS A PAY PERIOD | [✓] W - REMOTE WORK *(Employee works 100% of the time in non-VA-owned or leased space within the local commuting area of parent station)* |
| [ ] S - REGULARLY TELEWORKS ONCE PER MONTH | [ ] E - REGULARLY TELEWORKS 3 OR MORE DAYS PER WORKWEEK | [ ] M - REMOTE WORK *(Employee works 100% of the time in non-VA-owned or leased space outside the local commuting area of parent station)* |
| [✓] R - REGULARLY TELEWORKS 1 OR 2 DAYS A PAY PERIOD | | [ ] V - VIRTUAL *(Employee works outside of original hiring duty station at VA-owned or leased space)* |

| 4. ACTUAL LENGTH OF AGREEMENT<br>[ ] 1 - 3 MONTHS  [ ] 7 - 12 MONTHS<br>[ ] 4 - 6 MONTHS  [✓] 12 MONTHS + | 5. POSITION TELEWORK SUITABLE<br>[✓] YES  [ ] NO | 6. EMPLOYEE TELEWORK ELIGIBLE<br>[✓] YES  [ ] NO |
|---|---|---|
| 7. FULLY SUCCESSFUL OR HIGHER PERFORMANCE RATING<br>[✓] YES  [ ] NO | 8. MANDATORY TELEWORK TRAINING COMPLETED<br>[✓] YES  [ ] NO | 9. MANDATORY PRIVACY ACT TRAINING COMPLETED<br>[✓] YES  [ ] NO |
| 10. EMPLOYEE SIGNED RULES OF BEHAVIOR<br>[✓] YES  [ ] NO | 11. TYPE OF WORK SCHEDULE *(Check only one)*<br>[ ] BASIC  [ ] FLEXIBLE  [✓] COMPRESSED | |

#### SECTION III - TYPE OF ALTERNATIVE WORKPLACE (TELEWORK) ARRANGEMENT APPROVED
*(Complete Section XI if the employee's Telework request is denied)*

| 1. [✓] REGULAR AND RECURRING *(Employees who telework on regularly scheduled days each biweekly pay period, and have completed required Telework Training and Telework Request/Agreement. A portion of a day is acceptable. Indicate the number of days approved to telework per week, pay period or month (i.e. approved to telework 1 day per week).* | 2. [ ] AD-HOC *(Employees who telework on an occasional, episodic, or short-term basis, and have completed required telework training and telework agreement.) (A portion of a day is acceptable)* |
|---|---|

#### SECTION IV - WORK SCHEDULE AND TOUR OF DUTY

1. APPROVED BI-WEEKLY TOUR OF DUTY: *(Indicate AWS for Alternative Worksite or ODS for Official Duty Station)*

| WEEK 1 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
| HOURS | | 7 - 4:30 | 7 - 4:30 | 7 - 4:30 | 7 - 4:30 | 7 - 4:30 | |
| LOCATION AWS/ODS | | ODS | AWS | ODS | AWS | ODS | |

| WEEK 2 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
| HOURS | | 7 - 4:30 | 7 - 4:30 | 7 - 4:30 | 7 - 4:30 | CWS | |
| LOCATION AWS/ODS | | ODS | AWS | ODS | ODS | | |

VA FORM
JAN 2019 **0740**   PREVIOUS VERSIONS OF THIS FORM WILL NOT BE USED

**Exhibit F**

**SECTION V - CONTINUITY OF OPERATIONS AND "EMERGENCY RESPONSE GROUP" STATUS**

☑ The employee is expected to telework for the duration of an emergency pursuant to a pandemic and/or when the traditional worksite/official duty station is closed due to emergency situations (e.g., snow emergencies, floods, hurricanes, act of terrorism, etc.). If the employee is unable to work due to illness, dependent care responsibilities, or other personal needs, the employee will take appropriate leave (e.g., annual or sick leave). The employee may be granted excused absence on a case-by-case basis when other circumstances (e.g., power failure) prevent the employee from working at the telework site. To the extent practicable, management will include a description of emergency duties with this agreement if the emergency duties differ from the employee's normal duties. *(Employee to check to acknowledge reading and understanding this term of the telework agreement)*

☐ The employee has been designated as a team member of the Department's and/or organization's Continuity of Operations Plan (COOP). The employee agrees to follow the procedures established for reporting to duty when a COOP plan is activated. The employee understands that during any period that VA is operating under a COOP plan, the plan shall supersede any telework policy. *(Employee to check if applicable)*

**SECTION VI - DISABILITY AND  MEDICAL CONDITIONS**

VA Alternative Workplace Arrangement (Telework) Policy may be used as a reasonable accommodation for a qualified disability or as an accommodation for a temporary disability or for temporary medical reasons. All appropriate and applicable procedures must be applied and acceptable medical documentation provided accordingly. *(Check only one)*

☑ NOT APPLICABLE: The employee is not using telework as an accommodation for a qualified temporary disability or for medical reasons.

☐ QUALIFIED DISABILITY: The employee is using telework as a reasonable accommodation for a qualified disability.

☐ TEMPORARY DISABILITY/TEMPORARY MEDICAL REASONS: The employee is using telework as an accommodation for a temporary disability or for temporary medical reasons.

**SECTION VII - TELEWORKER SELF-CERTIFICATION SAFETY CHECKLIST**

Please complete and sign the self-certification safety checklist. The purpose of the checklist is to assess the overall safety of your alternative workplace.

**LIST OF ITEMS/CONDITIONS TO INSPECT**

| | YES | NO | NA |
|---|---|---|---|
| 1. Are temperature, noise, ventilation, and lighting levels adequate for maintaining your normal level of job performance? | ☒ YES | ☐ NO | ☐ NA |
| 2. Are all stairs with four or more steps equipped with handrails? | ☒ YES | ☐ NO | ☐ NA |
| 3. Are all circuit breakers and/or fuses in the electrical panel labeled as to the intended service? | ☒ YES | ☐ NO | ☐ NA |
| 4. Do circuit breakers clearly indicate if they are in the open or closed position? | ☒ YES | ☐ NO | ☐ NA |
| 5. Is all electrical equipment free of recognized hazards that would cause physical harm (frayed wires, bare conductors, loose wires, flexible wires running through walls, exposed wires to the ceiling? | ☒ YES | ☐ NO | ☐ NA |
| 6. Will the building's electrical system permit the grounding of electrical equipment? | ☒ YES | ☐ NO | ☐ NA |
| 7. Are aisles, doorways, and corners free of obstructions to permit visibility and movement? | ☒ YES | ☐ NO | ☐ NA |
| 8. Are file cabinets and storage closets arranged so drawers and doors do not open into walkways? | ☒ YES | ☐ NO | ☐ NA |
| 9. Do chairs have any loose wheels or unsturdy legs or loose/missing rungs? | ☐ YES | ☒ NO | ☐ NA |
| 10. Are the phone lines, electrical cords, and extension wires secured under a desk or alongside a baseboard? | ☒ YES | ☐ NO | ☐ NA |
| 11. Is the office space neat, clean, and free of combustibles? | ☒ YES | ☐ NO | ☐ NA |
| 12. Are floor surfaces clean, dry, level and free of worn or frayed seams? | ☒ YES | ☐ NO | ☐ NA |
| 13. Are carpets well secured to the floor and free of frayed seams? | ☒ YES | ☐ NO | ☐ NA |
| 14. Is there enough light for reading? | ☒ YES | ☐ NO | ☐ NA |
| 15. Is there a smoke detector in or near the work area? | ☒ YES | ☐ NO | ☐ NA |
| 16. Are lavatories available with hot and cold running water? | ☒ YES | ☐ NO | ☐ NA |
| 17. Is the workspace free of asbestos-containing materials? | ☒ YES | ☐ NO | ☐ NA |
| 18. Is there a potable (drinkable) water supply? | ☒ YES | ☐ NO | ☐ NA |
| 19. Is the space free of noise hazards? | ☒ YES | ☐ NO | ☐ NA |
| 20. To the extent it can be determined, is the work area free of indoor air quality problems? | ☒ YES | ☐ NO | ☐ NA |
| 21. Is your chair adjustable? | ☒ YES | ☐ NO | ☐ NA |
| 22. Do you know how to adjust your chair? | ☒ YES | ☐ NO | ☐ NA |
| 23. Is your back adequately supported by a backrest? | ☒ YES | ☐ NO | ☐ NA |
| 24. Are your feet on the floor or fully supported by a footrest? | ☒ YES | ☐ NO | ☐ NA |
| 25. Are you satisfied with the placement of your computer and keyboard? | ☒ YES | ☐ NO | ☐ NA |
| 26. Is it easy to read the text on your screen? | ☒ YES | ☐ NO | ☐ NA |
| 27. Do you need a document holder? | ☒ YES | ☐ NO | ☐ NA |
| 28. Do you have enough leg room at your desk or seat? | ☒ YES | ☐ NO | ☐ NA |
| 29. Is the computer screen free from noticeable glare? | ☒ YES | ☐ NO | ☐ NA |
| 30. Is the top of the computer screen eye level? | ☒ YES | ☐ NO | ☐ NA |
| 31. Is there space to rest the arms while not keying? | ☒ YES | ☐ NO | ☐ NA |
| 32. When keying, are your forearms close to parallel with the floor? | ☒ YES | ☐ NO | ☐ NA |
| 33. Are your wrists fairly straight when keying? | ☒ YES | ☐ NO | ☐ NA |

VA FORM 0740, JAN 2019, page 2

**Exhibit F**

**SECTION VIII - TERMS OF TELEWORK ARRANGEMENT**

The terms of this agreement must be read in conjunction with the Department of Veterans Affairs (VA) Alternative Workplace Arrangement (Telework) Policy (VA Handbook 5011, Part II, Chapter 4), applicable collective bargaining agreement, and/or any other guidance provided by the employing organization. VA Telework Policy is available on the Office of Human Resources Management Web Site at http://vaww1.va.gov/ohrm/HRLibrary/Dir-Policy.htm. Signatories certify that they will abide by this agreement, the VA Telework Policy, and/or other supplemental terms established by the employing organization. Where any Department regulation conflicts with a Collective Bargaining Agreement covering an individual, the Collective Bargaining Agreement language shall govern.

**1. Voluntary Participation:** The employee voluntarily agrees to work at the VA approved alternative worksite and follow all applicable policies, and procedures. The employee recognizes that the telework arrangement is not an employee right but is an additional work flexibility that VA management may approve at its discretion to accomplish organizational and VA mission.

**2. Work Schedule and Tour of Duty:** Management and the employee agree that the employee will work the same work schedule at the alternative worksite that the employee works at the regular office. Management determines the day(s) that the employee will work at the alternative worksite. The employee's official tour of duty will be as stated in Section III - Work Schedule and Tour of Duty. Work schedules and hours of duty may be modified as necessary but are subject to local management procedures and approval and/or collective bargaining agreement requirements prior to the effective date of any change. If the employee is designated to telework in an emergency situation (as indicated in Section V of this agreement), the work hours may be subject to change. Emergency schedules will be set based on mission needs. The employee understands that during any period that VA is operating under a COOP plan, the plan shall supersede any telework policy.

   a. The employee may be required to return to the traditional worksite on scheduled telework days based on operational requirements. If a change in the employee's work schedule is necessary, management will afford the employee as much advance notice as practicable. The employee understands that a recall to the office for operational reasons is not a termination of the telework agreement. In situations where the employee is called to return to the office outside of normal work hours, the recall shall be made in accordance with established policy and/or collective bargaining agreements, if applicable.

   b. Management agrees to accommodate the request of the employee for a change in the employee's scheduled telework day(s) to the extent possible in a particular week or bi-weekly pay period consistent with mission requirements.

   c. Management and the employee agree that a permanent modification in the telework arrangement will require approval of a new Telework Agreement.

**3. Duty Station and Alternative Worksite:** The employee and management agree that the employee's official duty station is based on how often an employee reports to the worksite or approved alternative worksite on a regular and recurring basis. If the employee reports to the traditional worksite at least twice per pay period, the traditional worksite is the official duty station as defined in part 531.605, of title 5, Code of Federal Regulations. The employee understands that all pay, leave, and travel entitlements are based on the official duty station. With reasonable notice to the employee, management has the right to change the workdays at the official duty station or alternative worksite. If the employee does not report to the traditional worksite at least twice each biweekly pay period, the official duty station is the location of the employee's telework site. Exceptions to the twice each biweekly pay period requirements may be made during emergencies (including a pandemic) and for short-term situations (e.g., special projects, medical accommodation).

**4. Pay and Benefits:** Management agrees that a telework arrangement is not a basis for changing the employee's pay and benefits, unless the employee's official duty station is changed due to an approved alternative workplace arrangement in a different geographical location. All pay (to include locality pay or local market supplement) is based on the employee's official duty station as documented on a SF-50, Notice of Personnel Action.

**5. Official Duties:** The employee agrees to only perform official duties when on duty at the traditional worksite or approved alternative worksite although limited personal business may be conducted within the parameters of VA Directive 6001, http://vbaw.vba.va.gov/ro/south/winsa/va%20directive%206001.htm . The employee acknowledges that telework is not a substitute for dependant care.

**6. Time and Attendance:** The employee's supervisor will ensure that the timekeeper has a copy of the employee's telework work schedule.

**7. Leave:** The employee agrees to follow established office procedures, policy and regulations for requesting and obtaining approval of leave.

**8. Emergency Dismissal or Closure Procedures:** The employee is expected to telework for the duration of an emergency pursuant to a pandemic and/or when the traditional worksite/official duty station is closed due to emergency situations (e.g., snow emergencies, floods, hurricanes, act of terrorism). If the employee is unable to work due to illness, dependent care responsibilities or other personal needs, the employee will take appropriate leave (e.g., annual or sick leave). The employee may be granted excused absences on a case-by case basis when other circumstances (e.g., power failure) prevent the employee from working at the telework site. To the extent practicable, management will include a description of emergency duties with this agreement if emergency duties differ from the employee's normal duties.

**9. Overtime.** The employee agrees to work overtime (e.g., time in excess or the prescheduled and authorized tour of duty) only when ordered and approved in advance by the supervisor. The employee understands that working overtime without permission may result in termination of the telework arrangement, including appropriate disciplinary action.

VA FORM 0740, JAN 2019, page 3

**SECTION VIII - TERMS OF TELEWORK ARRANGEMENT** *(Continued)*

**10. Equipment/Supplies:** The employee agrees to protect any government-owned equipment and use equipment for official purposes. It is understood that limited personal use of government-owned equipment is acceptable within the parameters of VA Directive 6001, http://vbaw.vba.va.gov/ro/south/winsa/va%20directive%206001.htm The employee agrees to promptly report the need for repairs and return the equipment to the designated office for maintenance and repairs as necessary. The employee further agrees not to install any non-approved software or hardware to government-owned equipment issued to them and comply with the terms of computer software license and copyright agreements, computer virus protection requirements and procedures. Management agrees to service and maintain any government-owned equipment issued to the employee and may require that the employee transport any equipment provided to and from the office for maintenance or other business purposes.

**11. Damage to Government Equipment:** The employee agrees to protect and maintain government-owned equipment in a secure environment. The employee understands that the loss, theft, or damage to government equipment will be handled in accordance with procedures for comparable situations at the traditional worksite. If equipment is damaged by someone other than the employee (for example, dependents of the employee) the employee may be held responsible for the repair or replacement of the equipment, software, etc., if government equipment is damaged due to the employee's own negligence or other misconduct by the employee.

**12. Lost, Mislaid or Stolen Equipment:** In the event that a laptop or other equipment issued to the employee is lost, mislaid or stolen, the employee shall immediately notify his or her Information Security Officer, immediate supervisor, and the Privacy Officer.

**13. Liability:** The employee understands that the government will not be responsible for damages to an employee's personal or real property while the employee is working at the approved alternative worksite, except to the extent the government is held liable by the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, or the Military Personnel and Civilian Claims Act, 31 U.S.C. § 3721, 38 U.S.C. §§ 14.664-14.669.

**14. Work Area (work-at-home only):** The employee agrees to provide a distraction-free worksite adequate for the performance of official duties and sign the Self-Certification Safety Checklist certifying that the telework location meets all safety requirements.

**15. Worksite Inspection:** The employee agrees to permit the government to inspect the alternative worksite during the employee's normal working hours to ensure proper maintenance of government-owned property and conformance with safety standards. The employer will give the employee reasonable notice of a planned inspection.

**16. Alternative Worksite Costs:** The employer agrees that the government will not be responsible for any operating costs that are associated with the employee using his or her home as an alternative worksite (e.g., home maintenance and utilities). Utility costs include monthly service charges for telephone, cable or Internet service providers. Management agrees to reimburse the employee for business-related long distance calls with prior written approval only. Management has the option to provide the employee with a government-issued calling card or personal digital assistant (e.g., Blackberry) for business-related long distance calls. Approved authorizations are filed with this agreements. The employee understands that he or she does not relinquish any entitlement to reimbursement for authorized expenses incurred while performing official duties, as provided for by statute or regulation.

**17. Workers' Compensation:** The employee understands that he or she is covered under the Federal Employees' Compensation Act if injured while performing official duties at the authorized alternative worksite. The employee agrees to notify the supervisor immediately of any accident or injury that occurs at the alternative worksite and to complete any required forms. The supervisor will investigate all reports of injury as soon as practicable following the notification.

**18. Work Assignments/Performance:** The employee agrees to complete all assigned work according to procedures established by the supervisor. The employee may be required to attend meetings, conferences, training or otherwise report to the traditional office on day or hours normally scheduled as the alternative worksite. The employee will meet with the supervisor to receive assignments and review completed work as necessary and appropriate. The employee's performance will be evaluated against standards contained in the employee's performance plan. Management and the employee understand there will be no distinction in the performance standards for teleworkers and non-teleworkers. Teleworkers and non-teleworkers will be treated equally for purposes of periodic appraisals of job performance, training, rewarding, reassigning, promoting, reduction in grade, retaining, and removal, work requirements, and acts involving managerial discretion.

**19. Information Security:** The employee will apply approved safeguards to protect government/VA records from unauthorized access, disclosure or damage and will comply with the requirements of the Privacy Act of 1974, (5 U.S.C. § 552a), all applicable Federal privacy laws, regulations, and VA policies and procedures. The employee understands that if confidential, sensitive, sensitive classified, unclassified or source selection data is authorized for use at the alternative worksite location, management will include criteria for proper handling, encryption, storage, safeguarding, and return of such information and data in the space allowed for Supervisor - Employee Specific Terms and Conditions (Section VIII-A) of this agreement.

**20. Standards of Ethical Conduct:** The employee agrees that he or she is bound by official standards of conduct, Handbook 5025, while working at the alternative worksite.

**21. Compliance with this Agreement:** The employee understands that failure to comply with the terms of this agreement may result in termination of this agreement. The employee also understands that nothing in this agreement precludes management from taking any appropriate disciplinary or adverse action against an employee who fails to comply with the provisions of the agreement. Failure to comply also may result in disciplinary action against the employee if just cause exists to warrant such action.

**22. Termination of Agreement:** The employee may terminate participation in the telework arrangement at any time with appropriate notice, in compliance with VA Handbook 5011, Part II, Chapter 4 or applicable collective bargaining agreement.

**23. Telework Agreement Revalidation:** The employee understands that this Telework Agreement will need to be recertified or renewed based on the length of approval for the agreement in Section II. This requirement is not applicable to agreements approved for 12 months + or for agreements which are canceled or terminated.

**Exhibit F**

**SUPERVISOR/EMPLOYEE SPECIFIC TERMS AND CONDITIONS**
*(If this section is completed, the employee and supervisor must sign and date)*

• Consistent, reliable VPN connection is vital to a successful telework environment. On occasion, the employee may experience connectivity issues. The employee agrees to maintain an Internet connection of enough speed and bandwidth to allow reliable VPN connection. Should reliable connection be unattainable, the employee agrees this telework agreement will be void.

• As a condition of telework, the employee agrees to maintain an active Skype/Lync connection throughout his approved tour of duty. When the employee experiences connectivity issues, the employee will take steps to reconnect (restart machine, contact OIT help-desk, etc.). If a connection cannot be reestablished within one hour, the employee shall contact his supervisor for further instruction.

• Log into Skype/Lync for Business at the beginning of daily tour and remain logged in until the end of the work day. Be available to respond to instant messaging (IM).

• Email supervisor at the beginning and end of the workday.

• Establish and provide your supervisor a standard daily lunch time between 11am-1pm. And if needed, a morning and evening break time no later than 3:00pm EST.

• Telephone calls should generally not go to voice mail during normal working hours, unless you're on another work-related call or at lunch.

• Attend all Office of VA/DoD Health Affairs (OHA) meetings as applicable.

---

**CERTIFICATION**

**Employee Certification:** By signing this Telework Agreement, the employee certifies that he/she has read the terms of this agreement, taken the required training, and agrees to adhere with applicable policies and procedures.

**Management Certification:** By signing this Telework Agreement, management officials certify that the position of the employee is suitable for telework, the employee is personally eligible for telework, and they have taken required telework training.

| EMPLOYEE SIGNATURE | | DATE *(MM/DD/YYYY)* |
|---|---|---|
| Bean, Edith | Digitally signed by Bean, Edith Date: 2019.09.24 11:57:17 -04'00' | 09/24/2019 |
| SUPERVISOR SIGNATURE | | DATE *(MM/DD/YYYY)* |
| Patrick W Grady 1750246 | Digitally signed by Patrick W Grady 1750246 Date: 2019.09.27 10:37:15 -04'00' | 09/27/2019 |
| AUTHORIZING OFFICIAL SIGNATURE *(If required by your management)* | | DATE *(MM/DD/YYYY)* |
| | | |

VA FORM 0740, JAN 2019, page 5

**Exhibit F**

## SECTION IX - TECHNOLOGY/EQUIPMENT CHECKLIST
*(This checklists must be completed and approved.)*

| (1) TECHNOLOGY/EQUIPMENT *(Include all that apply)* | (2) REQUIREMENT | | (3) OWNERSHIP: VA OR PERSONAL | | (4) REIMBURSEMENT BY ORGANIZATIONAL COMPONENT | |
|---|---|---|---|---|---|---|
| | YES | NO | VA | PERSONAL | YES | NO |
| **1. COMPUTER EQUIPMENT** | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| a. LAPTOP | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| b. DOCKING STATION | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| c. DESKTOP | ☒ | ☐ | ☐ | ☒ | ☐ | ☐ |
| d. PDA | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| e. SOFTWARE | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| f. BLACKBERRY | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| g. OTHER *(Identify)* | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| **2. ACCESS** | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| a. IPASS/VPN ACCOUNT | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| b. CITRIX - WEB ACCESS | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| c. OTHER *(Identify)* | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| **3. REQUIRED ACCESS CAPABILITIES** | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| a. SHARED DRIVES *(e.g., H or Q)* | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| b. EMAIL | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| c. INTERNET | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| d. INTRANET | ☒ | ☐ | ☒ | ☐ | ☐ | ☐ |
| e. OTHER APPLICATIONS *(Identify)* | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| **4. CONNECTIVITY** | ☒ | ☐ | ☐ | ☒ | ☐ | ☒ |
| a. DIAL-IN | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| b. BROADBAND | ☒ | ☐ | ☐ | ☒ | ☒ | ☐ |
| c. AIR CARD | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| d. OTHER *(Identify)* | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| **5. EQUIPMENT/SUPPLIES** | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| a. COPIER | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| b. SCANNER | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| c. PRINTER | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| d. FAX MACHINE | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| e. DESK AND CHAIR | ☒ | ☐ | ☐ | ☒ | ☐ | ☒ |
| f. PAPER SUPPLIES | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| g. PHONE CARD | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| h. OTHER *(Identify)* | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |

6. Does the employee's job require access to confidential and/or secure files and information?  *(If "YES", complete question 6a and contact your supervisor for approval and certification)*   ☐ YES  ☒ NO

6a. Identify the type of confidential and/or secure files and information the employee will need access to at the alternative worksite?

| 7. EMPLOYEE SIGNATURE | | DATE *(MM/DD/YYYY)* |
|---|---|---|
| Edith A. Bean 102649 | Digitally signed by Edith A. Bean 102649 Date: 2019.09.24 11:59:02 -04'00' | 09/24/2019 |

| 8. SUPERVISOR SIGNATURE | ☒ APPROVED    ☐ DISAPPROVED *(Explain in 8a)* | | DATE *(MM/DD/YYYY)* |
|---|---|---|---|
| Patrick W Grady 1750246 | Digitally signed by Patrick W Grady 1750246 Date: 2019.09.27 10:37:56 -04'00' | | 09/27/2019 |

8a. COMMENTS

**Exhibit F**

USAO_130_001153

# EXHIBIT G



**VHA SERVICING HUMAN RESOURCES OFFICE (VSHO)**

In Reply Refer To: 10A2A6C

March 19, 2020

Allison Gill
3575 Quince Street
San Diego, CA 92104

1. In connection with the letter of February 27, 2020 in which you were given advance notice of your proposed removal, a decision has been made to remove you from employment with VA under the authority of 38 U.S.C. § 714, effective March 25, 2020, based on the following reasons: due to your medical inability, you are unable to perform the essential functions of your job as a Health Systems Specialist at the Medical Sharing Office, functions which are critical to your position. The medical evidence shows that you cannot perform the essential function of your position in an office environment. It was determined that the essential functions of the position cannot be performed exclusively via telework. A job search was conducted on August 14, 2019, September 13, 2019 and again on October 10, 2019 but no positions were identified that meet your medical restrictions.

2. In reaching this decision, your oral and written reply was carefully considered along with all the evidence developed and provided to you.

3. Removal is the action required because you are unable to perform the essential job functions.

4. You will be retained in a pay and duty status until the effective date of your removal.

5. You may seek review of this action. Such reviews include:

      a.    Appealing to the Merit Systems Protection Board (MSPB)
      b.    seeking corrective action before the U.S. Office of Special Counsel (OSC)
      c.    a grievance under the negotiated grievance procedure or
      d.    pursuing a discrimination complaint with the Office of Resolution Management.

An appeal, complaint, or review concerning this action may not be filed with more than one administrative body. You shall be deemed to have exercised your option to appeal this action at such time as you timely initiate action to appeal to MSPB or timely file a grievance in writing under the negotiated grievance procedure. If you believe that this action constitutes a prohibited personnel practice under 5 U.S.C. § 2302(b), including retaliation for protected whistleblowing, you may elect to file an appeal to MSPB, seek corrective action from OSC, or timely file a negotiated grievance, and your election is based on which election you file first. If you believe that this action was taken against you for discriminatory reasons, see paragraph nine of this memorandum.

6. Merit Systems Protection Board (MSPB): If you appeal to the MSPB, your appeal may be submitted by mail, facsimile, by commercial overnight delivery, by electronic filing the MSPB Appeal Form (https://e-appeal.mspb.gov), or in person at any time after you receive this letter, but only if such appeal is made not later than 10 business days after the date of this action. The address to mail your appeal is 1301 Clay Street, suite 1380N Oakland, Ca 94612-5217. You must submit an original and one copy of both your appeal and all attachments. If you do not submit an appeal within the time set by statute, regulation, or order of a judge, it will be dismissed as untimely filed unless a good reason for the delay is shown. The judge will provide you an opportunity to show why the appeal should not be dismissed as untimely. A copy of the form is available by request if you are unable to access it at the MSPB website. Please refer to the MSPB website (www.mspb.gov) for information regarding the appeals process and procedures that must be followed. You may be represented by an attorney or other representative of your choice. If you decide to file an appeal with MSPB, you should notify the Board that the agency's point of contact for this appeal is: Anthony Graves, 202-880-9468, or Anthony.Graves3@va.gov.

7. Office of Special Counsel (OSC): If you elect to seek corrective action by the OSC's Complaints Examining Unit (OSC Appeal Form) (https://osc.gov/), your complaint will be limited to a determination as to whether the agency took one or more personnel actions against you in violation of 5 U.S.C. § 2302(b) (prohibited personnel practices). This can include but is not limited to claims of reprisal for whistleblowing and/or engaging in protected activity. If you are making a claim of retaliation for engaging in one or more protected activities and OSC dismisses your claim, you may have the right to file an individual right of action (IRA) appeal to the MSPB, but such an appeal will be limited to an adjudication of whether you proved that your protected activity was a contributing factor in the effected action.

8. Negotiated Grievance: If you elect to file a grievance through the negotiated grievance procedures such appeal must be made in accordance with the provisions of the labor agreement between the Department of Veterans Affairs and (AFGE) not later than 10 business days after the date of the action. If you elect to file a grievance, you will be entitled to union representation as provided for in the negotiated agreement. Additionally, if you believe you have been subjected to discrimination within the meaning of 5 U.S.C. § 2302(b)(1), you have the right to file a request for the MSPB to review the arbitrator's decision within 35 days after the date of issuance of the decision, or, if you show that you received the decision more than 5 days after the date of issuance, within 30 days after the date you received the decision. If you do not raise the issue of discrimination in the grievance and subsequently request that MSPB review the arbitrator's decision regarding your grievance, MSPB will not allow the issue of discrimination to be raised. The request for review must be filed with the Clerk of the Board, Merit Systems Protection Board, 1615 M Street, Washington, D.C. 20419, and must contain the following:

a.   A statement of the grounds on which review is requested;
b.   References to evidence of record or rulings related to the issues before the Board;
c.   Arguments in support of the stated grounds that refer specifically to relevant documents and that include relevant citations of authority; and
d.   Legible copies of the final grievance or arbitration decision, the agency decision to take the action, and other relevant documents. The documents may include a transcript or recording of the hearing.

9. Equal Employment Opportunity Commission (EEOC): If you believe this action is based on discrimination on the basis of race, color, religion, sex, national origin, age or handicap, you may file a complaint of discrimination or raise the issue of discrimination in any appeal to MSPB (insert the following if applicable: or in a grievance under the negotiated grievance procedure as described above, when the negotiated grievance procedure allows a complaint of discrimination to be raised in connection with a grievance. If you do not raise the issue of discrimination in the negotiated grievance procedures and subsequently request that MSPB review the arbitration's decision regarding your grievance, MSPB will not allow the issue of discrimination to be raised. If you elect to file a complaint of discrimination, you may do so by contacting the Office of Resolution Management (ORM) at 1-888-566-3982. Your complaint will be processed in accordance with EEOC regulations at 29 C.F.R., Part 1614. Your initial contact with the ORM office must be done within 45 calendar days of the effective date of this action.

10. Whichever option you may choose to pursue regarding this action (an appeal to the MSPB, a request for corrective action to OSC, a grievance under the negotiated grievance procedure*, or a discrimination complaint), shall be considered an election by you to proceed under that appeal process. However, you may concurrently file a corrective action to OSC and a discrimination complaint.

11. For further information about your appeal rights, you may consult with Anthony Graves HR specialist at Anthony.Graves3@va.gov .

_Lucille B. Beck_

Lucille B. Beck, Ph.D.
Deputy Under Secretary for Health for Policy and Services

3/19/20
Date

**Exhibit G**
USA Page 137 001012